**UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**

**PAUL RICHARDSON,** Plaintiff,

**v.**

**SMARTRONIX, LLC (SMX), WENDY MAROTTA, JOHANNA REAM, and**

**JOHN/JANE DOES 1–10,** Defendants

**Civil Action No.: 3:25-cv-14057-GC-RLS**

**FIRST AMENDED COMPLAINT**

(Bench Trial Elected)

# FIRST AMENDMENT FOLLOWING REMOVAL

1.          This is the first amended complaint following removal from the Superior Court of New Jersey by Defendants pursuant to 28 U.S.C. §§ 1441 and 1442. Plaintiff disputes the propriety of that removal and expressly reserves all rights to challenge it. The amendments include adding federal Count XI – Retaliation in Violation of the False Claims Act (31 U.S.C. § 3730(h)) and making the corresponding update to the Prayer for Relief. All other changes are minimal and limited to: (i) updating citations and procedures to conform to the Federal Rules of Civil Procedure; and (ii) recording Plaintiff's election to proceed with a bench trial pursuant to Fed. R. Civ. P. 38(d) and 39(a)(1).

2.      Without conceding the propriety of removal, Plaintiff alleges that this Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action includes a claim under the federal False Claims Act, 31 U.S.C. § 3730(h). The Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District.

# PRELIMINARY DECLARATIONS

3.      No classified facts or information are disclosed in this Complaint. Plaintiff does not seek any classified information in discovery, and no such material is necessary or being presented for adjudication.

4.      Plaintiff reserves the right to oppose any future motion to seal or restrict public access to these proceedings.

5.      This Complaint asserts solely state law causes of action under New Jersey law. It does not raise any federal claims and does not rely on classified material or any federal statutory scheme requiring exclusive federal jurisdiction. Any references to federal conduct are presented solely to establish the context of SMX's actions—not to implicate federal actors in this proceeding. Removal would be improper.

6.      Defendant SMX was Plaintiff's employer for purposes of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq. While this Complaint references actions taken by officials within the United States Indo-Pacific Command (PACOM), such references are made solely to demonstrate SMX's coordination with external actors, to establish the broader retaliatory context, and to rebut SMX's assertion that PACOM acted as a

neutral third party. No CEPA claim is asserted against PACOM or any federal agency or official in their official capacity.

7. Non-party individuals referenced in this Complaint are known to Plaintiff and identified by initials in order to respect their privacy at this preliminary stage.

8. Plaintiff has simultaneously filed multiple motions, including a Motion for Judicial Stay and a Motion to Compel Limited Factual Disclosure, both of which incorporate and rely upon facts asserted herein and are referenced throughout this Complaint. These motions are necessary to preserve access to justice in light of ongoing medical harm, unresolved coercive threats, and structural barriers that impair Plaintiff's ability to proceed without court-ordered relief.

9. While Plaintiff does not yet possess official documentation verifying the classification status of the November 9, 2023 meeting room or Defendant Ream's clearance as of that date, he has reached a near-certain conclusion—based on firsthand observation, a reliable insider source familiar with PACOM's layout, and new knowledge about the facility—that the room was not a certified SCIF and that Ream was not read-on. Plaintiff raised these concerns directly and gave Defendants multiple opportunities to confirm or deny the classification status. They refused, despite the simplicity of the request and being advised that failure to clarify would result in Plaintiff proceeding under the presumption that the room was unclassified and Ream was not cleared. Accordingly, Plaintiff asserts that presumption here and has requested narrowly tailored discovery on the issue. If Defendants later produce credible evidence to the contrary, Plaintiff will amend the Complaint accordingly.

10. Plaintiff is currently proceeding pro se due to the exceptional complexity of this matter, which spans CEPA, Pierce public policy doctrine, national security-adjacent procedural

risks, and emerging AI/ML model governance. These intersecting legal threads present unique litigation challenges and also raise questions of first impression under New Jersey law. Plaintiff has made good-faith efforts to retain qualified counsel and remains open to representation by trial counsel with experience in CEPA and whistleblower litigation.

## NATURE OF THE CLAIMS

11.     This Complaint arises under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq., and includes common-law claims pled in the alternative, including criminal coercion and fraudulent inducement. Plaintiff alleges that Defendants engaged in unlawful retaliation following his protected disclosures concerning AI model governance failures, procurement misrepresentation, and coercive threats. These disclosures implicated matters of public concern—including national security, public safety, and engineering ethics— and are protected under CEPA § 34:19-3(a)(1), (a)(2), and (c), as well as the public policy doctrine articulated in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). The claims address not only individualized retaliation, but systemic risk concealment and governance breakdowns in a national security AI program.

12.     These acts include extensive coordination between Defendant SMX and personnel at U.S. Indo-Pacific Command (PACOM), among them: (1) issuance of a pretextual "Lack of Work" (LOW) order; (2) obstruction of Plaintiff's classification challenge by denying access to an Original Classification Authority (OCA) under 32 C.F.R. § 2001.14; and (3) retaliatory rejection of Plaintiff's lawful ArmyAI SCIF proposal, which would have resolved the disputed task instruction.

13.     The factual record underlying these claims includes two discrete episodes of criminal coercion—each directly connected to Plaintiff's protected activity under CEPA. These coercive acts not only intensified Plaintiff's ongoing medical and legal harm, but also serve as probative evidence of retaliatory motive and suppression of whistleblower disclosures. If substantiated, these events significantly heighten the legal complexity of this case and support claims for equitable tolling, expanded discovery, and punitive damages.

14.     This Complaint asserts ten causes of action, including statutory claims under CEPA and common-law claims under *Pierce*. Depending on the outcome of Plaintiff's equitable tolling request and early discovery—Plaintiff offers a three-track litigation structure reflecting distinct protected activities and legal standards: (1) common-law tort claims arising from SCIF deception; (2) wrongful termination under the Pierce public policy doctrine; and (3) statutory CEPA retaliation. Each track stands independently and may proceed even if others are stayed or dismissed.

15.     The length of this Complaint reflects the number and nature of Plaintiff's protected disclosures; the scope and progression of retaliatory actions; events continuing beyond Plaintiff's termination, including new medical developments and evidence of harm; and the complexity of the AI/ML, model risk governance, legal, and regulatory issues involving legal and regulatory issues that are evolving in the context of CEPA litigation. It also reflects the national security and classified context in which the events occurred, the broader public interest at stake, and the necessity of preserving a detailed factual record to support both retaliatory motive and procedural obstruction.

# CONTENTS

FIRST AMENDMENT FOLLOWING REMOVAL ...................................................................... 1

PRELIMINARY DECLARATIONS.................................................................................... 2

NATURE OF THE CLAIMS .......................................................................................... 4

CONTENTS ............................................................................................................... 6

INTRODUCTION...................................................................................................... 10

PUBLIC INTEREST STATEMENT ................................................................................. 12

PARTIES................................................................................................................. 15

JURISDICTION AND VENUE ...................................................................................... 16

LITIGATION FRAMEWORK AND SIMPLIFICATION......................................................... 17

    I. Simplification Contingent on Equitable Tolling and Early Discovery ..................................... 17

    II. Litigation Overview Framework (Framing of Allegations)...................................................... 19

        Abstract for Track 1: SCIF Deception and Coercive Tort Liability (all defendants) ................ 20

        Abstract for Track 2: Pierce Claim Based on AI Model Risk Retaliation and Predicate FCA and Gross Mismanagement (all defendants)........................................................................ 23

        Abstract for Track 3: CEPA Violations Arising from the Vulnerabilities Task (SMX – all defendants with equitable tolling)................................................................................. 25

    III. Summary of Three Track Simplification Offering .................................................................. 27

FACTUAL ACCOUNT ................................................................................................ 28

    I. EMPLOYMENT AT SMX ....................................................................................... 28

        A. Plaintiff's Credentials ............................................................................................. 28

        B. SMX and Private Equity Backers OceanSound ............................................................ 31

        C. SMX Employment Representations to Plaintiff............................................................. 32

    II. PROTECTED DISCLOSURE: AI MODEL RISK ............................................................ 40

        A. AI-Enabled Stormbreaker's Stormy History .............................................................. 40

        B. Primer: AI Model Risk Governance, Engineering Practices, and Whistleblowers ............ 41

C. Third Work Day at SMX—Plaintiff Notices Red Flags—Raises Model Risks ..................... 47

D. October 26—Plaintiff Warns of AI Fraud and AI Model Risk............................................ 50

E. October 30—Plaintiff Alerts Marotta to New Executive Order 14110 ............................ 52

F. Plaintiff Makes Disclosures to Ream, DOD IG—Terminated Two Weeks Later ................. 56

G. Plaintiff's Warnings Had Strong Basis in Engineering Principles and Public Policy .......... 60

H. AI-Enabled Stormbreaker Posed Significant Danger to Public Health Safety Welfare ..... 64

I. Public Policy Requirements for Safe, Reliable Engineering and AI Systems in Defense .... 71

III. PROTECTED DISCLOSURE: PREDICATE FCA AND GROSS MISMANAGEMENT ...................... 72

A. December 13—Stormbreaker IOC Announcement........................................................... 72

B. Defendants' Strategic Manipulation of "AI" Semantics...................................................... 76

C. Second Cancelation of Stormbreaker Indicates Serious Procurement Failures................ 82

D. Constructive Fraud, Procurement Misrepresentation, and PACOM's De Facto Control .. 83

E. Failure of AI Model Risk Compliance ............................................................................... 92

F. Legal and Technical Framework for Reasonable Belief in AI Risk Disclosures................... 99

G. Summary of Procurement Fraud and Gross Mismanagement Predicates..................... 100

IV. PROTECTED DISCLOSURE: ILLEGAL TASK .............................................................................. 106

A. Retaliatory "Vulnerability" Task Becomes a New Protected Disclosure ........................ 106

V. PROTECTED DISCLOSURE: ESCALATED DISCLOSURES TO DOD IG ....................................... 120

A. SCIF Meeting, Defendant's Interfered with Plaintiff's Protected Disclosures ................ 120

B. SCIF Deception: Coercive Setup..................................................................................... 128

C. SCIF Deception: Criminal Coercion as Retaliation, Civil Conspiracy .............................. 130

D. SCIF Deception: Compact Timeline and Coercive Retaliation Conclusions .................... 134

E. Adverse Inference: SMX's Refusal to Clarify Critical Facts Has Prolonged Harm ............ 139

VI. RETALIATION AND WRONGFUL TERMINATION .................................................................... 140

A. Retaliation Following Plaintiff's Initial Protected Disclosures ........................................ 140

B. SCIF Deception and Criminal Coercion as Retaliation...................................................... 143

C. Coordinated Obstruction of Plaintiff's Lawful SCIF Solution by PACOM & SMX............. 145

D. Demotion Reveals Prior Retaliatory Planning, Implicates PACOM ................................. 148

E. Plaintiff's "Lack of Work" Termination, PACOM is Not a Neutral Third Party ................ 151

F. Defendants' Retaliatory Animus Toward Plaintiff's Protected Activity .......................... 154

G. Coercive Threat Interfering with Employment................................................................ 155

H. Post-Termination Obstruction and Bad-Faith Reassignment by SMX............................ 156

I. Plaintiff Gathered Exculpatory Evidence, Escalates Complaint to DOD IG ..................... 160

COORDINATION WITH PACOM, PRETEXT, BAD FAITH ........................................................... 167

I. PACOM WAS NOT A NEUTRAL THIRD PARTY........................................................................ 167

A. Evidence of Pre-Hire PACOM–SMX Alignment ............................................................. 168

B. Evidence of Post-Hire PACOM–SMX Alignment ............................................................ 169

C. Evidence of Post-Termination PACOM–SMX Alignment ................................................ 170

D. Legal Synthesis............................................................................................................... 173

II. PACOM's "LACK OF WORK" IS OBVIOUSLY PRETEXTUAL .................................................... 174

A. LOW Timing and Context Reveal Retaliatory Pretext ..................................................... 174

B. Even if the LOW was Genuine, Plaintiff's Selection is Suspicious ................................... 179

C. Retaliation is the Only Explanation for Plaintiff's Termination ...................................... 180

D. Legal Synthesis............................................................................................................... 181

III. SMX BAD-FAITH CONDUCT: BEFORE, DURING, AFTER........................................................ 183

A. Plaintiff's Demonstrated Pattern of Good-Faith ............................................................ 184

B. SMX's Pre-Hire Bad-Faith Conduct ................................................................................ 185

C. SMX's Bad-Faith Conduct During Employment .............................................................. 185

D. SMX's Post-Termination Retaliation and Obstruction .................................................... 187

E. Legal Synthesis ............................................................................................................... 188

LEGAL SUMMARY OF PROTECTED ACTIVITY, RETALITORY MISCONDUCT................................. 189

HOSPITALIZATION UPDATE ..................................................................................................... 196

ONGOING THREAT, MEDICAL AND LEGAL HARM................................................................ 200

EQUITABLE TOLLING............................................................................................................ 204

    I. Ongoing Coercive Threat Prevented Timely Access to Counsel........................................... 204

    II. Diligent Efforts to Seek Legal Representation and Preserve Claims .................................. 207

    III. Bad Faith Negotiations for Tolling Agreement and Mediation ......................................... 208

    IV. Equity Favors Tolling to Prevent Injustice........................................................................ 209

    V. Request for Tolling.............................................................................................................. 211

CAUSES OF ACTION ............................................................................................................. 213

    COUNT I. EQUITABLE TOLLING (STATUTORY PRESERVATION OF CEPA & RELATED CLAIMS) .. 213

    COUNT II. CRIMINAL COERCION (SCIF COERCION) AS EVIDENCE OF CEPA AND PIERCE RETALIATION....................................................................................................................... 215

    COUNT III. CRIMINAL COERCION (ArmyAI LEGAL THREAT) AS EVIDENCE OF CEPA AND PIERCE RETALIATION.............................................................................................................. 220

    COUNT IV. CONSTRUCTIVE DISCHARGE ................................................................................ 222

    COUNT V. CIVIL CONSPIRACY .............................................................................................. 225

    COUNT VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED) ................................ 227

    COUNT VII. FRAUDULENT INDUCEMENT (SCIF DECEPTION, NDA/IP LEGAL) ........................ 231

    COUNT VIII. FRAUDULENT INDUCEMENT (PRE-EMPLOYMENT)............................................ 233

    COUNT IX. WRONGFUL TERMINATION (PIERCE CLAIM) ........................................................ 238

    COUNT X. RETALIATION UNDER THE NEW JERSEY CEPA (N.J.S.A. 34:19-3) ........................... 242

    COUNT XI. RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3730(h))... 247

        A. Protected Activity ............................................................................................................ 248

        B. Employer Knowledge ....................................................................................................... 249

        C. Adverse Actions and Causation........................................................................................ 250

        D. Harm ............................................................................................................................... 251

PRAYER FOR RELIEF ............................................................................................................ 252

NO OTHER ACTIONS PENDING............................................................................................. 256

SIGNATURE.......................................................................................................................... 256

APPENDIX A: May 2025 Update – SMX's Repeated Bad-Faith Conduct and Procedural Obstruction ............................................................................................................ 258

(i) Tolling Agreement and Mediation Negotiation Phase......................................... 259

(ii) Post DOD IG Mediation and Refusal to Mitigate Medical and Legal Harm ...................... 259

(iii) End-of-Tolling Agreement Silence and Final Bad-Faith Conduct ................................... 262

(iv) Additional Historical Context ........................................................................ 263

(v) Adverse Inference: SMX's Refusal to Clarify Critical Facts Has Prolonged Harm............... 264

(vi) Conclusion............................................................................................. 266

# INTRODUCTION

16.     This is a whistleblower retaliation case arising from a simple act of professional integrity. Dr. Paul Richardson—a national security-cleared AI/ML expert with over 35 years of experience in predictive modeling, model risk governance, and real-world systems—was recruited into a leadership role on Stormbreaker, a Department of Defense AI-enabled wargaming system publicly promoted by U.S. Indo-Pacific Command (PACOM) as a next-generation war planning platform.

17.     Within days of joining SMX, Dr. Richardson identified serious technical and ethical red flags. Stormbreaker lacked a model validation plan, claimed artificial intelligence capabilities far beyond what its architecture and budget could reasonably support, and posed a significant risk of catastrophic failure—including misinformed strategic planning and the unintended escalation of armed conflict. The system fell well below the Department of Defense standards Plaintiff had observed throughout his career.

18.     In good faith, Dr. Richardson did what any responsible expert would do: on his third day of work, he literally raised his hand during a Stormbreaker meeting and voiced concern about these serious governance failures. When internal concerns were disregarded, he escalated them to a PACOM civilian official—a public body under CEPA § 34:19-2(c). Within two days of that protected disclosure, SMX retaliated. Defendant Wendy Marotta quietly removed Dr. Richardson from the Stormbreaker organizational chart, stripping him of all formal leadership status, reporting lines, and team affiliation. Although no termination was publicly announced, he was functionally "orphaned"—placed in professional limbo, cut off from communications, and deprived of meaningful work.

19.     This marked the beginning of a sustained campaign of retaliation that included coerced assignments raising potential classification law concerns, exclusion from AI oversight, and eventual termination.

20.     At its core, this case is about what happens when a subject matter expert, hired for his judgment and experience, does exactly what he was paid to do—raise his hand and say there are risks that need to be addressed—and is punished for it. Rather than confront the risks, SMX chose to isolate, coerce, and ultimately terminate the one person who tried to ensure the Stormbreaker system operated safely and responsibly. Today, that system continues unchecked, and the expert who tried to protect it has suffered career-ending retaliation, medical harm, and loss of reputation.

21.     The retaliation Dr. Richardson experienced was not limited to professional isolation. It escalated into a campaign involving coerced tasking with potential classification law violations, psychological coercion via a deceptive SCIF meeting, coordination with PACOM officials to orchestrate a pretextual termination, and ultimately, the infliction of medically

documented physical harm—including a stress-induced stroke and permanent neurological injury. Plaintiff's disclosures triggered not only workplace retaliation but institutional suppression—creating a coercive legal environment that delayed access to legal representation and contributed to long-term harm.

22.     This case sits at the intersection of AI ethics, government accountability, and national security. It raises urgent public interest concerns about the deployment of unvalidated artificial intelligence systems, the suppression of internal engineering safety warnings, and the systemic retaliation against whistleblowers who act to protect the public interest. The trustworthiness, safety, and governance of AI in defense applications is not a theoretical issue—it carries direct implications for national security, human welfare, and public safety. Plaintiff brings this action not only to redress personal injuries, but to expose a broader pattern of risk concealment, institutional coercion, and model governance failures in one of the most consequential technology domains of our time.

## PUBLIC INTEREST STATEMENT

23.     This case reflects a broader pattern evident in other high-profile engineering disasters—such as the Boeing 737 MAX, Titan submersible, and Deepwater Horizon—where internal safety warnings were disregarded, technical experts were sidelined, and inadequately tested systems were deployed with catastrophic results. These tragedies show that public safety depends on empowering engineers to speak out in a non-retaliatory environment. Willful ignorance by management is not a defense when preventable harm results from silencing those disclosures. Whistleblower protections exist not only to protect individual rights, but to prevent

precisely the kinds of avoidable disasters that occur when leadership refuses to hear inconvenient truths and willfully blocks their disclosure.

24.     Plaintiff's objections are grounded in Executive Order 13960's mandate for trustworthy AI across federal agencies and Executive Order 14110, which directs agencies to ensure the safety, auditability, and accountability of AI systems in high-consequence domains. These standards were systematically ignored by Stormbreaker, despite its use in military planning.

25.     Plaintiff was also acting under professional obligations set by engineering and modeling ethics codes (including IEEE and the Simulationist Code), which impose duties to disclose unsafe design risks, maintain integrity in technical reporting, and place public welfare above employer loyalty.

26.     When simulation-based systems like Stormbreaker are deployed without proper scientific calibration, as occurred in the U.S. Marine Corps' Force Design overhaul, the resulting decisions can be dangerously flawed and controversial.

27.     Given the far-reaching consequences of AI failures in high-impact sectors, this case is not merely an employment dispute but a matter of substantial public concern regarding the responsible and transparent deployment of AI in industry and defense.

28.     A central theme of this case is the governance of risk—rare but catastrophic long-tailed events that are often ignored or concealed in pursuit of speed, growth, or competitive advantage. This dynamic, well known in financial markets, is equally dangerous in AI-enabled systems. New Jersey's global leadership in financial services and quantitative risk management—anchored by institutions like BlackRock, Prudential, Bank of America, and numerous model-governed trading platforms—makes its courts particularly well-positioned to

adjudicate matters involving unpriced systemic risk, deceptive modeling practices, and emerging AI safety standards. A decision in this case would not only protect the public interest in AI accountability but would reinforce New Jersey's role as a national leader in model risk governance and ethical technology oversight. This case also presents an opportunity for the Court to set a global precedent for how whistleblowers are protected in an era of emerging AI model risk.

29.     Plaintiff is currently proceeding pro se due to the exceptional complexity of this matter, which spans CEPA, Pierce public policy doctrine, national security-adjacent procedural risks, and emerging AI/ML model governance. These intersecting legal threads present novel litigation challenges and raise questions of first impression under New Jersey law. Plaintiff has made good-faith efforts to retain qualified counsel and remains open to representation by trial counsel with experience in CEPA, whistleblower law, and public interest technology litigation. Given the broader implications of this case for engineering ethics, AI accountability, and whistleblower protections in high-risk domains, Plaintiff respectfully welcomes interest or amicus participation from professional societies, academic institutions, public interest organizations, and others with a stake in the responsible deployment and governance of AI in national security settings.

30.     Plaintiff objects to any effort to seal these proceedings, as public transparency is essential to ensure accountability in AI deployment and to protect whistleblowers acting in the public interest.

# PARTIES

31.     Plaintiff, Dr. Paul Richardson, is a resident of New Jersey. At all relevant times while employed by SMX, Plaintiff worked remotely from New Jersey and traveled to Hawaii on two occasions, for week-long team meetings, at SMX's request.

32.     Defendant Smartronix, LLC ("SMX"), is a Maryland-based defense contractor headquartered in Hollywood, MD, that employs personnel in New Jersey and upon information and belief conducts business within the state.

33.     Defendant Wendy Marotta ("Marotta"), is a resident of Hawaii and at all relevant times, was SMX employee, served as Program Director for Stormbreaker, was Plaintiff's direct supervisor until he was formally demoted, originally negotiated employment with the Plaintiff, and led the call where the Plaintiff learned that his employment at SMX was to end.

34.     Defendant Johanna Ream ("Ream"), is a resident of Hawaii and at all relevant times, was SMX employee, served as Deputy Program Director for Stormbreaker, was Plaintiff's peer and then direct supervisor following his formal demotion.

35.     Defendants John/Jane Does 1-10 are unknown individuals and/or entities who directly participated in or conspired to commit retaliation against Plaintiff, including SMX's senior executives, HR representatives, and USINDOPACOM ("PACOM") personnel who knowingly assisted in Plaintiff's wrongful termination.

36.     Plaintiff expressly reserves the right to amend this Complaint pursuant to Federal Rule of Civil Procedure 15(a) and Federal Rule of Civil Procedure 21, and to substitute named parties for fictitious defendants consistent with Federal Rule of Civil Procedure 10(a) and applicable law, to identify additional defendants upon discovery. These may include, but are not limited to, currently unnamed individuals at PACOM and SMX who participated in, enabled, or

conspired in the retaliation and coercive acts described herein. Plaintiff anticipates that discovery will reveal further details regarding the involvement of PACOM personnel and other John/Jane Doe parties.

## JURISDICTION AND VENUE

37.　　　Jurisdiction and venue are proper in New Jersey Superior Court because:

- Plaintiff has been a resident of New Jersey and has paid property and income taxes within the state for over ten years.

- Plaintiff was a resident of New Jersey throughout his employment with SMX and performed his work while residing in New Jersey.

- Plaintiff's employment contract explicitly states that it is governed by the laws of his state of residence, which was New Jersey.

- Plaintiff's payroll taxes were withheld for New Jersey, further establishing New Jersey as his primary place of employment.

- Defendants directed employment-related decisions, including demotion and termination, toward Plaintiff while he was physically present in New Jersey.

- The wrongful acts—coercion, retaliation, and termination—caused harm to Plaintiff while he was physically present in New Jersey. This harm includes a medically confirmed recurrent stroke suffered by Plaintiff while preparing this filing in New Jersey, resulting in hospitalization and neurological rehabilitation within the state. Diagnostic imaging also revealed multiple prior silent strokes, almost certainly suffered in New Jersey during the period of retaliation. Accordingly, both the retaliatory acts and their physical consequences occurred in

Page **16** of **267**

and substantially affected New Jersey, further reinforcing the appropriateness of jurisdiction and venue in this Court.

38.     Moreover, given New Jersey's role as a global hub for financial services, quantitative modeling, and risk governance—industries in which Plaintiff has worked and whose principles inform both this case and national public policy—its courts are particularly well-positioned to adjudicate disputes involving AI model governance, long-tail systemic risk, and emerging safety standards.

39.     This Complaint asserts only New Jersey state law claims and does not seek adjudication of any federal claim, nor does it require interpretation or application of classified material or federal statutory schemes. No federal question is presented, and removal is improper.

# LITIGATION FRAMEWORK AND SIMPLIFICATION

## I. Simplification Contingent on Equitable Tolling and Early Discovery

40.     In light of the complex factual and legal issues at play, and without conceding that any claims are legally duplicative, Plaintiff respectfully offers the following organizational framework. This structure outlines how the Complaint's allegations may support three independently viable litigation tracks. It is offered to assist the Court and parties in understanding the evidentiary landscape, and to preserve flexibility in case management or future motions.

41.     Plaintiff's final day of employment at SMX was March 29, 2024. Accordingly, the default CEPA filing deadline for claims against untolled parties would have been March 29, 2025. Defendant SMX has executed a written CEPA tolling agreement with Plaintiff. However,

SMX refused to coordinate any equivalent tolling agreement for its executives and individual defendants Marotta and Ream, despite Plaintiff's efforts to bring all parties into procedural alignment.

42. Plaintiff's equitable tolling arguments—grounded in documented coercion, medically verified harm, attorney declines, and procedural misconduct—are set forth in detail in a later section of this Complaint. In parallel, Plaintiff's request for limited early discovery, including verification of the SCIF classification status and Defendant Ream's clearance level, is the subject of a contemporaneously filed motion and may further guide the appropriate procedural framework for this case.

43. Plaintiff respectfully affirms that if the Court grants equitable tolling of the CEPA filing deadline for all defendants and claims, and if early factual discovery confirms the core allegations surrounding the November 9, 2023 SCIF deception, then Plaintiff may elect to streamline the litigation.

44. Simplification could include consolidating non-CEPA counts into the statutory CEPA framework, to the extent permitted by law and consistent with the scope of harm established. Plaintiff also reserves the right to pursue bifurcated or multiple parallel tracks—including common law tort claims such as IIED, civil conspiracy, or fraudulent inducement—if the factual or procedural posture supports independent treatment of those theories.

45. Plaintiff's conditional pleading of Counts IV through VIII ensures no waiver under N.J.S.A. 34:19-8 until tolling and early discovery is resolved, and preserves judicial efficiency by allowing a streamlined case structure to be adopted once threshold issues are clarified.

## II. Litigation Overview Framework (Framing of Allegations)

46.     Plaintiff respectfully proposes the following framework to organize the

chronology into legal claims and streamline both judicial understanding and case management.

To promote efficiency across this complex factual landscape, Plaintiff asserts the following

allegations as part of an integrated litigation structure.

47.     The framework below is offered to assist the Court and opposing counsel in

understanding the proposed structure of Plaintiff's claims and the evidentiary foundation

expected to emerge through discovery. For purposes of brevity and clarity, all factual assertions

herein are based on Plaintiff's personal knowledge, public records, contemporaneous

documentation, sworn statements, or *upon information and belief* unless otherwise specifically

noted. Where Plaintiff refers to anticipated discovery (e.g., SCIF status, Ream's clearance, or

contractual irregularities), such references reflect a good-faith expectation grounded in

preliminary investigation and supported by detailed allegations throughout this Complaint.

Plaintiff expressly reserves the right to amend or supplement these claims as additional evidence

becomes available through formal discovery, FOIA responses, or third-party disclosures.

48.     This structure anticipates a logical bifurcation (or trifurcation) of the litigation

into distinct legal tracks—each based on independent conduct, legal standards, and factual

evidence. It also serves as a useful framework for interpreting the detailed factual account that

follows. Each track stands on its own as a legally sufficient theory of liability, supported by

contemporaneous documentation, witness testimony, and public policy concerns.

49.     Each track stands on its own merits, is supported by contemporaneous

documentation and corroboration, and justifies compensatory and punitive relief under well-

established New Jersey law.

50.     This structure is offered solely to assist the Court and opposing counsel in navigating the factual account that follows.

Abstract for Track 1: SCIF Deception and Coercive Tort Liability (all defendants)

**(Counts: II: Common law coercion, III: Common law coercion, V: Conspiracy, VI: IIED, VII: Fraudulent Inducement)**

51.     On November 9, 2023, Defendants Wendy Marotta and Johanna Ream led Plaintiff into what they explicitly represented as a certified SCIF (Sensitive Compartmented Information Facility) at PACOM's Camp Smith, Hawaii. Plaintiff was induced to disclose Top Secret information in reliance on these representations.

52.     Early discovery—requested in a simultaneous motion—is expected to confirm, with high confidence (>95%), that the room lacked SCIF certification and that Ream did not possess an active TS/SCI clearance. These conclusions are supported by Ream's own canceled read-on appointment days earlier and subsequent credible reports from people familiar with the building's facility configuration.

53.     This created a coercive threat: that Plaintiff could be falsely accused of an espionage offense for mishandling classified material.

54.     This was not a misunderstanding. Audio recordings confirm that both Marotta and Ream later reaffirmed the "SCIF" status of the meeting, and that Plaintiff had made Top Secret (TS) disclosures during that meeting [important: the contents of those TS disclosures were not repeated or recorded unclassified]. Moreover, Plaintiff's expectation of a SCIF environment is supported by considerable pre-planning efforts for a secure meeting and the fact that the meeting occurred at Camp Smith—a secure military installation where SCIF access is routine for classified briefings. All parties traveled to Camp Smith solely to access secure facilities—travel that would have been unnecessary for a routine, unclassified meeting. Indeed, had the meeting

been unclassified, it could have been conducted by videoconference after Plaintiff's return to New Jersey.

55.     The fact that Plaintiff's attempts to report a suspected security violation with PACOM after the SCIF meeting were ignored, and that his DOD IG complaint was closed-out by PACOM's IG in just four weeks amplified Plaintiff's reasonable fear of retaliatory suppression by informal networks within PACOM, resulting in significant intimidation effect.

56.     Realizing his legal jeopardy, Plaintiff took measures to record exculpatory and protective evidence. On February 20 and March 6, 2023, Defendants reinforced the deception regarding the room's classification on recorded calls. These follow-up statements, captured on recordings, reinforced the initial deception and constitute a continuing tort, violating clear ethical and legal standards. On Plaintiff's March 6 termination call, Marotta specifically drew attention to her unified position with Ream, signaling alignment to suppress objections.

57.     Pre-litigation (March 3, 2025) Plaintiff shared third-party platform blood pressure records with SMX demonstrating that 2023-2024 coercive and retaliation incidents were linked to significant hypertensive events thereby increasing the risk that Defendant's coercive and retaliatory actions could have caused Plaintiff to suffer a recurrent stroke. This risk is no longer theoretical.

58.     On April 5, 2025, Plaintiff had a medically confirmed stroke while working on this very complaint. Subsequent medical imaging confirmed that Plaintiff had neurologically permanent damage from this stroke. This stroke was likely avoidable if SMX had heeded Plaintiff's March 2025 warning and acted to remove the coercive threat. Instead, multiple times SMX refused to clarify events surrounding the "SCIF" meeting.

59.     SMX's post-termination conduct—especially during the pre-litigation period—reinforced that the actions of Defendants Marotta and Ream were not isolated misconduct by "rogue" employees, but instead reflected behavior that was either systematically condoned or deliberately ignored by SMX leadership.

60.     Additionally, medical imaging revealed signs of multiple "silent strokes" that treating physicians have directly linked to the 2023-2024 sustained hypertensive stress caused by Defendants' unresolved coercive threat and retaliations. Therefore, in addition to confirming neurological damage as a result of the avoidable April 2025 stroke, MRI imaging provided direct causal connection between Defendant's 2023-2024 coercive and retaliatory activity and Plaintiff's permanent neurological damage caused by the "silent strokes".  This establishes both the proximate cause of the silent strokes and the foreseeability of the April 2025 stroke, along with the resulting permanent harm, as stemming from the unresolved coercive threat.

61.     The SCIF deception and post-disclosure silence give rise to actionable claims under New Jersey common law for Intentional Infliction of Emotional Distress, Fraudulent Inducement, and Criminal Coercion under New Jersey common law. These injuries, and the retaliatory concealment that followed, are traceable to the Defendants' actions and are actionable under New Jersey common law independent of any statutory claim under CEPA.

62.     Taken together, these facts present a rare convergence of documented inducement, corroborated deception, and medically verified harm—creating a near textbook case for common-law tort liability independent of any statutory claim.

Abstract for Track 2: Pierce Claim Based on AI Model Risk Retaliation and Predicate FCA and Gross Mismanagement (all defendants)

**(Counts: IX: Wrongful Termination under Pierce, IV: Constructive Discharge, VIII: Fraudulent Inducement pled in the alternative)**

63.    Plaintiff's pre-termination disclosures focused on SMX's failure to implement adequate AI model risk governance for Stormbreaker—an unvalidated, AI-enabled decision support platform used for operational planning. Drawing on decades of experience in defense and financial model risk, Plaintiff warned that Stormbreaker's lack of basic AI model components—such as objective function, ground truth, and test/validation protocols—constituted not only a technical failure but also a latent public safety threat. Marketing statements that appeared to misrepresent the system's readiness and capabilities to federal stakeholders likely exposed SMX to liability under the False Claims Act (FCA) or, at minimum, reflected gross mismanagement of federally funded defense technology.

64.    Plaintiff's disclosures were strongly supported by public policy and defense engineering standards. There is significant evidence of recent engineering failures arising from the very deficiencies Plaintiff sought to address. As a professional engineer bound by ethical duties, Plaintiff had a reasonable and good-faith belief in the existence of a material risk. Even if system failure seemed improbable, Plaintiff had an obligation to act where he had a reasonable belief that the potential consequences included catastrophic harm—particularly to military personnel and mission safety.

65.    Rather than investigate or address Plaintiff's concerns, Defendants Marotta and Ream marginalized him. He was excluded from leadership meetings and organizationally "orphaned" on the company chart—functionally removed from his role and foreshadowing his future termination—within two days of escalating his concerns to a PACOM official. This

structural sidelining was later disguised as a "demotion" in a retroactive attempt to justify the move. Just two weeks later, Plaintiff was terminated. These retaliatory actions followed closely on the heels of multiple protected internal and external disclosures, including reports to PACOM officials and the DoD IG, warning of procurement integrity risks and the externalization of AI risk costs to the government

66.    To the extent Defendants now claim that Stormbreaker's AI capabilities were merely aspirational or exploratory—rather than a foundational element of the program or work effort—Plaintiff alternatively pleads that he was fraudulently induced into accepting the position through material misrepresentations regarding AI central role in what was universally described as "AI-enabled Stormbreaker".

67.    Moreover, any assertion that Stormbreaker's AI capabilities were merely aspirational or intended as a future, optional goal further supports Plaintiff's concerns regarding procurement misrepresentation and undermines the credibility of prior marketing claims. This position is also directly contradicted by the public announcement that "AI-enabled Stormbreaker" would be initially operational as of December 2023.

68.    The fraudulent inducement theory reinforces Track 2's foundation by showing that suppression of dissent existed from the outset. Retaliation escalated when Plaintiff attempted to correct misrepresentations internally. This alternate pleading preserves liability even if Defendants attempt to minimize Plaintiff's assigned responsibilities or portray his AI Model Risk concerns as premature.

69.    Because equitable tolling may not extend to the individual defendants, the common-law public policy retaliation claim under *Pierce* ensures that Defendants Marotta and Ream remain individually liable for their role in suppressing disclosures tied to public risks

involving AI model governance failures, government contract fraud, and misuse of public funds. These are classic *Pierce* policy predicates, supported by contemporaneous documentation, the pattern of conduct, and Defendants' knowledge of Plaintiff's protected disclosures.

Abstract for Track 3: CEPA Violations Arising from the Vulnerabilities Task (SMX – all defendants with equitable tolling)

**(Counts I and X: CEPA Claims)**

70.     Following Plaintiff's October 26, 2023, disclosures regarding AI risk and validation failures, SMX retaliated by assigning him a "vulnerabilities" task. Plaintiff refused to complete this task outside of a SCIF due to statutory and contractual obligations concerning the handling of classified information—including his SF312 nondisclosure agreement with the federal government, which mandates caution even in cases of mere "uncertainty" regarding classification. Plaintiff reasonably believed that performing the task outside of a SCIF would be illegal, a belief later validated by the Head of Information Security at Camp Smith and additional sources.

71.     This is not an obscure federal law or process, in one of Plaintiff's earlier defense positions this was a near daily experience. In such cases, established rules and procedures exist—beginning with a classified SCIF meeting—to resolve classification disagreements. Plaintiff's action was fully in accordance with these procedures.

72.     Instead of following proper channels, Defendants Marotta and Ream reiterated the unlawful instruction on seven separate occasions and obstructed Plaintiff's repeated attempts to remove the resulting work "blocker." On a February 20, 2023, recorded call, Defendant Ream explicitly acknowledged Plaintiff's reasonable belief: *"I know vulnerabilities get into the*

*classified realm REALLY QUICK,"* and further admitted that legal execution of the task would require her to get Plaintiff's access to a SCIF.

73. But this didn't happen. Two weeks later, Plaintiff was terminated. On the termination call, Marotta explicitly contradicted Plaintiff assertion that he couldn't complete the task at the unclassified level, and she did this despite having actively avoided Department of Defense procedures for resolving the classification dispute and having obstructed Plaintiff's multiple efforts to do so.

74. Plaintiff's refusal to perform the vulnerabilities task outside a SCIF constitutes protected activity under CEPA § 34:19-3(a)(1). His continuing objections to the absence of a proper classification review process, his formal disclosures to PACOM and the DoD IG, and his internal advocacy for risk governance additionally fall under CEPA §§ 34:19-3(a)(2) and (c).

75. In retaliation, Plaintiff was progressively isolated, demoted, and ultimately terminated under a fabricated "Lack of Work" (LOW) pretext. SMX's claim that the LOW directive originated from PACOM is contradicted by contemporaneous hiring for comparable roles and ongoing AI-related marketing of Stormbreaker. These facts support a strong inference of pretextual termination—an outcome clearly foreshadowed by Plaintiff's December 13 organizational "orphaning" and further reinforced by Defendant Ream's February 20 admission that Plaintiff's refusal to perform the vulnerabilities task outside a SCIF was legally justified.

76. SMX's Human Resources function facilitated Plaintiff's demotion and termination without investigating the surrounding circumstances or consulting with Plaintiff. Additionally, Human Resources represented that they would explore reassigning Plaintiff to other open positions within SMX, but failed to follow up or act on an excellent employment match identified by Plaintiff, further reinforcing that termination was retaliatory.

77.    These events collectively affirm Plaintiff's CEPA retaliation claims against SMX, regardless of tolling considerations for the individual defendants. Defendant's knowledge of the harm that Plaintiff's termination would cause—including financial hardship and disruption to planned family relocation—renders the conduct egregious and supports the imposition of punitive damages. The full extent of this harm, particularly its impact on a vulnerable family member, can be detailed *in camera* at the appropriate time.

### III. Summary of Three Track Simplification Offering

78.    In sum, even absent equitable tolling, Plaintiff's case moves forward on three independent and well-supported legal tracks:

- **SCIF deception-based tort liability** (all defendants),

- **Wrongful termination under the *Pierce* doctrine** (all defendants), and

- **Statutory CEPA retaliation** (SMX only, or all defendants if equitable tolling is granted).

79.    Although Tracks 2 and 3 culminate in the same adverse employment actions—namely, Plaintiff's demotion and termination—they are rooted in distinct protected activities governed by separate legal frameworks. Track 2 arises under the *Pierce* doctrine and addresses systemic retaliation stemming from Plaintiff's long-standing objections to AI model risk governance failures. Track 3 invokes CEPA and concerns Plaintiff's refusal to perform a specific classified task in violation of federal security laws. These whistleblowing acts were factually and legally independent. While they may have jointly contributed to the adverse employment outcome, each track stands alone as a viable and distinct theory of liability.

80.     Each track is supported by contemporaneous evidence—including audio recordings, medical documentation, and internal communications—and each is firmly anchored in New Jersey public policy. Plaintiff respectfully submits that this three-track structure ensures the case may proceed efficiently and on the merits, regardless of procedural rulings on tolling or case consolidation.

# FACTUAL ACCOUNT

## I. EMPLOYMENT AT SMX

### A. Plaintiff's Credentials

81.     Plaintiff, Dr. Paul Richardson, is a Top Secret/SCI-cleared Artificial Intelligence and Machine Learning (AI/ML) modeling and simulation expert with over 35 years of experience leading AI/ML programs in mission critical financial industry applications at BlackRock, Merrill Lynch, and Bank of America. He holds a Bachelors of Engineering (with honors) degree from a global top-50 university, an award-winning Ph.D. in Machine Learning, and an M.B.A. in Technology Management. More recently, Plaintiff has served in cleared national security roles supporting the United States Department of Defense, including projects for the Missile Defense Agency and a redacted position at a U.S. Army component hereinafter referred to as "ArmyAI." His work in these roles has spanned advanced predictive modeling of real-world systems and the governance of AI/ML model risk.

82.     Plaintiff's contributions were not only technically advanced, but widely recognized by colleagues and leadership as collaborative, strategic, and impactful. Feedback from recent employers reflects the following themes:

- **Productive and Initiative-Driven**: *"[Plaintiff] wrote a compete machine learning training, evaluation, and performance analysis suite in under 10 months at [company] and also delivered it for integration"* ; *"[Plaintiff] was able to come into [company name] as a new employee, hear descriptions of the shortcomings of [existing methods] and go off running to flesh it out into a full codebase and capability [that] has not only been user-friendly to operate, but has consistently shown high-performance on blind test data"* ; *"[Plaintiff] has exceeded my expectations in every aspect of the past year"* ; *"I would say [Plaintiff] exceeds expectations in all of the execution and innovation areas [...] Glad you are with us and good job!"*

- **Responsive and Collaborative**: *"[Plaintiff] is very receptive to feedback and requests for new features, which he prioritizes highly and addresses rapidly"* ; *"[Plaintiff] coordinated with [another] team to design a generic input format that we can use across projects [and] designed his own analysis suite."*

- **Leading-Edge Technical Expertise**: *"Nobody else has produced models capable of revealing this depth of insight or validated their performance so robustly—[Plaintiff's solution] is \*the\* leading edge globally"* ; *"[Plaintiff's project] is one of the top strategic priorities in [our $35b business]."*

- **Positive Cultural and Strategic Impact**: *"These meetings [with Plaintiff and his team] are one of the top highlight of my year."*

83.     A brief sample of Plaintiff's 35+ years of AI/ML modeling and simulation expertise includes technical depth which made him uniquely qualified for Stormbreaker:

- **Principal Research Scientist** for a major defense contractor, where he designed and implemented AI/ML algorithms for the Missile Defense Agency's Overhead Persistent Infrared (OPIR) early warning missile defense system—experience directly applicable to mission-critical DoD platforms.

- **Senior Vice President at Bank of America**, leading 50+ engineers and data scientists building the global AI/ML platform supporting thousands of users—demonstrating leadership of large mixed technical teams, large-scale model deployment, and AI/ML model governance.

- **Analytics and Strategy SME** at PwC's national analytics hub, applying AI/ML to real-world problems in telecom, finance, infrastructure, and education—showing broad, cross-sector modeling experience and practical implementation skills.

- **Co-founder of a quantitative hedge fund** that grew to $2.5 billion AUM within three years—reflecting high-level innovation, entrepreneurial drive and model risk management in an extremely high-risk adversarial environment.

- **Developed a novel AI/ML algorithm** used to value approximately $20 billion in pension risk transactions annually for a major U.S. life insurer—demonstrating trusted, high-stakes model deployment where decimal points in accuracy really do matter and model failure is not an option.

- **Contributed original algorithmic research** to the Dictionary Learning method and participated in foundational R&D behind the MPEG-2 video standard—demonstrating deep, leading-edge technical expertise with enduring global impact.

- **Possesses hands-on technical proficiency** across all domains relevant to Stormbreaker, including evidence-based systems for decision-making, automation, and risk reduction. Technical stack includes: AI/ML, modeling, simulation, Monte Carlo methods, signal processing, prediction, optimization, classification, compression, and large-scale distributed computing in C/C++/C#/Python—with experience spanning both algorithm development and deployment under secure, mission-critical conditions.

84.    Actions often speak louder than the words in a performance review, so it is significant to note that upon termination from SMX, Plaintiff's prior contracting employer asked him to return to work with them at ArmyAI. Plaintiff currently advises as an expert on AI/ML matters including contributions to risk modeling and simulation governance, underscoring his subject matter credibility that was fully established at the time of his protected disclosures to SMX.

## B. SMX and Private Equity Backers OceanSound

85.    SMX is a private equity–backed technology contractor serving clients across the defense, intelligence, and federal civilian sectors. Since 2019, it has been majority-owned and controlled by OceanSound Partners, a New York–based private equity firm that invests in technology and services companies operating in "highly regulated enterprise end markets." Under OceanSound's ownership, SMX has undergone rapid expansion—growing reported revenues from $68 million in 2019 to over $1.2 billion by 2023—through a strategy driven by acquisitions and aggressive scaling. In April 2024, OceanSound extended its ownership through a $1.15 billion continuation fund backed by Apollo S3, a global private equity investment platform with over $650 billion in assets under management.

86.      While SMX publicly positions itself as a mission-focused solutions provider, its corporate structure and operational tempo reflect the priorities typical of private equity ownership: accelerated growth, acquisition-based scaling, and investor-focused performance targets. This context is materially relevant. It helps explain why internal concerns about AI model risk, national security standards, and classified information handling were met not with investigation or ethical engagement, but with immediate isolation, coerced tasking, and ultimately, retaliatory dismissal. SMX's leadership, while publicly emphasizing "secure and scalable" technologies, operated within a governance environment fundamentally incentivized to prioritize deliverables, contracting velocity, and investor alignment over disclosure integrity and model safety. As detailed in the sections that follow, Plaintiff's protected disclosures disrupted that trajectory—and the institutional response was consistent with a culture designed to suppress internal scrutiny rather than confront inconvenient truths, as outlined in Appendix A.

## C. SMX Employment Representations to Plaintiff

87.      In August 2023, Plaintiff was recruited by Defendant Marotta to join Smartronix, LLC (SMX) as a Principal Data Scientist in a senior leadership role on "Stormbreaker," a U.S. Department of Defense "AI-enabled" war planning platform developed for U.S. Indo-Pacific Command (PACOM).

88.      During pre-hire discussions, Defendant Marotta made the following assurances to Plaintiff that formed the basis of Plaintiff's acceptance of the position and relocation plans:

- That long-term project funding for Stormbreaker was assured;

- That AI modeling and simulation was core to Stormbreaker's mission, and Plaintiff's expertise would directly support that objective;

- That Plaintiff would hold a leadership role on the Stormbreaker team where he could have significant impact.

89.    During August 2023 pre-hire discussions, Plaintiff expressed concern about the financial and professional risk of relocating his family to Hawaii if the Stormbreaker contract lacked long-term stability. Plaintiff pressed Marotta for details about the project's funding and longevity. Defendant Marotta responded with multiple assurances upon which Plaintiff reasonably relied:

- Funding for Stormbreaker in FY24 was already approved. This is corroborated by PACOM's October 12, 2023 public document describing funding as "… *Approved for FY23 & FY24 PDI funds...*";

- SMX was constructing a dedicated SCIF for Stormbreaker. Plaintiff recognized the significant upfront cost of building a SCIF and certification as a significant capital commitment strongly indicative of a long-term commitment to Stormbreaker.

- Stormbreaker was one of PACOM's four highest priorities, with Admiral-level sponsorship and an ongoing timeline. This is corroborated by a PACOM document identifying a $94 million allocation for Stormbreaker from FY2024-FY2027;

- SMX Human Resources (HR) offered Plaintiff two retention bonuses: one vesting after one year of service, and a second—specifically intended to offset relocation costs—that would not vest for two years (August 2025), reflecting SMX's clear long-term intent.

90.     During pre-hire discussions in August 2023, Defendant Marotta described "AI" modeling and simulation as a core, operational component of Stormbreaker—not as a future add-on or conceptual enhancement. She emphasized that the objective of *"AI-enabled"* Stormbreaker was to provide improved accuracy, fidelity, and confidence compared to existing manual war planning systems. Plaintiff's expertise in real-world AI/ML predictive modeling, simulation, and mission-critical defense systems was a perfect fit, and therefore Plaintiff relied on Marotta's representation in accepting the position. As shown below, Marotta's description was consistent with early (2022), contemporaneous (2023), and subsequent (2024-2025) PACOM, SMX, and congressional documents, all of which framed AI/ML as the foundational element of Stormbreaker's design and funding rationale—not an aspirational, later-stage option.

91.     Notably, Plaintiff is unaware of any internal or external document describing Stormbreaker as a "digitization effort," and its document management, data aggregation, and workflow components are barely mentioned. Instead, multiple public-facing and congressional sources highlight "AI-enabled planning and wargaming" as the core of the system, often naming AI/ML modeling and simulation directly in the context of capability delivery and funding justification. These representations were used not only to recruit technical staff like Plaintiff, but to secure multimillion-dollar appropriations through public channels such as the National Defense Authorization Act 2022 where AI is explicitly central: *"Stormbreaker (AI-enabled Planning & Wargaming) FY23 $22m, FY24-27 $72m)."*

92.     At the time of Plaintiff's recruitment and throughout the performance period, Defendants consistently promoted Stormbreaker's AI/ML modeling and simulation capabilities as essential to its mission—until Plaintiff began raising objections. Thereafter, Defendants began

to retroactively redefine or minimize "AI" in a pattern of semantic manipulation designed to discredit Plaintiff's disclosures and shield themselves from accountability.

93.     The following excerpts illustrate the consistent way in which Stormbreaker has been marketed and funded as an AI/ML modeling/simulation platform, all of which reinforce and are consistent with the pre-hire representations made by Defendant Marotta to Plaintiff:

- Defendant Marotta is author of *"Using Innovation to Help Protect and Defend the Indo Pacific Region"* (August 1, 2023), Marotta refers to Stormbreaker as *"AI/ML enabled plans & wargaming capability"* because *"… USINDOPACOM and the wider DoD lacked a high fidelity, advanced technology planning and decision-making tool to quickly generate and analyze multiple military options then wargame these options in a data-driven environment."*

- Committee on Armed Services House of Representatives (hearings held March 9 2022) *"Stormbreaker will support this effort by generating synthetic data in support of machine learning [ML]."*

- National Defense Authorization Act (2022) *"Seize the Initiative"* describes Stormbreaker as: *"AI-enabled planning and Wargaming […] by artificial intelligence, machine learning, and 5G technology."*

- PACOM's *"J5 STORMBREAKER JOINT OPERATIONAL PLANNING TOOLKIT (JOPT)"* (October 12, 2023) *"STORMBREAKER: USINDOPACOM's program to develop an Artificial Intelligence (AI)-enabled Joint Operational Planning Toolkit (JOPT) to support planning, wargaming, analysis, and execution of multi-domain, operational-level Course of Action (COA) development."*

- PACOM's *"Official announcement of Stormbreaker's Initial Operational Capability (IOC)"* (December 13, 2023), describes Stormbreaker as *"an AI-enabled Joint Operational Planning Toolkit (JOPT)"* intended to support wargaming and operational planning.

- PACOM's Army Maj. Gen. Joshua Rudd (March 2024), described Stormbreaker as: *"modeling and simulation capabilities that take existing data—so threat data, friendly data, operational plans—and then looks through an Artificial Intelligence/Machine Learning [AI/ML] lens to assess and then generate output."*

- Admiral Aquilino (March 20 2024), public comments: *"...the Pacific Multidomain Training and Experimentation Capability (PMTEC) enhances U.S., allied, and partner training by enabling realistic, joint, and combined training ranges to improve our future operations and exercises using STORMBREAKER, an AI-based gaming and simulation capability ... that will include advanced data optimization capabilities, machine learning, and artificial intelligence to support planning, war gaming, mission analysis, and execution of all-domain, operational level course of action development"* [this is post-IOC, but note tense].

- SMX public online marketing material titled *"Modeling, Simulation, and Training: Revolutionize Training and Predictive Analysis"* (last accessed May 17, 2025): claims: *"[Stormbreaker] modeling and simulation capability [...that] will drastically reduce the time from plan inception to decision-making while simultaneously increasing the fidelity, accuracy, and number of high-confidence options for the commander."*

- The focus and highlight of Stormbreaker product demonstrations was the *"AI-enabled"* modeling/simulation – for example the January/February 2024 demonstration.

94.    In addition to the AI modeling and simulation claims about Stormbreaker in these outward documents, internally Stormbreaker was also clearly focused on AI/ML modeling and simulation from the outset, for example:

- SMX organization chart October 16, 2023, prominently positions the *"Simulation Team"* with lead – D.S. described as *"Modeling and Simulation Director"*, D.H. as *"Principle Simulation Architect"* and a team of supporting software engineers. The design Team includes Butler *"Senior Simulation Visual Designer"* and J.S. *"Senior AI Analyst"*.

- In a LinkedIn profile for last viewed in May 2025 P.L. wrote: *"I worked with [D.S.] at Microsoft as well as SMX working on modeling & simulation projects in both cases [D.S.'s] deep experience in the mod/sim world ..."* and P.S.'s own LinkedIn profile describes his activities in *"simulation"*.

- A press release dated May 23, 2025, I.Y.L.'s professional background states: *"[IYL] led a new studio venture for US defense contractor SMX, where he applied commercial gaming and AI-enhanced technologies to strategic defense simulations."*

- SMX job listings for Stormbreaker firm-funded roles include positions such as *"Senior Modeling and Simulation Engineer,"* responsible for developing *"AI/ML enabled plans and wargaming capability"* with role being *"Mod/Sim [Modeling/Simulation] Director"*.

- Stormbreaker's internal technical architecture describes three primary components, one of which is titled "Modeling and Simulation Engine" and contains phrases such as *" AI-enabled feedback"* and produces *"AI enabled analysis of COAs"* and *"ML [Machine Learning] capture to teach/refine AI agent behavior"*.

- Based on the proportion of staff allocated to the simulation team compared to the rest of the Stormbreaker project, it is reasonable to conclude that a substantial portion of the system's design and budget from the outset was invested in the modeling and simulation engine.

95.     Collectively, both internal and external documents — including those used to support or justify federal government funding — (a) consistently describe Stormbreaker as an AI/ML modeling and simulation platform; (b) use the terms "AI/ML" and "modeling/simulation" interchangeably; (c) never describe Stormbreaker in terms of "document digitization" or "workflow automation" as core functions, nor suggest that AI/ML was an optional future feature; and (d) upon information and belief, rarely if ever reference document management or workflow technologies as defining aspects of the program. Further, upon information and belief, all government-facing programmatic documentation — including budget justifications and formal deliverables — refer to Stormbreaker using terms such as "AI-enabled."

96.     In August 2023, pre-hire discussions with Defendant Marotta, she assured Plaintiff that he would be positioned on the Stormbreaker leadership where he could have a significant impact on Stormbreaker's AI directions:

- In pre-hire conversations, Marotta agreed that Plaintiff would be placed in a leadership position where he could have a significant impact on Stormbreaker.

- Marotta directly interviewed and recruited Plaintiff in a manner consistent with him becoming one of her direct reports.

- Altogether this is consistent with the October 16, 2023, Stormbreaker Organizational Chart—dated approximately two months after the start of Plaintiff's SMX employment—where Plaintiff is illustrated on the leadership layer reporting directly to Marotta.

97.    Plaintiff reasonably relied on Marotta's representations when deciding to accept the position at SMX. However, each of the three core assurances—long-term funding, the centrality of AI modeling/simulation, and leadership inclusion where he could make impact—were later contradicted or denied by SMX upon Plaintiff's termination.

98.    If Defendants produce evidence that Plaintiff was not removed from the leadership team for retaliatory reasons but was never part of the "real" leadership team, then Defendant Marotta must have knowingly misrepresented this intention in pre-hire discussions. Upon information and belief, discovery will show that at the time Marotta was producing the deceptive October 16, 2023, organizational chart later shared with Plaintiff (the "fraud chart"), she was simultaneously operating a concealed and materially different internal leadership structure. This dual-track sleight-of-hand—outwardly presenting one leadership team while internally honoring another—constitutes fraudulent inducement. It reinforces Plaintiff's CEPA claim by demonstrating scienter: Marotta knowingly used false or misleading leadership representations to induce Plaintiff to join SMX, then later attempted to retroactively rewrite his status to avoid liability for retaliation.

99.    After accepting the role at SMX, a series of pre-hire events occurred that lend significant weight to the theory that Defendant Marotta intentionally misled Plaintiff and

concealed material facts she knew to be inaccurate. Specifically, upon receiving the SMX job offer, Plaintiff planned several weeks' notice so he could complete work at his current employer. When Plaintiff presented this proposal to Marotta, she insisted that it was critical for him to attend the August TEM event in Hawaii because urgent need for his expertise. Plaintiff's existing employer very reasonably and flexibly proposed that Plaintiff take time off to attend the SMX TEM, then return to ArmyAI to complete his outstanding work. However, when Plaintiff relayed this proposal to Marotta, she firmly rejected it, asserting that there were competitive risks with his existing employer and that Plaintiff was urgently needed on Stormbreaker due to an ambitious workplan. Reluctantly, Plaintiff resigned from ArmyAI on short notice. Had Plaintiff's proposed arrangement been accepted—allowing him to attend the TEM and then return to ArmyAI—Plaintiff would have identified the multiple red flags and experienced Marotta's inability to meet for an urgent briefing while he was on-island, and would have almost certainly discontinued the SMX role and withdrawn his resignation with his prior employer.

## II. PROTECTED DISCLOSURE: AI MODEL RISK

### A. AI-Enabled Stormbreaker's Stormy History

100.    Upon joining Stormbreaker, Plaintiff learned more about the Stormbreaker project's history. According to Marotta's account told to Plaintiff, Stormbreaker was originally contracted to Microsoft Federal by PACOM and most labor was provided by personnel from Microsoft's online cloud game development team. Microsoft, for unexplained reasons, terminated the entire online game development team. PACOM, then concerned about delivery of Stormbreaker, ended the contract with Microsoft Federal, and this contract cancellation became a matter of dispute, finally resolved with the contract cancelled and Microsoft refusing to hand over Intellectual Property (IP). This is all according to Marotta's account.

Page **40** of **267**

101.    Through a process that was not explained to Plaintiff, SMX emerged with the PACOM contract for Stormbreaker and with many of the former Microsoft employees originally involved in the contract now working for SMX under program director Marotta.

102.    Defendant Marotta implied to defendant that she was intimately connected to events including Microsoft's contract cancellation while also becoming SMX's Program Director for Stormbreaker shortly thereafter. Marotta explained to Plaintiff: *"It's a very small island, everyone knows everyone, and Microsoft don't understand island politics,"* implying insider dynamics and possible conflicts of interest.

103.    As Plaintiff learned more about the Stormbreaker, he would begin to question the procurement process surrounding PACOM's award of the Stormbreaker project to Microsoft and then SMX and the circumstances surrounding premature cancelation of these two incarnations of Stormbreaker.

---

B. Primer: AI Model Risk Governance, Engineering Practices, and Whistleblowers

104.    A model is an abstracted representation of a real-world system, designed to simulate (mimic) or predict future outcomes based on a set of inputs and internal assumptions. Unlike a calculation, which deterministically transforms inputs into outputs through fixed, known rules (e.g., arithmetic), a model incorporates assumptions, approximations, statistical variation, and often incomplete information. As a result, unlike a calculation where we can be certain of the result, a model carries inherent uncertainty—in how accurately it replicates behavior of the real system it models (represents). Typically, small variations between a model and the real system it represents (model errors) are treated as expected inconsequential 'noise.' Larger, rarer deviations are often referred to as model failures. The outcomes exist on a

continuum - all part of a model's uncertainty profile, with some outcomes being more likely than others.

105.    When a model is applied within a real-world application (use case), that model uncertainty is translated into potential losses. Risk is the product of two variables: the model's uncertainty, and the magnitude of the loss the application could produce. In some applications a model error might lead to negligible consequences (e.g. letter 'I' mistaken for numeric '1' in a scanned book) while in others a model error may produce a catastrophic loss, for example loss of life. It is important to understand that the same model with the same uncertainty will have a different risk in different applications, so for example an AI model to produce audio for text will have different risk helping a blind person read versus transmitting air-traffic control directions over the radio.

106.    Model risk can often be mitigated—through better model design, application redesign, redundancy, or validation procedures. A common mitigation strategy is human oversight. For example, a nuclear power plant may rely on models to manage core operations while humans monitor for faults. However, as the Chernobyl disaster and others have shown, human oversight is not a fail-safe: humans may overlook, misinterpret, or even amplify model errors, especially under pressure or in high-complexity systems.

107.    Effective model risk management depends on four foundational steps:

- Recognizing that one is building/designing/operating a model (not a deterministic calculation);

- Understanding the uncertainty of the model;

- Assessing the losses, especially worst-case losses ,the model uncertainty could produce in the context of the application; and

Page **42** of **267**

- Implementing scientifically grounded, test-driven, and structured controls to identify, mitigate, and (most importantly) understand those risks.

108. This is the core of AI model risk management—and it is also what defines engineering disciplines that are accountable for the systems they build: a professional focus on risk and the safety of downstream applications.

109. Plaintiff's concerns about Stormbreaker's AI model risk and lack of governance are objectively grounded in well-documented historical cases where similar governance failures led to catastrophic results:

- **Boeing 737 MAX**: Boeing introduced an autonomous pitch control system (MCAS) based on a single sensor input, but designers and management failed to recognize that MCAS was a model—one that embedded assumptions about input reliability, pilot response, and system control limits. Instead of treating it as a model with uncertainty, Boeing implemented it as a deterministic algorithm, without validating its behavior under real-world failure modes. On two occasions, faulty sensor input triggered MCAS as designed, but the underlying design assumptions proved fatally flawed. Pilots, unaware of the system and untrained in how to override it, were unable to recover—resulting in crashes that killed 346 people. Boeing's failure to govern MCAS as a high-risk autonomous model, combined with overreliance on untrained human oversight and dismissal of engineering warnings, led to mass fatalities and the FAA grounding the aircraft for 20 months.
- **Titan Submersible**: OceanGate deployed a deep-sea vehicle using novel carbon fiber hull designs without formal testing or third-party safety certification.

Internal engineers warned the company that the system was structurally unsafe and unvalidated, but they were silenced. In June 2023, the vessel catastrophically imploded during a dive, killing all five aboard. The tragedy stemmed from management's refusal to recognize the uncertainty of their simplified system models—treating them largely as deterministic calculations—and a reckless disregard for validating their simplified models under the full range of real-world conditions that mission-critical operations demand.

- **Millennium Challenge 2002**: A $250 million U.S. military wargame meant to simulate future combat was manipulated mid-exercise when Red Team forces used unexpected tactics that overwhelmed the high-tech Blue Team. DoD officials rewrote the scenario, allegedly suppressing the results, with the claim being that the simulation failed to model adversarial realism, leading to potential over confidence in U.S. operational plans. Millennium Challenge is an important reminder that 'playability' is not to be confused with validating the realism—therefore trustworthiness—of a predictive model. If there is no trustworthiness there will be eternal debate about the value of the insights derived from it.

- **Uber Autonomous Vehicle Crash**: In 2018, an Uber self-driving test vehicle failed to recognize a pedestrian at night and fatally struck her. Uber had disabled emergency braking and relied on a distracted human driver for oversight. The NTSB found that Uber's poor AI safety culture and overreliance on untrained human oversight contributed to the fatality.

- **Deepwater Horizon**: BP's reliance on under-validated risk models, ignored warnings about faulty well integrity, and overconfidence in human response led to

the 2010 well blowout, killing 11 and causing the largest marine oil spill in U.S. history. The tragedy resulted from dismissed engineering concerns and poor understanding of real-world system uncertainty.

- **MILES** (Multiple Integrated Laser Engagement System): A U.S. Army simulation tool used lasers to train soldiers but failed to model real-world ballistics, indirect fire, or penetration effects. This gave trainees a misleading sense of protection and encouraged tactics that would be highly dangerous in real combat. MILES required multiple upgrades to reduce its misrepresentation of the reality of battle—demonstrating how unrealistic models can dangerously distort combat training.

- **Theranos Diagnostics:** Theranos claimed it could generate lab-quality blood test results from a finger-prick blood sample. Technically, this was a sampling model—attempting to infer true analyte values from insufficient and noisily measured biological data. The system failed because its sampling assumptions were never empirically validated, and its predictions were often wildly inaccurate. Like Stormbreaker, Theranos marketed a predictive platform as operationally trustworthy despite lacking model validation, while internally suppressing disclosures that revealed foundational technical flaws. The result was a multi-billion-dollar collapse, widespread patient risk, and federal civil and criminal enforcement actions by the Securities and Exchange Commission and the Department of Justice.

- **Chernobyl Nuclear Disaster** (1986): Operators at the Chernobyl nuclear power plant conducted a turbine safety test under conditions that violated the reactor's

design parameters. Safety systems were disabled, warnings were disregarded, and the reactor entered a runaway state—triggering a catastrophic explosion and the release of radioactive material across Europe. Investigations later revealed that the disaster was rooted in a flawed mental model of reactor dynamics: operators assumed linear responses under low-power conditions, whereas the RBMK reactor exhibited dangerous nonlinear feedback due to its positive void coefficient. The failure was compounded by inadequate risk mitigation protocols and excessive discretion granted to human supervisors. Chernobyl remains a cautionary example of how flawed system models—whether mental, procedural, or algorithmic—and overreliance on inadequately equipped human oversight can lead to catastrophic failure in complex environments. The parallels to Stormbreaker's untested, AI-enabled war-planning system—and the dismissal of concerns based on the flawed assumption that human oversight alone can mitigate all risk and obviates the need for formal risk management protocols—underscore the urgent need for enforceable risk governance in high-stakes applications no matter how well operators think they understand the system being modeled.

110.    These engineering failures followed a familiar arc of managerial neglect and technical blindness: complex systems are marketed as safe or effective but lack appropriate risk governance including recognizing the difference between models and calculations, understanding their uncertainty, recognizing potential worst-case losses, and overconfidence in human oversight. Often experts who try to warn of the dangers are ignored or silenced by management focused on the model benefits and not the risks.

C. Third Work Day at SMX—Plaintiff Notices Red Flags—Raises Model Risks

111.     In Plaintiff's first week on the job, while participating in a team meeting in Hawaii, Plaintiff identified multiple red flags including: extremely serious AI model risks that rendered Stormbreaker not-fit-for purpose and potentially extremely dangerous.

112.     On Plaintiff's third day of employment at SMX—during his first in-person engagement with the Stormbreaker team at the August 2023 Technical Exchange Meeting ("TEM") in Hawaii—Plaintiff explained during a recorded session attended by team members both physically and remotely, that there is a critical engineering distinction between:

- AI used for entertainment or simulated behavior modeling (such as in video games), and

- AI used for predictive modeling intended to forecast real-world operational outcomes with real-world consequences if the AI model failed.

113.     Plaintiff articulated that predictive modeling of real-world systems requires objective ground truth standards, error metrics, calibration, validation testing, and adherence to rigorous model governance practices, whereas entertainment-focused AI does not. Plaintiff respectfully raised these concerns at the meeting, conscious of the delicate balance between being newly employed and the professional obligation to flag critical risks.

114.     Plaintiff immediately experienced marked hostility and isolation by members of the Stormbreaker team, particularly from the large block of Former Microsoft Employees. At the evening social event Plaintiff was visibly ostracized—Former Microsoft Employees formed exclusive groups, deliberately excluding Plaintiff from conversations and social interactions. Over the subsequent days of the TEM, Plaintiff was subjected to ongoing coldness, snubbing, and even verbal hostility.

115.     Plaintiff contemporaneously reported this unexpected hostility to Defendant Marotta using the term "Seattle snipers"—a metaphor for covert but coordinated professional attacks for which former Microsoft employees subjected to 'stack ranking' were legendary. Rather than addressing Plaintiff's hostile workplace concerns, Defendant Marotta admonished Plaintiff for referring to the Former Microsoft Employees as "Microsoft people"

116.     The timing, consistency, and escalation of these hostile reactions indicate that Plaintiff's initial, cautious, protected disclosures about Stormbreaker's AI model risk were met with retaliatory ostracization, hostility, and management inaction from the outset. This pattern continued to escalate over the following days and months as Plaintiff uncovered more concerns and persisted in making protected disclosures.

117.     On Plaintiff's fifth day of employment with SMX, the third and last day of the TEM, Plaintiff attempted to escalate his concerns to Defendant Marotta by suggesting an "urgent debrief" meeting. However, Marotta declined, claiming that she was too busy and could not meet with Plaintiff at any time over the next two days while he was on-island.

118.     On September 14, 2023, Plaintiff emailed Defendant Marotta and Sikorsky requesting critical information about Stormbreaker that he'd been unable to locate including "functionality and deliverable milestones" and other documents. Sikorsky referred Plaintiff to an online system, but after he received access he was still unable to locate any documents that defined Stormbreaker's expected functionality and deliverables: no requirements, no specifications, no test and validation framework, or anything else defining the final expected product.

119.     The "urgent debrief" meeting requested by Plaintiff did not occur until September, 2023. Plaintiff's written PPT screen notes for this audio-visual meeting, now titled "First

Impressions," provide evidence of his AI model risk warnings to Defendant Marotta and (according to the organizational chart) SMX peer Sikorsky:

- **Slide 1**: Stormbreaker by design was not fit for purpose. Plaintiff explained that he didn't want to expand any further on an unclassified call, but it warranted an urgent high-side (SCIF) discussion.

- **Slide 2**: Plaintiff identified multiple AI/ML model elements within Stormbreaker, specifically he articulated that: *"unit 'AI', adjudication, unit model, data fusion, post-analytics [indirectly], information sources [indirectly], [and] the overall simulation"* all needed to be recognized as AI/ML models and subjected to risk governance. Plaintiff mentioned some other Stormbreaker components that were not within his core expertise, such as Stormbreaker's digital document management and workflow systems, but that much of the Stormbreaker labor was on data, "unit AI", modeling and simulation components that should be recognized as constituting an AI model, and importantly that the overall Stormbreaker planning outcomes constituted an AI model output, and all required model governance.

- **Slide 3**: [Not relevant—Plaintiff praised other Data Scientists on Stormbreaker.]

- **Slide 4**: Plaintiff described the most serious issue *"We should be building an agent model, not a game platform ➔ totally different problem requiring totally different solution architecture implemented by totally different skill sets (Did Microsoft realize this—is this why they fired everyone?)"* and then went on to list three other concerns that reinforced this core issue: *"No sign of agile software development methodology, No sign of organizational and external process*

*awareness in software design, No sign of understanding state-transition diagraphs?!"*

120.    Marotta ended the call abruptly after Plaintiff's last slide. Instead of questioning Plaintiff about his concerns and proposed solutions—or promptly arranging a follow-up high-side meeting as Plaintiff had suggested—Defendants disengaged and commenced a campaign of retaliation, deception, and criminal coercion, culminating in Plaintiff's wrongful termination.

121.    To join the "initial impressions" meeting, Defendant Marotta had sent Plaintiff a recurring calendar invitation to a Monday "leadership" meeting. Thinking that he had finally been invited to the leadership meetings (as had been promised by Marotta pre-hire) Plaintiff joined the call again the following Monday. SMX peer (according to the org chart) Sikorsky expressed surprise that Plaintiff was on the call and directed him to leave immediately. Confused, Plaintiff emailed Marotta to understand the situation regarding leadership calls, Marotta replied without clarifying the situation, and removed Plaintiff from the recurring leadership meetings.

122.    By this time Plaintiff's supervisory contact with Marotta amounted to about 1.5hrs total, including initial greeting when he arrived in Hawaii and the "initial impressions" call. Marotta initiated no further supervisory contact for approximately six weeks, until the following event on October 26.

## D. October 26—Plaintiff Warns of AI Fraud and AI Model Risk

123.    On October 26, 2023, Defendant Marotta emailed Plaintiff and others about an upcoming meeting with DIU and CDAO, two other defense agencies. By that point, Plaintiff's work on Stormbreaker had uncovered significant AI model risk issues. He had grown increasingly concerned about the discrepancy between how Stormbreaker's AI capabilities were being represented and reality based on documentation he had reviewed.

124.    Plaintiff replied to Defendant Marotta's email (CC'ing Defendant Ream) and made multiple protected disclosures, including the following:

- **Lack of AI model risk governance**: *"Our team is way-out of its depth with regards to what real AI actually means and requires, and the liabilities use of this claim creates. The "AI" path Stormbreaker is going down will fail any risk assessment AI responsibility etc investigation that I can think of."*

- **Semantic misrepresentations of "AI" and False Claims Act liability**: *"What Microsoft describes as AI and sold as AI will dramatically fail all of the various defense requirements and guidelines, for example for 'Responsible AI' and I'm having a very difficult time articulating this. By describing this as AI, Stormbreaker invites validation to the proper AI standards, yet there is no aspect of the current Stormbreaker that comes close to satisfying these."*

- **Unqualified personnel for real-world AI modeling**: *"Microsoft folks are game developers and right out of their depth regarding advising on this—otherwise they should have already."*

- **Potential for catastrophic failure**: *"If we go into these discussions describing Stormbreaker as doing as AI we run the risk of inviting our own slaughter."*

125.    Defendant Ream responded to Plaintiff's email by stating: *"thank you for the outstanding insights. Will take them to heart during our orientation discussions today"*—indicating that she found Plaintiff's concerns both credible and worth discussing further.

126.    When Defendant Marotta responded, she did not acknowledge the substance of Plaintiff's concerns, inquire about potential corrective actions, or ask why a modeling expert with over 35 years of experience would use a term like *"slaughter."* Instead, Marotta dismissed

Page **51** of **267**

the warning: *"I assure you there was no, nor will there be a slaughter"*. Immediately thereafter, she instructed Plaintiff to complete a "vulnerabilities" report—a task she knew or should have known posed legal risks given Plaintiff's prior classified work, and which would become central to Plaintiff's CEPA claim. Marotta further admonished Plaintiff: *"...one last note, I will just point out that we do not have anyone from Microsoft current working on STORMBREAKER, we are a one SMX team."* At no point did Marotta acknowledge the seriousness of the disclosures or indicate any intent to investigate.

127.    In response, Plaintiff wrote that he couldn't complete the vulnerabilities task at the unclassified information level and they needed to discuss it: *"I've been begging for a high-side [SCIF] conversation, how can we do it?"* Marotta replied: *"I understand the request for a classified discussion however, that will need to happen when you are here on island,"* This was Plaintiff's second written request for a SCIF meeting, but once again, Marotta made no attempt to plan or facilitate one.

### E. October 30—Plaintiff Alerts Marotta to New Executive Order 14110

128.    On October 30, 2023, the President released Executive Order 14110 on the Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence. Plaintiff, already deeply familiar with the NIST AI Risk Management Framework cited throughout the Order, immediately recognized its implications for Stormbreaker. Since his first week at SMX—and most recently on October 26—Plaintiff had been raising concerns about the project's lack of AI model governance. Due to the time zone difference between New Jersey and Hawaii, Plaintiff had a six-hour head start in reading the Order. With 35+ years of experience in AI model governance, he was exceptionally well-qualified to advise the Stormbreaker team on the Order's implications and appropriate next steps.

129.    On October 30, 2023, at midday (around 6am Hawaiian time) Plaintiff emailed Defendants Marotta and Ream alerting them to the new Executive Order. In his 'EO email' Plaintiff explicitly connected the Order's requirements to the protected disclosures he had made four days earlier on October 26, and proposed immediate next steps—including yet another request for a classified discussion [his third written SCIF request].

130.    Upon information and belief, rather than respond to Plaintiff's EO email or forward it to the team, Defendant Marotta created and circulated a separate "faux parallel" email thread to a broader Stormbreaker list. In that thread, she referenced the EO without acknowledging Plaintiff's original email or incorporating any of his concerns.

131.    Eight hours after Plaintiff sent his EO email, Marotta finally responded, claiming she had only just seen it due to taking her son to the doctor. However, analysis of email traffic from Marotta showed that she had responded to other messages either side of Plaintiff's email earlier that day. Discovery is expected to confirm that Marotta read Plaintiff's message early that morning, discussed it at a "leadership synch" meeting, and then deliberately created a separate thread to obscure Plaintiff's protected disclosure

132.    Upon information and belief, Marotta's 'faux parallel' email thread was not accidental. It served several retaliatory purposes: (1) to 'muddy' the timeline of Plaintiff's disclosure and reduce its visibility to future investigators; (2) to hide Plaintiff's October 26 disclosures from the EO response; (3) to ensure Plaintiff's growing insights into Stormbreaker's AI model risk remained unrecognized; (4) to isolate Plaintiff from the EO response; and (5) to give the false impression that Marotta had originated the disclosure, while simultaneously retaliating against Plaintiff for making it.

133.    In an additional retaliatory gesture, Marotta wrote that she had instructed Plaintiff to complete the "vulnerabilities" report—framing it as his responsibility in front of the broader team. This created professional and peer pressure to complete a task Plaintiff had already objected to on legal grounds involving classified information handling.

134.    Plaintiff understood Executive Order 14110 as a formal legal mandate that validated the model risk concerns he had been raising since August. In his EO email, he wrote:

- **EO impacts the AI components of Stormbreaker**: *"I should stress that this affects all of Stormbreaker but not all modules equally: for example it doesn't have a huge impact on COA document management system or data repository. It does significantly impact the SIM/wargaming component and thus the overall system."*

- **Reinforces prior disclosures**: *"Fortuitously, this also provides an excellent opportunity to address the concerns I raised last week [i.e. October 26 email four days earlier]."*

135.    Although Plaintiff's EO email was never shared with the full Stormbreaker team due to Marotta's concealment, the written record shows that key stakeholders understood the seriousness of his disclosure and understood there was a need to comply:

- Defendant Marotta wrote: *"I expect we will be asked questions about how STORMBREAKER will comply with some of the items mentioned here."*

- SMX's "Principal Creative Director" I.Y.L. acknowledged a need to adhere to the EO: *"we should be able to articulate a plan on how we'd address the spirit of the*

*bill"* and he later wrote: *"...its existence [the EO] is a clear signal we should not ignore."*

- Plaintiff wrote about the Executive Order: *"The presidential EO may seem high level, but in fact I expect it enables (or rather adds explicitly authority to) very specific and established Model Risk Management processes that I am very familiar with through a 30+ year career."*

- Marotta raised the EO in a leadership meeting that included PACOM official ND—but did not invite Plaintiff, despite prior promises to include him on the leadership team and Plaintiff's specialized expertise in this exactly this area.

- Upon information and belief, Marotta's creation of a separate EO thread was itself a tacit acknowledgment that Plaintiff's message constituted a serious Protected Disclosure requiring concealment.

136.    Rather than engage in any good-faith discussion of AI model risk or the implications of the EO, Defendants adopted a posture of willful ignorance and retaliation. Plaintiff was excluded from EO-related conversations, subjected to ongoing pressure to complete the vulnerabilities task, and progressively marginalized—culminating in his demotion then termination.

137.    As a result, PACOM was denied timely access to Plaintiff's 35+ years of subject matter expertise—including a six-hour head start in evaluating the EO, deep prior analysis of Stormbreaker's AI risk, and well-developed compliance strategies. This exclusion strongly suggests gross mismanagement and reinforced Plaintiff's belief that Stormbreaker's AI capabilities were being deliberately misrepresented.

138.    Plaintiff's same-day identification of EO 14110 and its significance to Stormbreaker was not coincidental. He had been closely monitoring emerging federal policy on AI—particularly in defense—and understood that his disclosures were not only technically accurate, but now directly aligned with binding federal guidance.

## F. Plaintiff Makes Disclosures to Ream, DOD IG—Terminated Two Weeks Later

139.    On February 20, 2024, Plaintiff participated in a 90-minute call with Defendant Ream, his new supervisor. She confirmed the formal position that Plaintiff's December 13 "orphaning" was to be interpreted as a demotion from the Stormbreaker leadership layer.

140.    On the call, Ream claimed to be reading from her notes of the November 9, 2023 SCIF meeting stating: *"Wendy had asked for some things that had not yet been delivered"*—a clear reference to the "vulnerabilities" task, an inaccurate account of what Plaintiff said, and a clear attempt to create a record that characterized his actions as refusal to follow instructions. Plaintiff believed this inaccurate record indicated a clear conspiratorial intent to misrepresent the November 9 SCIF meeting and likely extended to other false claims to further the coercive threat. Plaintiff was so concerned by this conspiratorial indicator of the ongoing coercive threat that he contacted the Department of Defense Inspector General (DOD IG) the very next day, February 21, and again on February 23, to formally document his complaint—constituting disclosure to a public body under CEPA § 34:19-3(a)(2).

141.    On the February 20 call with Ream, Plaintiff immediately corrected the record, explaining: *"I had not refused to do work; I'd said I can't do it unclassified."* He then described how Marotta dismissed this legal concern and criticized him, rather than facilitating contact with an Original Classification Authority (OCA) as required under DoD classification procedures. Plaintiff then referenced PACOM's Head of Information Security, and reminded Ream that he

had characterized the issue as *"the most complex information security question"* he had ever encountered—validating the seriousness of Plaintiff's concern. Ream acknowledged these facts with, *"Yes, I remember,"* and offered no contradiction. This exchange constitutes a protected disclosure under CEPA § 34:19-3(a)(1) and (c), as Plaintiff lawfully objected to engaging in conduct he reasonably believed would violate federal classified information handling rules.

142.  Plaintiff also warned Ream that Stormbreaker's simulation engine lacked essential AI model risk management—particularly in the area of validation—and that this posed an extreme project risk. Drawing on his prior experience managing model governance at Bank of America, he explained: *"Stormbreaker [model risk] is OFF THE SCALE... if I was to score Stormbreaker on the same risk scale [used by Bank of America], it would be off the charts and then some..."* He underscored the consequences, stating: *"The dangers in [Stormbreaker's] modeling are ENORMOUS."* Ream did not dispute the substance of these disclosures. However, when Plaintiff referenced the potential for catastrophic outcomes by reiterating his November 9 *"body bags"* being his metric of concern, Ream rapidly ended the call. There is no evidence that any investigation or escalation occurred afterward. Plaintiff's objections based on safety and compliance risks with direct public interest implications constitutes a protected disclosure under CEPA.

143.  Throughout Stormbreaker planning meetings—including Technical Exchange Meetings (TEMs) and weekly program calls—the term "KIA" was routinely used as an operational planning metric. References to "KIA" were treated as standard and drew no objection from Stormbreaker leadership or PACOM officials. When framed in terms of 'KIA,' Plaintiff's concerns about the risks of deploying an 'AI-enabled' Stormbreaker system were dismissed or ignored—as though the metric carried no more operational weight than a video game score.

144.    KIA is a common military acronym for "Killed In Action"—so common in fact, that people have somewhat become immune to its real-world meaning. When Plaintiff intentionally shifted to using direct terms such as "body bags" and "slaughter" to humanize the same operational risk metrics, the reactions were markedly different. During the November 9 SCIF meeting, Defendant Marotta responded with a lengthy, emotionally charged rebuke—criticizing Plaintiff's use of the term "body bags" and implying he lacked the standing to discuss such matters due to not serving in the military. During the February 20, 2024 call, Defendant Ream ended the conversation shortly after Plaintiff again referenced "body bags" as the real-world consequence of model failure.

145.    Plaintiff respectfully submits that this contrast is telling. The use of technical acronyms like "KIA" can abstract or desensitize participants to the real-world consequences of system failure. Plaintiff's use of more emotionally direct language was not intended to offend, but to ground the discussion in the real-world human cost of deploying unvalidated AI in war planning scenarios. Far from being insensitive, this choice of language reflects Plaintiff's deep ethical awareness, professional integrity, and the seriousness with which he approached the modeling risks inherent in Stormbreaker.

146.    Plaintiff's choice to speak plainly—using real-world, human-centered terms such as "body bags" and "slaughter"—was consistent with his obligations under engineering and modeling ethics codes, including those of IEEE and the Simulationist standard. These frameworks require engineers to prioritize public safety and communicate risks in terms that decision-makers cannot easily dismiss or ignore. While Defendants Marotta and Ream reacted with visible emotional discomfort to these terms—rebuking Plaintiff or terminating discussions—they nonetheless showed no corresponding interest in mitigating the risks those

terms represented. Their responses focused on tone, not substance. Plaintiff, by contrast, was the only participant who consistently sought to prevent the real-world consequences those terms described. His remarks were intended not to provoke, but to pierce institutional complacency— and they formed part of his protected disclosures under CEPA.

147.    Plaintiff described to Ream a viable, well-supported solution for completing the "vulnerabilities" task in a SCIF at ArmyAI—a proposal that ArmyAI had approved and offered to support. Despite the clear value and legality of this option, Marotta blocked the proposal and failed to follow up as she had indicated. Plaintiff expressed his growing frustration and isolation, stating: *"I've been DESPERATE for engagement... I was stunned when she said no."* This exchange reinforces both Marotta's obstruction of a lawful pathway to complete the task and the deepening impact of her December 13 "orphaning," which effectively terminated Plaintiff's leadership role and marginalized him. Together, they support Plaintiff's CEPA retaliation claim under N.J.S.A. 34:19-3(a)(1) and (c)—showing that Plaintiff was punished for lawfully objecting to improper conduct and that Defendants took adverse actions in response.

148.    Regarding the orphaning event, Plaintiff had escalated his protected disclosures to PACOM official ND on December 11, 2023. During the February 20, 2024 call, Ream described that disclosure as follows: *"[I'm] looking at your email now, I see it from December 11th... I see you've laid it out well... a lot of things to like... some minor concerns... I see a lot of potential to work with Strategy Robot if we were to build... so great—I think that was brilliant and thank you for CC'ing me on it."* Despite Ream's acknowledgment that the email was *"brilliant,"* Plaintiff received no follow-up from any of the email's recipient. Just two days after sending it, he was removed from the leadership layer and placed at the bottom of the Stormbreaker organizational

chart with no team affiliation or reporting lines—a retaliatory demotion functionally equivalent to constructive termination.

149.    Ream's own comments—including her description of Plaintiff's December 11 disclosure as *"brilliant"*—confirm that Plaintiff's concerns were credible and constructively received, undermining any assertion that his termination was performance-based. The contrast between Ream's praise and SMX's continued inaction reinforces the inference that Plaintiff's protected disclosures were the true cause of his removal. The February 20 call was Plaintiff's final effort to escalate concerns internally. The absence of any investigation or corrective response, followed by the proximity of Plaintiff's termination just two weeks later, provides compelling evidence of retaliatory intent under CEPA.

150.    Taken together, Plaintiff's statements during the February 20 call with Ream and February 21/23 calls with DOD IG constituted multiple, well-articulated protected disclosures under CEPA § 34:19-3(a)(1), (a)(2), and (c). These included objections to unlawful conduct (the "vulnerabilities" task), disclosures to a supervisor regarding gross mismanagement and safety risks (extreme AI model risk and lack of validation), and objections to retaliation and obstruction by SMX leadership.

G. Plaintiff's Warnings Had Strong Basis in Engineering Principles and Public Policy

151.    Plaintiff's protected disclosures regarding AI model risk were grounded in well-established public policy frameworks designed to prevent harm to public health, safety, welfare, and the environment. The importance of responsible AI model risk governance is now widely recognized across military, engineering, and regulatory domains. Examples include:

- **SR 11-7 (2011):** establishes the core principles of model risk management including model validation, independent review, governance and oversight, use of

models within their design limits, documentation and transparency. SR 11-7 has become the de facto standard for financial institutions, and its structure has influenced risk management expectations in other regulated industries, including insurance, fintech, and increasingly in AI/ML model governance.

- **DoD Directive 3000.09 (Autonomous Weapons Policy, 2012 & 2023 Update)**: Requires that lethal AI systems incorporate appropriate levels of human judgment.

- **OECD AI Principles (2019)**: Endorsed by 42 nations, including the U.S. and EU; emphasizes fairness, transparency, robustness, and accountability in AI.

- **DoD AI Ethical Principles (2020)**: Requires AI to be responsible, equitable, traceable, reliable, and governable.

- **National Security Commission on AI Report (2021)**: Warns of autonomous system risks in nuclear command and control; calls for robust AI safety in defense.

- **NATO AI Strategy (2021)**: Establishes governance requirements for military AI, including traceability, bias mitigation, and accountability.

- **White House AI Bill of Rights (2022)**: Establishes civilian AI protections and mandates human oversight in high-risk use cases.

- **Executive Order 14110 (2023)**: Mandates rigorous testing and validation for AI systems in national security and defense.

- **NIST AI Risk Management Framework (2023)**: Establishes best practices for governance, explainability, and transparency of high-risk AI.

- **Defense Innovation Unit Responsible AI Guidelines (2021–2022)**: Requires structured oversight of AI in defense contexts, including harm assessment and

rejection of unsafe systems. Cautions that in use cases involving catastrophic failure, systems may need to be redesigned or not deployed at all because "even the smallest error could be disastrous" in certain national security contexts.

- **G7 Hiroshima AI Process (2023)**: Affirms principles of trustworthy, human-centered AI and addresses misuse risks in civilian and defense contexts

- **FTC "Operation AI Comply" (2023)**: Targets deceptive AI marketing; recent actions penalize unsubstantiated AI claims.

- **IEEE Code of Ethics**: Requires engineers to prioritize public safety and disclose risks to public welfare.

- **Professional Modeling Standards (MORS, NDIA, DoD M&S Office)**: Emphasize model validation, verification, and the duty to disclose risks impacting defense operations.

152.    Plaintiff repeatedly warned about these issues with protected disclosures on this topic in August, September, October, November, and December of 2023, and again to Ream in February, 2024. For example: in Plaintiff's October 26, 2023, email he explicitly warned Defendants Marotta and Ream that Stormbreaker breached basic engineering and public policy standards:

> *"I cannot stress how important it is that we find time for a quality conversation about this before committing to doing anything involving DIU and CDAO."*
> *"If we go into these discussions describing Stormbreaker as doing as AI we run the risk of inviting our own slaughter."*

*"Our team is way-out of its depth with regards to what real AI actually means and requires and the liabilities use of this claim creates. The "AI" path Stormbreaker is going down will fail any risk assessment AI responsibility etc investigation that I can think of."*

*"What Microsoft describes as AI and sold as AI will dramatically fail all of the various defense requirements and guidelines, for example for 'Responsible AI' and I'm having a very difficult time articulating this. By describing this as AI Stormbreaker invites validation to the proper AI standards yet there is no aspect of the current Stormbreaker that comes close to satisfying these."*

*"… I find it necessary to say that I can't take responsibility for any adverse outcomes as a result of an ill-informed agreement…"*

*"We must set aside some time for a quality discussion on these matters."*

153.    Four days later, on October 30, 2023, Plaintiff followed up with another protected disclosure by directly linking the AI governance issues to President Biden's Executive Order on "Trustworthy AI" (EO 14110). In an email to Defendants Marotta and Ream, Plaintiff stated:

*"There has been a very significant development over the weekend that follows directly from the concerns I raised last week [four days earlier, October 26]… President Biden issued an executive order of 'Trustworthy AI' that will have a significant impact on Stormbreaker…"*

*"This development is right in my wheelhouse: I understand the implications, I understand what needs to be done to pivot for success, I've done this all many times before."*

*"There is no need for panic or drastic action until we've had a high-side conversation: I have some specific suggestions that you may want to consider before taking any action"*

154.    Plaintiff emphasized that the new federal AI governance requirements would significantly impact Stormbreaker's modeling components and offered to guide the realignment effort—an offer Defendants disregarded. The follow-up in the November 9, 2023 SCIF meeting expanded on these concerns in greater detail, including explicit references to liability and classified considerations.

155.    Not only did Defendants not have plans or budget assigned to these basic engineering principles and public policy standards; additionally Defendants actively and willfully ignored Plaintiff's many efforts to disclose and educate about these issues.

## H. AI-Enabled Stormbreaker Posed Significant Danger to Public Health Safety Welfare

156.    Stormbreaker's AI risks were not merely matters of internal technical disagreement. As detailed below, Plaintiff's disclosures implicated systemic deficiencies in oversight, validation, and accountability that elevated the platform's risk profile from a procurement or technical issue to a serious and imminent threat to public safety, national security, and the environment. These concerns independently satisfy CEPA's public policy prong and align with the broader whistleblower protections recognized in Pierce and federal law

157.    Recent research, including Rivera et al. (2023), shows that AI-enabled wargaming platforms tend to escalate conflict scenarios faster than human-only simulations—including premature nuclear weapon deployment. Stormbreaker's modeling and simulation models are comparably complex and notoriously unstable in the absence of meticulous calibration. Stormbreaker's lack of model validation and oversight posed not only procurement risk but also grave threats to national security, public safety, and environmental stability—particularly if deployed during live operational conflict.

158. While Stormbreaker's worst-case scenario—rapid conflict escalation, including premature nuclear deployment—may seem improbable, it exemplifies a classic *long-tailed risk* in statistical and engineering terms: low in likelihood, but catastrophic in consequence. Such risks demand heightened vigilance under responsible engineering standards, public policy, and common sense. This distinction—between low-probability events and high-consequence failures—is precisely why a flight simulator game requires fundamentally different governance from an actual aircraft control system. In risk governance, the obligation is not triggered by frequency alone, but by the scale of harm that could result if safeguards fail.

159. For comparison at Bank of America—a private institution where Plaintiff formerly worked—even far less risky AI models require million-dollar governance investments to meet internal policy and public accountability standards. For example, an AI model of significantly lower risk than Stormbreaker would undergo: independent analysis by a team of approximately ten Senior Quantitative Analysts (Plaintiff's qualification level); dedicated for three months; generating approximately 200+ pages of quantitative model documentation; another 150+ pages of narrative risk analysis; an extensive testing regime (especially for agent simulations like Stormbreaker); and an ongoing independent team charged with implementing quarterly model risk reviews. Bank of America would require all this to occur using minimal information and interaction with model developers.

160. The level of risk governance required for Stormbreaker would have necessitated a substantial realignment of project resources and budget, potentially exposing prior mismanagement and undermining existing timelines. This financial and reputational exposure created a strong incentive to suppress Plaintiff's disclosures.

161.    Plaintiff's background included model risk oversight at Fortune 100 financial institutions, mission critical defense systems, and intelligence roles. To Plaintiff's knowledge, he was the only individual qualified to conduct such oversight, and no time or funding was allocated or planned for either internal or independent external validation.

162.    In its defense, Stormbreaker may cite intentions for Red Team testing. For example, in his LinkedIn profile, Stormbreaker's Lead Product Designer P.L. describes creating *"multiple COAs (Course of Action) and ECOAs (Enemy Course of Action) to test, tune and validate the wargame system."* However, these activities fundamentally conflate red-team testing of game *playability*—in an entertainment or simulation sense—with the rigorous scientific validation required to assess the real-world accuracy and trustworthiness of predictive model outputs against actual ground truth. In national security contexts, these metrics are essential and non-negotiable: without validated, ground-truth-aligned outputs, no AI system should be used for operational decision-making.

163.    This distinction is critical. Red Teaming (adversarial testing) of a wargame is akin to testing a game of Monopoly for robust 'playability' across different scenarios—it assesses internal consistency and resilience to inputs, but does not and cannot validate whether the game accurately forecasts real-world economic outcomes. Stormbreaker's marketing materials, by contrast, repeatedly present Stormbreaker as an AI-enabled decision support system with claims of improved accuracy, fidelity, and confidence—asserting a level of analytically sound, real-world forecasting that red-teaming cannot measure. Red teaming cannot substitute for independent verification and validation (IV&V) processes required by DoD Instruction 5000.61 or numerous public policy AI frameworks like NIST.

164.    This risk is not theoretical. Recent public criticism of the U.S. Marine Corps' Force Design 2030 program offers a high-profile example of how wargames, when unvalidated or manipulated, can mislead decision-makers and produce national-level strategic consequences. Lieutenant General Paul Van Riper, a highly decorated combat development commander, has criticized the Force Design wargames for ignoring core operational functions such as logistics and command and control—despite being used to justify the divestment of entire weapons platforms and force structures. A subsequent report cited whistleblowers describing pressure to manipulate outcomes to match leadership's desired reforms. This incident reveals how wargames, when not scientifically validated, can become tools of confirmation bias—serving narrative alignment rather than truth-seeking. The risks are magnified when wargaming systems, like Stormbreaker, are advertised as "AI-enabled" without meeting any meaningful standard of model testing, documentation, or auditability. Public trust in AI-assisted defense decision-making cannot be sustained on "games" presented as validated planning systems.

165.    The long and complex history of wargaming underscores why scientific validation and transparency are essential. When Prussian Lieutenant Georg Heinrich von Reisswitz introduced a new type of map-based military wargame in 1824, the chief of staff declared, *"It's not a game at all—it's training for war."* That tool evolved into a powerful military planning instrument—but only when grounded in realism and rigor. Today, however, the cultural memory of that legitimacy is often misused. As critics of the Marine Corps' Force Design 2030 program have pointed out, wargames were invoked to justify wide-reaching structural changes—such as the elimination of tanks and artillery—without testing all seven warfighting functions, including logistics and command and control. Former senior officers have described how assumptions were hardcoded into games, concerns were suppressed, and game outputs were "massaged" to support

already-made decisions. The consequences: equipment divestments, force restructuring, and budgetary reallocations, all based on a fundamentally flawed analytical process.

166.    This example—an entire service branch restructured based on unvalidated or manipulated wargame results—reveals the dangers of confusing "decision support" with "decision justification." Wargames, especially when labeled as "AI-enabled," must not be used as opaque tools to reinforce preferred outcomes. As several wargaming experts have noted, these exercises cannot predict outcomes, replicate the complexity of conflict, or stand in for empirical model validation. Their utility lies in insight generation and structured learning—not in outcome substitution. When used improperly, they can become mechanisms for policy laundering. Stormbreaker's advertising as an "AI-enabled planning and decision-making tool" that will increase fidelity and reduce decision-making time is deeply concerning in this context. Without validated models, transparent assumptions, and independent oversight, such tools present a false veneer of analytical legitimacy—and expose military decision-making to concealed risks with potentially catastrophic real-world consequences.

167.    Without formal validation, calibration, or error measurement, Stormbreaker could not credibly support strategic or operational planning. Lacking meaningful AI governance, it functioned more as an unverified simulator than a legitimate decision aid—no more reliable than guesswork and suitable only for entertainment purposes. This resemblance was not accidental: Stormbreaker's core engineering team included former Microsoft game developers, and its behavioral logic and adjudication engine reflected aesthetic priorities typical of commercial entertainment rather than the rigor demanded by warfighting applications. Notably, the program's lead developer held the title *"Principal Creative Director,"* a role more aligned with

game studios than military systems—underscoring a design philosophy focused on interface and appearance over empirically validated engineering.

168.    Stormbreaker was publicly described by both PACOM and SMX as an AI-enabled predictive modeling platform designed to enhance fidelity, accuracy, and confidence for commanders in future conflict scenarios. Even if Defendants now attempt to characterize it merely as an exploratory or entertainment-level wargaming tool, the critical fact remains: Plaintiff's expert concerns—grounded in over 35 years of mission-critical experience with real-world AI modeling—were dismissed, silenced, and never addressed.

169.    Over the course of Plaintiff's seven-month tenure, not a single meeting was convened to evaluate the system's AI risk, model governance requirements, or potential failure modes—and Plaintiff was openly disparaged and ridiculed for raising such concerns. Although Plaintiff was recruited into the Stormbreaker leadership team, he was never afforded a peer-level opportunity to engage in substantive discussion of model risk with technical leads or decision-makers. This pattern of marginalization and suppression not only undermined responsible AI governance, but also laid the groundwork for the retaliatory acts that followed.

170.    Historical engineering failures underscore the systemic public dangers that arise when predictive systems are deployed without rigorous validation—treated as marketing showcases or interactive toys rather than mission-critical tools. Like the MCAS failure in the Boeing 737 MAX, Stormbreaker's unvalidated model logic risks producing real-time operational errors that cannot be intercepted or corrected by human oversight alone. In high-stakes military scenarios, such failures could result in irreversible battlefield outcomes, including unnecessary loss of life and uncontrolled escalation.

171.    Stormbreaker fits this pattern precisely—it was unvalidated, misrepresented, and deployed without a rigorous model governance framework, despite Plaintiff's repeated protected disclosures. Plaintiff's warnings were not speculative: they were grounded in engineering ethics, regulatory standards, and painful historical lessons that have consistently shown how dismissing model risk leads not just to technical failure, but to public harm and preventable catastrophe.

172.    Stormbreaker's most dangerous failure modes include unintended conflict escalation scenarios—including nuclear escalation—with catastrophic consequences for military and civilian populations, environmental systems, and national security. These public consequences are not hypothetical: they reflect plausible system failure trajectories acknowledged in the literature. That such a system might inform operational plans in real-time without any meaningful safeguard is not a theoretical risk—it constitutes an ongoing threat to national security that CEPA was enacted to allow employees like Plaintiff to safely report.

173.    Plaintiff anticipates calling expert witnesses with direct involvement in the development of the NIST AI Risk Management Framework and other federal AI governance initiatives, including former military personnel with operational war planning and modeling experience. These experts will testify that Plaintiff's disclosures were consistent with emerging national standards for responsible AI deployment in high-risk domains. They will also draw comparisons between Defendants' suppression of Plaintiff's warnings and established organizational failure patterns from prior engineering disasters—including the Boeing 737 MAX and Deepwater Horizon—where internal risk signals were similarly ignored, resulting in catastrophic consequences.

174.    Plaintiff's disclosures were grounded in factual, technical, and professional assessment—not speculative opinion—and were made pursuant to his ethical duty as an AI risk expert, consistent with the professional standards of the IEEE and Simulationist Codes of Ethics.

175.    These disclosures satisfy the statutory protections of CEPA § 34:19-3(a)(1) (refusal to participate in unlawful conduct) and § 34:19-3(c) (objections to conduct incompatible with clear mandates of public policy concerning health, safety, or national security). They also align with the broader standards of professional integrity and public interest recognized in Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980).

176.    That these disclosures were met with hostility and retaliation, rather than institutional accountability, underscores the need for judicial enforcement of CEPA's core protections.

## I. Public Policy Requirements for Safe, Reliable Engineering and AI Systems in Defense

177.    In addition to engineering ethics and national security consequences, Plaintiff's objections were rooted in explicit federal procurement and safety mandates, among them:

- **DoD Instruction 5000.61**: Mandates verification, validation, and accreditation (V&V&A) for any model or simulation supporting DoD decisions;

- **FAR 46.407(c)**: Requires rejection of unsafe or nonconforming systems unless confirmed "safe to use" by technical experts;

- **DFARS 252.246-7003**: Requires prompt disclosure of any design or quality issue that could impact safety;

- **MIL-STD-882E**: Requires formal safety engineering and hazard mitigation on all DoD systems, including modeling and simulation;

- **DoD Directive 5000.01**: Requires test and evaluation to confirm systems are safe, reliable, and suitable for operational use.

178.     Of particular relevance is **DoD Instruction 5000.61** which establishes that any *"Models, simulations, distributed simulations, and associated data used to support DoD processes, products, and decisions [must] undergo verification and validation (V&V) throughout their life cycles [and be] accredited for a specific or intended use."* The rigor of V&V is to be scaled to the importance and risk of the model's application, and documentation of V&V results is required. This policy is directly applicable to Stormbreaker's "AI" which—at its core—involved modeling and simulation. DoD policy prohibits deploying such systems in operational settings without proper V&V. Plaintiff's insistence on AI model governance, particularly regarding testing and validation, aligned precisely with this requirement.

179.     These requirements confirm that Plaintiff's objections—including the deployment of an unvalidated AI model in Stormbreaker—were not speculative, but rooted in clear mandates of public policy as embodied in DoD safety protocols and federal contracting obligations.

## III. PROTECTED DISCLOSURE: PREDICATE FCA AND GROSS MISMANAGEMENT

### A. December 13—Stormbreaker IOC Announcement

180.     Meanwhile, SMX and PACOM continued to market Stormbreaker publicly as "AI-enabled," touting improvements in fidelity, confidence, and accuracy for war planning—while internally disregarding Plaintiff's AI model risk concerns. Despite multiple protected disclosures, Defendants allocated no time or resources to engage with Plaintiff's escalating safety warnings.

181.    On November 9, 2023, Plaintiff met with Defendants Marotta and Ream in a SCIF at Camp Smith, prepared to provide a detailed expansion of his earlier protected disclosures, including multiple AI model risks grounded in engineering principles, public policy, and classified context. The outcome of this meeting will be detailed in later sections. In summary, Plaintiff's efforts to convey these warnings were met with hostility and willful ignorance; no risk mitigation was undertaken, and the only organizational response was retaliation.

182.    On December 11, 2023, Plaintiff sent an email to a broader distribution list that included Defendants Marotta, Ream and PACOM official ND. As a federal civilian executive branch official, ND qualifies as a "public body" under CEPA § 34:19-2(c). In this email Plaintiff made several weighty protected disclosures about AI model risk and referred to his earlier November 9 disclosures. Nobody, neither PACOM official ND nor any SMX personnel, responded to the email or to Plaintiff's offer to provide additional details in a classified setting— suggesting a coordinated non-response between SMX and PACOM.

183.    Even as Defendants marginalized and retaliated against Plaintiff internally, they accelerated Stormbreaker's public readiness narrative, declaring Initial Operational Capability (IOC) despite the unresolved AI model risks Plaintiff had raised.

184.    In a press release dated December 13, 2023, PACOM formally announced that Stormbreaker had achieved Initial Operational Capability (IOC). Stormbreaker was described as *"... an Artificial Intelligence (AI)-enabled Joint Operational Planning Toolkit (JOPT) to support planning, wargaming, analysis, and execution of multi-domain, operational-level Course of Action (COA) development."* IOC typically refers to the point when a new system is ready for real-world deployment.

185.     PACOM's announcement strongly implied that AI capabilities had been deployed and validated. However, Plaintiff was unaware of the IOC announcement for several months after his termination from SMX, and while at SMX was unaware of any documented AI model testing leading up to the December IOC announcement. Upon information and belief, no independent AI model risk review—consistent with EO 14110, NIST AI RMF, DoD Instruction 5000.61 or other guidelines—had occurred and core components—such as agent behavior, adjudication logic, and simulation—remained incomplete and under development for at least a month, and likely much longer, beyond the December 2023 IOC announcement.

186.     The December 2023 IOC announcement—jointly issued by PACOM and the Defense Innovation Unit (DIU)—appears inconsistent with DIU's own Responsible AI Deployment Guidelines, which require formal testing, validation, and mission-alignment prior to fielding AI systems. Plaintiff's warnings (October 26 and 30) specifically cautioned against misrepresenting Stormbreaker's AI readiness to DIU or CDAO. The IOC declaration ignored those warnings and instead advanced exactly the kind of deceptive claims Plaintiff had tried to prevent.

187.     Plaintiff repeatedly warned SMX and PACOM that Stormbreaker lacked predictive validation, posed escalation risks, and failed to meet even basic AI safety standards. Declaring Initial Operational Capability (IOC) under these conditions falsely signaled to stakeholders that the system had undergone appropriate validation and could be trusted for operational use, despite clear internal objections to the contrary. This conduct may constitute not only gross negligence but criminal recklessness—particularly given the foreseeable risks to public health, safety, the environment, and national security

188.    This pattern of conduct closely parallels other high-profile failures in which institutions ignored internal warnings with devastating results. Boeing executives certified the 737 MAX despite known software flaws; Michigan officials enabled the Flint Water Crisis despite clear contamination data; and BP leadership disregarded safety concerns before the Deepwater Horizon explosion. In each case, decision-makers bypassed foreseeable, preventable risks—with catastrophic consequences.

189.    As their defense, Defendants may claim that human oversight was sufficient to mitigate Stormbreaker's AI risks. This rationale is contradicted by real-world incidents and published safety research. In 2018, an autonomous Uber vehicle—with a human safety driver present—struck and killed a pedestrian, illustrating that humans often fail to intervene in time. Likewise, the Chernobyl disaster involved human operators who misunderstood automated system logic, contributing to catastrophic failure. These examples demonstrate that rigorous, independent AI validation—grounded in engineering standards such as the NIST Risk Management Framework—is indispensable. Human oversight is neither a universal substitute for model risk governance nor a legally defensible failsafe against negligent, reckless, or fraudulent AI system design and deployment.

190.    Plaintiff's concerns were neither hypothetical nor speculative. Courts have imposed liability for foreseeable harm even where it had not yet materialized, and federal regulators—including the FAA, DOJ, and FTC—have pursued enforcement actions in precisely such circumstances. Declaring IOC without model validation, despite detailed warnings from a subject matter expert, without adhering to DoD Instructions such as 5000.61, created a clear and actionable danger, warranting punitive damages and civil accountability.

191.    In sum, the December 2023 IOC announcement—made in defiance of Plaintiff's protected disclosures and in the absence of basic AI governance—raises serious questions under the False Claims Act, including whether Defendants knowingly presented false or misleading claims to obtain government support, funding, or endorsement. By pushing forward with IOC—over expert objection, without validation, and in disregard of formal guidance, Defendants acted with gross mismanagement and reckless disregard for national security obligations. This establishes a clear predicate for CEPA and *Pierce*-based whistleblower protections.

B. Defendants' Strategic Manipulation of "AI" Semantics

192.    In January 2024, SMX hosted a Stormbreaker demonstration for a senior defense official. Defendants made numerous deceptive claims about the system's current and future AI capabilities. Important guest questions seeking to uncover actual AI capabilities were either deflected or inaccurately answered. The presentation featured staged demonstrations of Stormbreaker's AI modeling and simulation functionality and failed to disclose any of the unresolved model risks previously raised by Plaintiff, including the absence of testing for realistic predictive outputs. This event exemplifies the pattern of misrepresentation that divorced public posture from internal engineering reality.

193.    Stormbreaker's "AI-enabled" claims at this event mirrored—and further complicated—discrepancies between the system's internal functionality and the representations made to various funding authorities, and raised further concerns about intentional misrepresentation of AI capabilities and concerns of procurement fraud, for example both of the following claims are at odds with the reality observed by Plaintiff:

- **Committee on Armed Services House of Representatives (hearings held March 9, 2022)**: *"Stormbreaker will support this effort by generating synthetic data in support of machine learning [ML]."*

- **National Defense Authorization Act (2022)**: *"Seize the Initiative"* describes Stormbreaker as: *"AI-enabled planning and Wargaming [...] by artificial intelligence, machine learning, and 5G technology."*

194. In March 2024, Plaintiff was terminated under the pretext that PACOM had decided to "scale back" Stormbreaker's AI functionality, rendering his expertise unnecessary. Yet just weeks earlier, SMX had hired personnel with similar AI/ML skill sets and continued to do so after Plaintiff's termination. In late March 2024, PACOM issued public statements further expanding its AI claims for Stormbreaker—directly contradicting Defendants' justification for Plaintiff's dismissal and further supporting the inference that "AI" was strategically defined to fit whichever narrative best suited Defendants' current objective. Even more striking, back in December 2023, Stormbreaker had been publicly declared "AI-enabled" at Initial Operational Capability (IOC). This contradiction—portraying AI as simultaneously present, future, optional, abandoned, or irrelevant depending on audience—exemplifies the strategic use of semantics to mislead both stakeholders and regulators.

195. This semantic inconsistency surrounding the term "AI-enabled" is not mere academic confusion; it lies at the material core of a deliberate deception designed to suppress Plaintiff's protected disclosures, justify premature IOC declaration, evade accountability for AI misrepresentations, and enable wrongful termination—all while maintaining the outward appearance of program success. By strategically shifting the internal definition of "AI,"

Defendants were able to placate internal skepticism, secure external marketing and funding, and neutralize dissent—including Plaintiff's.

196. If Stormbreaker truly achieved Initial Operational Capability (IOC) without core AI functions such as unit behavior, adjudication, or predictive simulation, then the IOC declaration misrepresented the system's actual readiness. Conversely, if such features were present but deployed without the AI model risk governance procedures advocated by Plaintiff, the result was a dangerous and noncompliant system. Plaintiff believes the most likely scenario is that Stormbreaker's core AI components were nonfunctional and untested at the time of IOC— meaning the public declaration that the system was "AI-enabled" may constitute a material misrepresentation under the False Claims Act and further reinforce Plaintiff's claims of fraudulent inducement, procurement misconduct, and retaliatory termination.

197. Throughout Plaintiff's tenure, Defendants frequently shifted the definition of "AI" to fit their agenda. Internally, they minimized Stormbreaker's AI features when confronted with risk concerns, dismissing Plaintiff's warnings as inapplicable or premature. Externally, however, they touted Stormbreaker as "AI-enabled" in official documents, hiring advertisements, and public press releases. This semantic double standard enabled Defendants to misrepresent compliance externally while ignoring governance obligations internally—a strategy that suppressed valid concerns and laid the groundwork for Plaintiff's eventual retaliation—all while continuing to court funding and public credibility based on claims Defendants internally disavowed.

198. Stormbreaker's modeling and simulation team was primarily staffed by former Microsoft game developers, all of whom—subject to discovery—appear to lack experience in real-world AI/ML predictive modeling or model risk governance, particularly in defense

applications. Despite this, these individuals were tasked with developing Stormbreaker's core predictive "AI" components. This reflects a significant shift in the meaning of "AI": in entertainment contexts, AI performance is measured by user experience or gameplay immersion, whereas in defense, AI must meet rigorous standards of predictive accuracy, validation, and safety. Conflating these distinct definitions enabled Defendants to claim AI capabilities while bypassing the governance obligations imposed by engineering standards and public policy.

199.    Discovery is expected to reveal that Defendants applied contradictory definitions of "AI" depending on purpose: to secure funding, Stormbreaker was presented as already "AI-enabled"; to evade accountability, AI was described as non-operational; to justify Plaintiff's termination, it was rebranded as an abandoned future feature; to promote public image, it remained a core capability; and to claim delivery milestones and report project success, they again invoked the term "AI-enabled." This strategic inconsistency enabled retaliation against Plaintiff while shielding Defendants from oversight.

200.    Defendants' conduct mirrors the deceptive practices targeted by the Federal Trade Commission in its "Operation AI Comply" initiative—a regulatory crackdown on inflated or unsubstantiated AI marketing claims. In enforcement actions like *DoNotPay* and *Ecommerce Empire Builders*, the FTC penalized companies that exaggerated or fabricated AI functionality to mislead consumers, investors, or regulators. Similarly, Defendants invoked "AI-enabled" capabilities to justify program funding, obtain hiring approvals, and represent Stormbreaker as operationally ready—despite knowing that its core AI components were either unvalidated or nonfunctional. These semantic manipulations were not peripheral—they were central to the misconduct Plaintiff sought to disclose and for which he was retaliated against.

201.    Even if no intent is ultimately proven under the False Claims Act, these facts strongly support Plaintiff's allegations of gross mismanagement. Stormbreaker was either marketed through material misrepresentation or deployed with reckless disregard for known safety risks—both of which validate Plaintiff's protected disclosures and his concern for public safety.

202.    Finally, Plaintiff reasonably suspects procurement misconduct surrounding SMX's acquisition of the Stormbreaker contract. After Microsoft's prior contract was terminated under opaque circumstances, SMX inherited the work and rehired many of the same individuals—without a clear re-competition process. SMX's proposals may have contained inflated representations of AI capabilities and staff expertise—including recycled personnel from the Microsoft team—raising additional concerns about procurement integrity and possible misrepresentation to federal evaluators, for example regarding staff qualifications and prior program performance. According to publicly available employment data (social media), Stormbreaker appears to have been cancelled a second time, in 2024 or 2025—the second time the program has failed to complete as intended. This recurring failure underscores the accuracy and professional credibility of Plaintiff's August–December 2023 warnings, which were both timely and undeserving of retaliation.

203.    Viewed in totality, Plaintiff observed numerous anomalies surrounding Stormbreaker's "AI-enabled" designation—including material misstatements about predictive fidelity, the absence of model validation, concealment of Plaintiff's risk warnings, refusal to implement any governance framework, and the IOC declaration itself—all of which are best explained by a deliberate semantic shift in the meaning of "AI." These anomalies cannot be dismissed as mere oversight or definitional ambiguity. Taken together, they point to one of three

possible realities: procurement fraud, gross mismanagement, or a coordinated effort to suppress and conceal unlawful retaliation.

204.     These concerns were not hypothetical or abstract. On November 9, 2023, during the SCIF meeting at PACOM Headquarters, Plaintiff explicitly warned Defendants Marotta and Ream that Stormbreaker was *"not fit for purpose"* due to unresolved AI validation issues and misleading public representations of the system's readiness. Believing at the time that the issue may have been a lack of technical comprehension, Plaintiff attempted to educate Defendants on fundamental modeling concepts—including ground truth, objective function, and error metrics—in order to halt the "definitional sleight-of-hand" in how Stormbreaker's AI capabilities were being framed.

205.     By February 2024, Plaintiff had concluded that the problem was not lack of understanding, but willful ignorance—a deliberate refusal by Defendants to engage with the topic of AI model risk. For example, Plaintiff proposed to speak on AI model risk and governance at 2024's first Technical Exchange Meeting (TEM), but he was deliberately excluded from both in-person and remote access. Even the agenda of the TEM was hidden from Plaintiff despite the meeting's direct relevance to his expertise and the protected concerns he had repeatedly raised.

206.     On February 21 and again on February 23, 2024, Plaintiff contacted the Department of Defense Inspector General hotline to report his belief that Stormbreaker's deficiencies—including unvalidated AI systems and inflated claims—could constitute violations of the False Claims Act. He also described a growing pattern of retaliation following his earlier disclosures. Despite Defendant Ream's assurances on February 20 that several issues would be

addressed, Plaintiff was terminated less than two weeks after his calls to the DOD IG hotline—strongly suggesting a proximate connection.

207. These communications to the DOD IG are explicitly protected activities under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3(a)(2). Even if SMX was not aware of these specific reports at the time of Plaintiff's termination, the calls reinforce the overall pattern of protected whistleblowing activity and further validate Plaintiff's reasonable belief that fraud, mismanagement, and safety violations were occurring.

## C. Second Cancelation of Stormbreaker Indicates Serious Procurement Failures

208. Publicly available social media updates (e.g., LinkedIn) from 2024 suggest that Stormbreaker's second incarnation—now under SMX—was prematurely cancelled, under circumstances that may mirror the earlier termination of Stormbreaker's original Microsoft-led version.

209. Defendants will likely characterize the SMX phase as a successful deployment of an "AI-enabled" capability by exploiting the semantic ambiguity for misrepresenting "AI" that Plaintiff previously objected to, for example in his October 26, 2023, email.

210. However, termination of Stormbreaker in 2024 would directly contradict Defendants' pre-hire representations to Plaintiff , these include: (i) assertions of long-term funding, including an already approved FY2024 budget; (ii) a two-year retention bonus offered to Plaintiff, indicating an expected Stormbreaker project duration through at least August 2025; and (iii) SMX's investment in constructing a dedicated SCIF for Stormbreaker—an expenditure only rational for a sustained, multi-year effort.

211. Contemporaneous PACOM documents confirm that funding for the *"AI-enabled"* Stormbreaker was approved in FY2024. Another publicly available PACOM publication

identifies a $94 million allocation for Stormbreaker through FY2027, intended to support *"AI-enabled planning and wargaming [...] by artificial intelligence, machine learning, and 5G technology."* While this specific document it is not clear whether funding was fully approved, as Marotta implied, the publication demonstrates clear intention that Stormbreaker would be a long-term initiative. Together, these documents corroborate the funding assurances given to Plaintiff by Defendant Marotta during recruitment. Accordingly, if Stormbreaker was scaled back or canceled in early 2024, that decision was clearly premature—and signals a second program failure, consistent with the technical and ethical concerns Plaintiff raised from the outset.

212.    Plaintiff believes that discovery will confirm Stormbreaker was again terminated before fulfilling its claimed AI-enabled objectives—indicating systemic procurement failure, possible violations of the False Claims Act, and, at a minimum, gross mismanagement. If confirmed, this second premature cancellation would substantially vindicate Plaintiff's protected disclosures regarding AI model risk, semantic misrepresentation, and underlying technical and ethical deficiencies.

## D. Constructive Fraud, Procurement Misrepresentation, and PACOM's De Facto Control

213.    Overview. The following section sets forth Plaintiff's post-termination discovery (May 2025) that Stormbreaker may never have existed as a formal contractual deliverable. Instead, it appears to have been a loosely defined initiative embedded in an omnibus labor contract with no Statement of Work, no defined system requirements, and no mechanism for technical validation or government acceptance. This section explains how that ambiguity materially misled Plaintiff, enabled retaliation, and supports claims of constructive fraud, CEPA liability, and potential False Claims Act exposure.

214.    Plaintiff affirms that he has no direct access to SMX's contracting documents or internal representations to federal agencies. The observations in this section are based solely on post-termination investigation of publicly accessible records (e.g., FPDS, SAM.gov, USASpending.gov), and are presented upon information and belief. The Stormbreaker contract is the subject of a PACOM FOIA request, but as of May 2025 has not been received. Plaintiff expects to amend this section upon receipt of responsive FOIA records or discovery materials clarifying Stormbreaker's contractual structure.

215.    Upon closer inspection of public contract databases, federal budget justifications, and procurement archives—including FPDS, SAM.gov, and USASpending.gov—Plaintiff has discovered post-termination (May 2025) that no standalone federal contract or task order for the "Stormbreaker" program appears to exist. Specifically, no record of a contract award naming Stormbreaker as a deliverable system, no program element code assigned to Stormbreaker in the RDT&E or Procurement portfolios, and no evidence of a government-issued Statement of Work (SOW), specification document, or delivery milestone plan that would typically accompany a formal acquisition program could be located.

216.    Instead, it now appears that Stormbreaker may have been embedded as an internal sub-project under a broad indefinite-delivery/indefinite-quantity (IDIQ) contracting vehicle— most likely the Alliant 2 GWAC contract #47QTCK18D0007 held by Smartronix, LLC (SMX). SMX's services were procured through omnibus task orders supporting INDOPACOM's headquarters and operational initiatives, under budget activity code 1CCM (Combatant Commander's Direct Mission Support). Funding for Stormbreaker was likely funneled through O&M accounts earmarked for "AI-enabled planning and wargaming tools" or "wargaming

analytical capabilities," but no formal award, line item, or contracting vehicle publicly links that funding to a defined set of deliverables.

217.    This structural ambiguity is materially significant for Plaintiff's claims. During his employment, Plaintiff repeatedly attempted to identify the official specifications, delivery expectations, or validated performance metrics governing Stormbreaker. On September 14, 2023, as a new employee orientating himself to the project, he had emailed Defendant Marotta and Sikorsky asking for documentation such as *"functionality and deliverable milestones"* and *"description of the deliverable that is expected in January"* and was directed to an online document repository where he was still unable to find this fundamental project information. At no time did Marotta or anyone else correct his understanding by saying that there was no defined deliverable, specifications, or requirements.

218.    In October 2023, Defendant Marotta instructed Plaintiff to produce a "vulnerabilities" report (on October 26), subsequently referring to it as a "gap" report (on October 30). Completing such a task inherently requires clear product specifications or documented performance requirements, yet Defendants failed to provide these fundamental documents. Similarly, the declaration of Initial Operating Capability (IOC) necessarily depends upon predefined requirements or acceptance criteria. Without clear, predefined conditions, declaring IOC is essentially meaningless, as it lacks any objective standard and could be declared arbitrarily at any time. The lack of defined product specifications or documented testing requirements suggests not merely an oversight, but rather a deliberate omission that rendered meaningful validation and accountability impossible.

219.    Additionally, the core technical foundation of AI/ML systems is the use of an "objective function"—a precisely defined criterion that measures how accurate or effective the

system's predictions are for given inputs. Without explicit performance specifications or clearly defined requirements, it becomes fundamentally impossible for Stormbreaker to meaningfully claim an AI-enabled capability. Stated differently, without a defined objective function or clear success criteria, any representation of Stormbreaker as "AI-enabled" would lack technical validity, rendering such a claim fundamentally misleading or fraudulent.

220.    Plaintiff's inability to locate any such documentation was not due to oversight or lack of diligence—it now appears such documents did not exist at all. The absence of these foundational documents is consistent with a program constructed more as a marketing façade than as a formal acquisition. Defendants referred to Stormbreaker as an *"AI-enabled planning and wargaming capability,"* yet failed to provide any written articulation of what that capability entailed, how it would be measured, or what its functional safety requirements were.

221.    In this context, Plaintiff's repeated objections to the absence of AI model validation, risk governance, and oversight take on added legal weight. He was not objecting to technical shortfalls within a lawful contract execution—he was disclosing what now appears to be a case of constructive fraud: the presentation of Stormbreaker as a government deliverable, while internally avoiding all the procedural and technical obligations that such a deliverable would require. This includes failure to define system requirements, failure to conduct independent verification and validation, and failure to document AI model testing—all in violation of DoD Instruction 5000.61, EO 14110, and other procurement and safety mandates.

222.    In addition to the lack of formal contracting documentation, Plaintiff was personally misled about the nature of the Stormbreaker project. During recruitment and initial onboarding, Plaintiff was told that Stormbreaker was governed by an internal leadership team, was supported by a formal contract previously held by Microsoft, and operated under typical

defense program expectations. These representations induced Plaintiff to accept the position under the belief—based on information and belief now supported by subsequent research— that Stormbreaker was a formally governed DoD software acquisition effort. In reality, it appears Stormbreaker lacked formal requirements, test plans, or defined delivery milestones. Plaintiff's conviction that Stormbreaker required responsible AI governance was not only grounded in public risk concerns—it was shaped directly by Defendants' own misrepresentations regarding the system's maturity, structure, and compliance. Those same misrepresentations later enabled Defendants to declare Initial Operational Capability (IOC) without any meaningful validation, oversight, or delivery testing—misleading both internal personnel and external stakeholders.

223.    The misrepresentation extended beyond technical management to contractual and fiscal representations. Public-facing statements by PACOM, SMX, and the Defense Innovation Unit described Stormbreaker as an active deliverable under development, with Initial Operational Capability (IOC) declared on December 13, 2023. Yet if no formal contract governed that deliverable, the IOC declaration was materially misleading. It falsely implied compliance with DoD requirements for system fielding—including successful testing, acceptance, and contractual verification—none of which were documented or disclosed to Plaintiff during his tenure.

224.    Defendants may argue that the government agency involved was satisfied with Stormbreaker's performance. However, under well-established procurement law and whistleblower protection standards, subjective agency satisfaction does not excuse the absence of defined deliverables, objective validation, or compliance with applicable safety and acquisition requirements. The legal standard is not whether PACOM was content with the outcome, but whether SMX's representations and performance complied with federal expectations, avoided material misrepresentation, and ensured the responsible use of AI in national security operations.

225.    SMX's public marketing materials—including a brochure publicly available as of June 2025—described Stormbreaker as a *"DoD wide advanced technology… poised to deliver an operational solution."* These materials state that SMX was partnered with PACOM to *"deliver a DoD wide advanced technology, AI/ML enabled planning and decision-making tool."* However, Plaintiff's firsthand experience, corroborated by public contract databases and post-termination research, confirms that no formal deliverable was defined, no specification existed, and no validated outputs were governed by contract or technical baseline. This contradiction further supports Plaintiff's allegations of constructive fraud, procurement misrepresentation, and the retaliatory suppression of engineering integrity in a program that was marketed as a deliverable solution but operated as an ungoverned prototype without safeguards.

226.    Upon information and belief, SMX's public marketing claims—unbacked by any formal deliverable, specification, or testing documentation—may also constitute materially deceptive AI marketing under the Federal Trade Commission's *"Operation AI Comply"* initiative, which targets exaggerated or unsubstantiated claims of AI functionality. SMX's characterization of Stormbreaker as *"poised to deliver an operational solution that exceeds industry standards for deployment timeline and user integration"* and *"STORMBREAKER will drastically reduce the time from plan inception to decision-making while simultaneously increasing the fidelity, accuracy, and number of high-confidence [decisions]"* when no such deliverable, objective performance metrics, or validation methodology existed or was planned.

227.    For example, in the consumer products domain, if a company claimed that a product *"… will drastically reduce your decision-making time while increasing your accuracy"* it would be treated under FTC advertising standards as a factual cognitive performance claim that implies a measurable functional benefit. Such claims require substantiation through

controlled studies or clinical evidence. In defense contexts, this evidentiary standard is mirrored by DoD Instruction 5000.61, which mandates independent verification and validation for models used in acquisition, planning, and operational decision-making. SMX's Stormbreaker claims appear to meet multiple red-flag criteria outlined in FTC guidance and recent enforcement actions.

228.    Plaintiff was hired into a leadership role described as having a significant impact on Stormbreaker's AI deliverables, but the absence of any formal Statement of Work or government contract governing the program means that his actual status may have been closer to that of a general-purpose staff augmentation contractor, not a team member executing a defined technical mission. This apparent reality was concealed by Defendants and only came into focus after Plaintiff's termination and during Plaintiff's pro se research for this claim upon investigating the federal budget and contract record (May 2025). If true, this suggests that Stormbreaker was a construct of convenience—it may have been used to secure funding and sustain program credibility while avoiding contractual oversight and evading the legal obligations of a government acquisition program.

229.    Accordingly, the Stormbreaker program may have functioned as a vehicle for constructive fraud and procurement misrepresentation—supported by ambiguous internal documentation, inflated external claims, and the retaliatory suppression of subject matter experts like Plaintiff who attempted to clarify its actual status. Discovery is expected to confirm that no formal contract existed between the government and SMX (or any other party) to deliver a product called Stormbreaker, and that the $22 million in FY23 appropriated under that name was executed without the standard accountability mechanisms applicable to major defense deliverables.

230.    This structural reality also implicates the question of retaliatory agency. If SMX lacked substantive design authority over Stormbreaker's requirements, funding allocations, or safety governance—and acted primarily as a labor supplier—then effective control over the project, its scope, and Plaintiff's role rested with PACOM. Plaintiff's disclosures were accordingly directed at deficiencies within what was, in practice, a government-led initiative. To confirm the structure and accountability of Stormbreaker, Plaintiff submitted a FOIA request to PACOM seeking the underlying contract. Despite that request fitting the definition of a 'simple' request that should be prioritized, PACOM has failed to produce any responsive records as of the date of filing. This delay strongly suggests that either no formal contract governing Stormbreaker's system-level design or deliverables exists, or that disclosure would reveal substantial procurement irregularities. While Plaintiff had sufficient facts to file a narrow CEPA claim against SMX, the absence of a discoverable contract—and PACOM's continued withholding of that document—materially impaired Plaintiff's ability to identify the correct agency relationships, name the appropriate individual defendants, and confirm the structural misrepresentation at the heart of this action. Plaintiff exercised reasonable diligence by timely pursuing FOIA channels, and any delay in filing this broader claim was the result of the government's failure to disclose foundational contracting information. Plaintiff seeks equitable tolling only to preserve claims against individual and potentially immunized actors whose conduct and agency roles were effectively concealed by this irregularity

231.    Accordingly, upon information and belief, any subsequent retaliation, including the December 13 demotion ("orphaning") and March 6, 2024, termination following PACOM's "Lack of Work" order, must be understood as retaliation by PACOM itself. SMX's participation in this retaliation—by implementing the LOW, concealing the absence of specifications, and

affirmatively misleading Plaintiff regarding his program authority—renders it complicit in PACOM's unlawful actions. SMX cannot invoke the LOW order as a defense while simultaneously disclaiming knowledge or control over the program that generated it. These facts further reinforce the predicate for CEPA liability and rebut any assertion that PACOM acted as a neutral third party.

232.    This absence of contractual governance further validates Plaintiff's protected disclosures and reinforces the predicate for False Claims Act investigation, CEPA retaliation claims, and independent review of PACOM's procurement and oversight practices.  The gap between SMX's public representations and the underlying contractual reality only came into focus after Plaintiff's termination, and underscores the importance of whistleblower protections in environments where systemic misrepresentation is obscured by ambiguous contracting structures.

233.    The structural irregularities in Stormbreaker's development not only created a retaliatory environment for Plaintiff—they also compromised national security oversight, squandered appropriated funds, and exposed the public to unjustified risk. Defendants' decision to suppress, marginalize, and terminate the one subject matter expert who attempted to apply AI model risk governance represents a textbook case of how constructive fraud metastasizes into retaliation. The gravity of these failures—and their concealment beneath semantic ambiguity and marketing misdirection—justifies not only CEPA liability, but regulatory and congressional scrutiny into the misuse of national security appropriations for unvalidated "AI" experimentation.

E. Failure of AI Model Risk Compliance

234.    This section is included to establish the technical and policy context necessary to evaluate the reasonableness and public importance of Plaintiff's disclosures. While CEPA does not require a court to second-guess technical disagreements, it does protect employees who object to conduct that undermines clear mandates of public policy. Plaintiff's disclosures were grounded in well-established principles of engineering ethics, AI safety, and federal model risk governance—fields that remain unfamiliar to many institutional actors. The discussion that follows explains (1) how such principles apply to AI-enabled military systems like Stormbreaker, (2) why Plaintiff's concerns reflect actionable risk and not mere difference of opinion, and (3) why his objections fall squarely within CEPA's protections under § 34:19-3(c). Without this context, Plaintiff's role—and the retaliatory consequences of raising long-tailed safety concerns—cannot be fully understood.

235.    Plaintiff respectfully notes that in financial markets organizations with mature model risk management frameworks—such as Bank of America, where Plaintiff previously served as a Senior Vice President—model risk governance functions are typically housed within the compliance or risk audit organization, independent from project delivery teams. This structural separation reflects the high stakes of model misuse and ensures that oversight is both technically informed and institutionally protected. Had the Department of Defense adopted a similar structure—such as establishing an independent AI model risk compliance function under the DoD Inspector General or within a dedicated compliance directorate—Plaintiff would have had access to a neutral, technically qualified, risk-aware, and compliance-empowered authority to whom he could safely and productively report his concerns. In such a structure, Plaintiff's

disclosures could have been evaluated with appropriate technical and regulatory expertise, sparing all parties the legal, medical, and operational consequences that followed.

236.    The absence of such a reporting channel within DoD reflects a structural governance failure. While existing policy and executive guidance correctly emphasize the criticality of AI model risk governance, the Department lacks an institutional enforcement mechanism to ensure those policies are meaningfully implemented. There is, in short, no "teeth"—no independent body empowered to audit compliance with AI safety and modeling standards, akin to the role the DoD Inspector General plays in other domains. In this respect, the Department could draw a valuable lesson from the commercial world, where risk and compliance functions are embedded with both authority and independence. Establishing such a function—either within or in coordination with the DoD IG—could provide a secure and effective path for technical whistleblowers to report high-risk concerns before they escalate into litigation, reputational harm, operational failure, or more catastrophic outcomes.

237.    Plaintiff's disclosures threatened more than a single program—they challenged what appeared to be a systemic risk posture embedded, whether intentionally or through structural neglect, in SMX's contract delivery strategy. Upon information and belief, by cutting corners on testing, documentation, and AI governance, SMX accelerated delivery timelines, underpriced competitors, and effectively externalized risk—first to the government, and ultimately to the public. This is analogous to a hedge fund writing out-of-the-money options: achieving short-term outperformance by concealing long-tail exposure. Plaintiff's insistence on proper model validation, clearly defined objective functions, and the secure handling of classified information introduced unwelcome friction into that strategy—and his removal served

to eliminate that friction. The retaliation he experienced was not incidental; it was structurally incentivized.

238.    In Plaintiff's experience, the role of an AI model risk compliance function mirrors that of a middle-office risk team in financial markets: to identify, surface, and properly price hidden risks—particularly systematic, common factor, and long-tail risks that are easily overlooked or deliberately obscured, such as the low-probability but catastrophic threat of escalation to global nuclear war. These functions are essential not only to ensure technical integrity, but also to uphold fairness across the competitive landscape and to prevent systemic failure. Plaintiff's disclosures underscored the absence of such controls within SMX and exposed a structural vulnerability that made his presence inconvenient to an organization optimizing for unchecked growth. This is precisely why model risk managers with institutional authority— model risk managers with "teeth"—are essential to give policy frameworks like "Trustworthy AI" real-world enforceability and meaning.

239.    The safety failures in Stormbreaker were not solely technical—they reflected a cultural misalignment between engineering rigor and software development priorities. Plaintiff observed that SMX's project environment drew heavily from entertainment-sector talent, including game designers and UI developers without formal training in predictive modeling or system safety. This background, while valuable for visual and interactive elements, was ill-suited for a system advertised as "AI-enabled" and used in national security planning. The absence of verification protocols, agile development cycles, and lack of traceable performance metrics reflected this cultural blind spot—one Plaintiff sought to correct. The Boeing 737 MAX disasters followed a similar trajectory: software engineers, operating without the safety-critical mindset embedded in traditional engineering disciplines, were tasked with designing flight control

systems—an organizational failure that contributed to fatal outcomes. Plaintiff believes Stormbreaker exhibited a comparable risk pattern: the absence of engineering-grade risk governance. The resistance Plaintiff encountered underscores the urgent need for domain-aware oversight and structurally embedded governance in AI-critical systems.

240.    This gap in technical culture was reflected in written materials prepared by Stormbreaker's technical leadership in response to Executive Order 14110. On or about November 1, 2023, "Principal Creative Director" I.Y.L.—who served as a senior design authority and led Stormbreaker's AI/ML modeling and simulation development team—circulated a one-page summary purporting to address the Order's implications. The document, which Plaintiff reviewed, made no mention of model validation, objective function definition, error metrics, traceability, or compliance with Executive Orders 13960 or 14110, the NIST AI Risk Management Framework, or DoD Instruction 5000.61. It cited the use of Python as a proxy for transparency and asserted, incorrectly, that much of the Executive Order was not applicable to Stormbreaker. For comparison, similar AI-adjacent tools at Bank of America—where Plaintiff previously served as a Senior Vice President—would typically require more than 200 pages of quantitative risk documentation and independent model review, even for far lower-risk applications. "Principal Creative Director" I.Y.L.'s memo exemplifies the cultural and technical blind spot Plaintiff sought to correct: an approach to "AI" centered on modularity and user interface, but devoid of the governance structures required for systems asserting operational relevance in national security contexts. Its contrast with Plaintiff's risk-based disclosures further underscores the retaliatory motive behind his marginalization.

241.    Just as middle-office risk functions level the playing field in financial markets by preventing hidden-risk strategies from producing artificial gains, AI model risk compliance

serves as a competitive equalizer in government procurement. Contractors that skip validation, overstate AI functionality, or rely on ambiguity to win bids gain an unfair advantage over firms investing in rigorous model governance. Plaintiff's disclosures not only raised safety concerns—they also exposed a market distortion that undermines innovation and procurement integrity. His removal ensured that unchecked delivery velocity could continue without resistance. This reinforces the principle that structural compliance functions are not only essential for public safety, but also to uphold fair market competition.

242.    In high-risk systems—particularly those involving common-factor, systemic, or long-tailed risks—the suppression of risk disclosures is often used as a tool to yield short-term operational or financial gains by externalizing risk: shifting the burden of failure onto the government, the public, or downstream institutions least equipped to manage the consequences. This creates a perverse incentive: contractors that cut corners on model testing, documentation, or governance may appear more "efficient" or "agile" than those that act responsibly—yet their true costs are simply deferred.

243.    A useful analogy comes from the Champlain Towers South condominium collapse in Surfside, Florida, where cost-cutting on structural maintenance increased the long-tailed risk of sudden failure. In such scenarios, property owners or boards may defer repairs to avoid short-term costs—thereby endangering others and undermining responsible actors who do invest in proper governance. In response, the Florida Legislature enacted new laws requiring routine structural inspections and mandatory reserve funding to deter risk-shifting and improve accountability. These reforms reflect the same principle at stake in AI model governance: unchecked incentives to delay or suppress risk management lead to public harm—and regulatory intervention is essential to prevent catastrophe.

244.    Building safety codes exist to correct this asymmetry—they penalize reckless cost-cutting and reward risk-aware governance. Similarly, as more of our critical infrastructure and decision-making systems come to depend on AI/ML models, whistleblower protections and independent compliance mechanisms must mature to serve the same essential function. They help enforce risk accountability in environments where structural incentives often favor silence over disclosure, and where those who raise early warnings may otherwise be punished instead of protected. Plaintiff's disclosures sought to restore that balance—and his removal ensured that those systemic risks remained unpriced, undisclosed, and unopposed.

245.    Ultimately, Plaintiff's termination can be understood as the result of his resistance to institutionalized risk concealment—specifically, his efforts to surface and address unpriced risks embedded in the Stormbreaker program's design and procurement posture. This institutional vacuum not only exacerbated the retaliation Plaintiff experienced, but also underscores an urgent public interest need for structural reform in the governance of AI-enabled defense systems and other high-risk government programs. The issues raised in this case extend beyond individual harm; they reflect systemic vulnerabilities in how AI-related risk is priced, governed, and escalated in public contracting environments.

246.    Plaintiff's disclosures reflect a core tenet of engineering ethics: credible risk—especially in safety-critical systems—must be identified and mitigated before harm occurs. Yet many institutions, including the legal system, are biased toward recognizing only actualized harm—after the crash, after the breach, after the arm is severed. This creates a dangerous moral inversion: the trial lawyer who litigates for the armless person after catastrophe has struck is rewarded, while the engineer who attempted to prevent it from happening in the first place is ignored, sidelined, or punished—as seen in the Boeing 737 MAX disaster. CEPA was designed to

correct this imbalance: to protect those who act in the public interest before failure occurs, not merely those who respond after the damage is done. In this respect, CEPA holds the potential to lead the nation in addressing emerging AI risks—by safeguarding those who raise credible warnings before catastrophe strikes.

247.     This disconnect creates a structural blind spot for technical professionals tasked with preventing disasters before they occur—particularly when the threat involves abstract or emergent domains such as AI model governance. As with attempted murder, the existence of credible latent risk may demand urgent intervention, even in the absence of realized harm. Yet in engineering, professionals are often ignored or punished for warning that "the plant could have blown up," even when it hasn't—yet. A similar institutional inertia afflicted financial markets for decades, until repeated crises forced recognition of the dangers posed by unpriced, hidden, systemic, and long-tailed risks. That reckoning gave rise to robust model risk management frameworks—such as SR 11-7 issued by the Federal Reserve Board—structures that were entirely absent at SMX and PACOM. Plaintiff respectfully asserts that, had a comparable compliance function existed, he would not have been forced to stand alone. His disclosures were not speculative; they adhered to executive mandates, engineering ethics, and widely recognized principles of public safety and risk governance. These are precisely the types of disclosures CEPA § 34:19-3(c) was enacted to protect. That they were met with hostility and retaliation, rather than institutional support, is the systemic failure this action seeks to expose and remedy.

248.     In light of these systemic implications, Plaintiff respectfully reserves the right to submit further proposed findings or public interest recommendations following trial, should the Court find in Plaintiff's favor.

### F. Legal and Technical Framework for Reasonable Belief in AI Risk Disclosures

249.    Legal doctrines often define thresholds for action in terms of probability—such as "preponderance of the evidence," "beyond a reasonable doubt," or "reasonable belief." However, in the context of forward-looking safety disclosures, particularly those involving AI/ML systems, the assumption that a risk must be probable in order to be reasonably believed is fundamentally flawed. This interpretation conflates a reasonable belief about the likelihood of an outcome with a reasonable belief about its material consequences. In long-tailed risk environments, where even low-probability failures may result in catastrophic harm, it is not the probability of harm but the expected severity that must guide whether a belief is reasonable.

250.    For example, consider an engineer who warns: *"This nuclear weapon could accidentally detonate in transport due to a faulty trigger model."* If that engineer is subsequently terminated, the termination should not be upheld merely because the engineer reasonably believed the odds of failure were, say, 1 in 1,000,000. In long-tailed, catastrophic risk contexts, the test for reasonable belief must hinge not on raw probability, but on materiality—specifically, expected loss in a risk-weighted or statistical sense. This is a *reasonable belief of materiality*.

251.    A risk with low probability but extreme consequence may be far more material than a high-probability, low-impact flaw. For example, an engineer believing there's a 99% chance that a nuclear weapon's exterior will be painted the wrong color may be technically accurate, but operationally trivial. Conversely, a 0.0001% chance of accidental detonation when passing through your town, though remote, demands immediate attention due to its catastrophic potential.

252.    This risk assessment principle aligns with Model Risk Management frameworks used in high-stakes sectors such as financial services—including those employed by institutions

like Bank of America—which prioritize material impact, not merely perceived likelihood, when assessing and governing risk models.

253. Plaintiff's disclosures regarding the Stormbreaker system followed this same principle. In fact, in a recorded meeting, Plaintiff specifically raised the issue of materiality on the fourth day of his employment at SMX and was immediately rebuked for doing so. His objections to AI model risk were not grounded in speculation or statistical overconfidence, but in a reasonable belief that the AI/ML modeling failures posed materially catastrophic consequences if left unaddressed. Under both CEPA and Pierce, this belief qualifies as protected activity—regardless of the estimated probability of system failure.

254. This principle—that reasonable belief should be assessed based on materiality, not probability—is directly reflected in Plaintiff's SF312 nondisclosure agreement, which specifies that even "uncertainty" about classification level is sufficient to require non-disclosure. This standard recognizes that Top Secret information, by definition, pertains to matters that could cause "exceptionally grave damage to national security." Accordingly, even a low-probability risk of inadvertent disclosure constitutes a material expected loss, and must be treated as such under Plaintiff's legal and contractual obligations.

255. The inescapable conclusion is that Plaintiff's core claims—his efforts to warn about AI Model Risk and his refusal to perform the "vulnerabilities" task—both stem from the same underlying dynamic: Plaintiff's acute awareness of materially significant risks, and Defendants' reckless disregard for responsible risk management.

G. Summary of Procurement Fraud and Gross Mismanagement Predicates

256. Defendants may now argue that Stormbreaker was merely a wargame delivered in accordance with PACOM's specifications, and that SMX lacked responsibility for how it was

validated, governed, or represented. But SMX cannot simultaneously claim in its marketing materials to be delivering an operational *"AI/ML-enabled planning and decision-making tool"* that will *"drastically reduce the time from plan inception to decision-making while simultaneously increasing the fidelity, accuracy, and number of high-confidence options for the Commander."* These SMX claims constitute objective performance claims under established Federal Trade Commission guidance—especially when offered in publicly funded, mission-critical contexts. Statements promising measurable operational improvement, even when phrased in future tense or qualitative terms, must be substantiated by reliable evidence under the FTC's *Operation AI Comply* initiative.

257.     As reaffirmed by the Federal Trade Commission in its official guidance *"Policy Statement Regarding Advertising Substantiation"*:

> *"Advertisers and ad agencies [must] have a reasonable basis for advertising claims before they are disseminated. ... Objective claims for products or services represent explicitly or by implication that the advertiser has a reasonable basis supporting these claims. ... Therefore, a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act."*

258.     As stated in the FTC's *"Keep your AI claims in check"* guidance:

> *"If you make claims about AI, be sure you can back them up with sound evidence. That's true regardless of who your customer is."*

259.     The importance of substantiating AI performance claims was reaffirmed in April 2025, when the Federal Trade Commission issued an administrative complaint against Workado,

LLC, a company that marketed an "AI Content Detector" as described in "*FTC Order Requires Workado to Back Up Artificial Intelligence Detection Claims*" (AI performance claim enforcement in technical tool marketed for public and institutional use):

> "*Consumers trusted Workado's AI Content Detector to help them decipher whether AI was behind a piece of writing, but the product did no better than a coin toss … Misleading claims about AI undermine competition by making it harder for legitimate providers of AI-related products to reach consumers.*"

260.    The FTC found Workado's claims to be unsubstantiated and misleading, based on independent testing that showed performance was no better than a coin toss. The FTC issued a proposed order prohibiting Workado from making similar representations without *"competent and reliable evidence."* The Commission emphasized that unsupported AI performance claims distort markets and violate Section 5 of the FTC Act—regardless of whether the audience is consumer, commercial, or institutional. These standards apply equally to companies like SMX, whose promotional claims about Stormbreaker's predictive accuracy and decision-making benefits were similarly unverified, yet used to market the system as operationally ready and AI-enabled. SMX's performance statements, like those in the Workado matter, fall squarely within the category of AI-related marketing claims that federal regulators now require to be substantiated by competent empirical evidence. These claims, when made without substantiating evidence, also potentially violate Section 5 of the Federal Trade Commission Act.

261.    Hidden unpriced risk—especially when knowingly ignored or misrepresented—can itself constitute a form of constructive fraud or gross mismanagement in public contracting. In defense and finance sectors alike, failure to disclose material risk undermines fair competition and responsible stewardship of public funds. When such concealed risks are paired with

unvalidated performance claims—as in SMX's portrayal of Stormbreaker—liability may arise under the False Claims Act, particularly if those representations were used to secure federal funding or milestone approvals. Plaintiff's disclosures directly addressed this type of systemic misrepresentation and risk externalization.

262.     The essential point is this: SMX cannot simultaneously disavow responsibility for validating Stormbreaker to appropriate standards—by, for example, claiming it was merely a wargame designed, implemented, and accepted according to PACOM's internal criteria—while publicly asserting that it delivers enhanced AI capabilities such as *"increased fidelity, accuracy [and] confidence."* That contradiction lies at the heart of the constructive fraud and procurement misrepresentation Plaintiff sought to clarify—most notably in his protected October 26, 2023 disclosure—and for which he was ultimately isolated, discredited, and terminated. Plaintiff's disclosure regarding these misrepresentations therefore constitutes protected activity under CEPA §34:19-3(a)(2), as it involved reporting conduct reasonably believed to be fraudulent or unlawful, and under §3(c), as it implicated a clear mandate of public policy grounded in procurement integrity and federal regulatory enforcement.

263.     As a side note illustrating the broader pattern of conduct, SMX's March 2024 claim—used to justify Plaintiff's removal—stated that Stormbreaker's AI development was being scaled back. Yet, as of June 2025, SMX continues to promote Stormbreaker publicly using forward-looking language asserting future AI capabilities and operational value, including in a brochure dated February 2025 (external date, internal metadata 2/11/2025 11:22am)— indicating that these claims were published well after PACOM's alleged scale-back of Stormbreaker AI. This inconsistency further supports Plaintiff's contention that SMX misrepresented the nature, readiness, and scope of the Stormbreaker program—both internally and externally—and that

Plaintiff's disclosures were reasonable, accurate, and made in accordance with public interest obligations. If this marketing material, or similar future-facing AI claims, were included in any bid for government work, such representations would likely constitute a false claim under the standards of the federal False Claims Act.

264.    Plaintiff's December 11, 2023 disclosure to PACOM official ND—a federal civilian executive branch employee—constitutes protected activity under CEPA § 34:19-3(a)(2), as PACOM official ND qualifies as a "public body" under CEPA's statutory definition. This disclosure, combined with the surrounding pattern of misrepresentation and retaliation, supports a strong inference of either procurement fraud, gross mismanagement, or both. The facts outlined above—including semantic manipulation of "AI," unvalidated IOC certification, misrepresented staffing qualifications, and suppression of classification challenges—are not isolated lapses. Rather, they reflect a systemic effort to conceal deficiencies, suppress whistleblower risk, and present a false appearance of program readiness. If Defendants knowingly misrepresented Stormbreaker's capabilities to funders or certifying authorities, liability may arise under the False Claims Act (FCA). If, alternatively, Stormbreaker was administered with reckless disregard for contract compliance, security, and safety, then the program was grossly mismanaged. In either case, the misconduct substantiates Plaintiff's protected disclosures and reinforces the applicability of CEPA

265.    Discovery is expected to uncover internal SMX and PACOM documents substantiating:

- Misrepresentations about Stormbreaker's AI capability and readiness;

- Billing for unvalidated AI deliverables;

- Inflated designation of entertainment industry staff as having appropriate experience for real-world predictive modeling;

- Fabricated or vague rationale for the PACOM-issued LOW order;

- Suppression of classification challenges and protected disclosures; and

- Timeline coordination between protected disclosures and retaliatory actions (e.g., org chart edits, ArmyAI rejection, demotion, LOW implementation).

266. These facts also justify inquiry into whether PACOM personnel—including John/Jane Doe(s)—knowingly cooperated with SMX to retaliate against Plaintiff and obscure Stormbreaker's AI deficiencies. Given that PACOM official ND received Plaintiff's December 11, 2023 protected disclosure and failed to respond, discovery into IOC milestone approvals, LOW drafting rationale, internal communications with SMX, and FOIA handling is expected to reveal whether PACOM participated in a coordinated effort to suppress Plaintiff's disclosures and sustain a false readiness narrative.

267. If substantiated, these findings will support liability under the False Claims Act, require referral to the Defense Counterintelligence and Security Agency (DCSA), and raise grave concerns regarding PACOM's procurement integrity, program oversight, and safeguards.

268. Even if fraud is not conclusively proven, Stormbreaker's structural failings—including the lack of AI risk governance, inappropriate or inflated staff credentials, and the strategic redefinition of "AI"—plainly meet the threshold for gross mismanagement. These conditions fully justify Plaintiff's disclosures and reinforce their protected status under CEPA and *Pierce*. In particular, the absence of a formal contract, Statement of Work, or defined deliverable for "Stormbreaker" despite the allocation of substantial federal funds raises serious questions of procurement integrity. Defendants received funds under the name "Stormbreaker,"

yet no delivery accountability mechanism appears to have been imposed—an ambiguity that constitutes not just mismanagement, but a red flag for potential constructive fraud or False Claims Act liability.

269.    Plaintiff's disclosures were reasonable and objectively grounded in public policy mandates codified in the following federal statutes:

- 10 U.S.C. § 4701: Defense Contractor Whistleblower Protection;

- 41 U.S.C. § 4712: Federal Contractor Whistleblower Protection;

- 31 U.S.C. § 3729 and § 3730(h): False Claims Act—FCA liability and whistleblower protection

270.    These statutes are not asserted as standalone causes of action but are cited to establish the public policy framework underpinning Plaintiff's CEPA and *Pierce* claims. They demonstrate that Plaintiff's concerns were reasonable, well-founded, and clearly aligned with mandates protecting whistleblowers, public funds, and national security. Defendants' retaliation in response to these disclosures confirms the core liability asserted in this action.

## IV. PROTECTED DISCLOSURE: ILLEGAL TASK

### A. Retaliatory "Vulnerability" Task Becomes a New Protected Disclosure

271.    When Plaintiff informed Defendant Marotta of his October 26, 2023, AI model risk protected disclosure, she responded by assigning him a task that she must have known or should have known that he could not legally complete without violating federal classified information laws. Specifically, Marotta instructed Plaintiff to write a "vulnerability" report at the unclassified level. Plaintiff replied that he could not discuss this topic at the unclassified level and—as is standard protocol—he requested a high-side [SCIF] meeting to resolve.

272.     Defendant Marotta, as SMX Program Director who hired Plaintiff and knew of his prior AI/ML modeling roles would have—or perhaps should have—anticipated that assigning a "vulnerabilities" task to Plaintiff had the potential to pose difficulties for the Plaintiff to complete at the unclassified level. Although Marotta was Plaintiff's program manager, she lacked any legal authority to determine the classification level of sensitive material. Only an Original Classification Authority (OCA) or equivalent designated personnel could adjudicate Plaintiff's classification concerns.

273.     Plaintiff had a reasonable and well-founded belief that completing the "vulnerabilities" task at the unclassified level would violate federal law, including 18 U.S.C. §§ 793 and 798 (Espionage Act), which prohibit the unauthorized disclosure of national defense information and classified communication intelligence. Plaintiff's caution was reinforced by his binding obligations under the SF312 Classified Information Nondisclosure Agreement, which makes clear that classification uncertainty must be treated as classified until formally resolved:

> *"… I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it […] I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information."*
> [SF312 paragraph 3]

274.     Under SF312 and related DoD protocols, when in doubt, information must be handled at the higher classification level until formally resolved. Accordingly, Plaintiff's refusal to proceed outside a SCIF was not only justified, but legally mandated—and his subsequent demotion and termination constitute actionable retaliation under CEPA.

275.     Plaintiff refused to complete the "vulnerabilities" task at the unclassified level until a high-side [SCIF] discussion could occur because, based on his prior TS/SCI work, he reasonably believed the task posed a legal risk under the Espionage Act (18 U.S.C. §§ 793, 798) and derivative classification rules established in Executive Order 13526. As a cleared professional bound by the SF312 nondisclosure agreement, Plaintiff was obligated to treat uncertain material as classified unless and until an Original Classification Authority (OCA) determined otherwise. The requested report involved analysis of technical vulnerabilities of a defense-related system—a task inherently shaped by Plaintiff's prior classified experience. Even if the source materials were nominally unclassified, the risk of inadvertently incorporating derivative insights from Plaintiff's prior TS-level work posed a serious classification concern. A SCIF meeting with Defendant Marotta was essential to define task boundaries, determine which components required classification handling, and assess whether the report's objectives could lawfully be achieved at the unclassified level. Proceeding without that conversation would have required Plaintiff to speculate about classification boundaries, potentially exposing him to criminal liability or a security violation—outcomes the classification system is specifically designed to prevent. This is not a complicated process; among cleared professionals, such classification clarifications are routinely resolved in a single SCIF meeting—one that Marotta was never willing to schedule.

276.     At his first opportunity—during his November 6, 2023 TS/SCI read-on at Camp Smith—Plaintiff consulted directly with an information security official. Plaintiff was later informed by Marotta that this individual was the Head of Information Security at Camp Smith. Plaintiff explained the classified basis for his refusal to complete the "vulnerabilities" task at the unclassified level. The official confirmed that consultation with an Original Classification

Authority (OCA) was the appropriate next step and agreed that Plaintiff's refusal to proceed without a secure facility was correct unless an OCA determined otherwise. Plaintiff's refusal to proceed without a secure facility was correct. This conversation validated Plaintiff's position. It confirmed that his refusal to complete the task unclassified was not only reasonable and professional, but legally required under federal classification protocols and his binding SF312 nondisclosure agreement

277.    Where there is disagreement about the appropriate classification level of information, federal regulations provide procedures for resolution, for example:

- **Informal Challenges Encouraged**: 32 CFR § 2001.14(c)(2*): "The classification challenge provision is not intended to prevent an authorized holder from informally questioning the classification status of particular information. Such informal inquiries should be encouraged as a means of holding down the number of formal challenges and to ensure the integrity of the classification process."*

- **Formal Resolution by Original Classification Authority**: 32 C.F.R. § 2001.14(a): *"Authorized holders [...] who want to challenge the classification status of information shall present such challenges to an original classification authority with jurisdiction over the information [...] A formal challenge under this provision must be in writing, but need not be any more specific than to question why information is or is not classified, or is classified at a certain level."*

- **Protection Against Reprisal**: 32 CFR § 2001.14(b)(1): *"Because the Order encourages authorized holders to challenge classification as a means for promoting proper and thoughtful classification actions, agencies shall ensure that*

*no retribution is taken against any authorized holders bringing such a challenge in good faith."*

278.     Although Marotta held managerial authority over Plaintiff at SMX, she had no legal authority to override federal laws, policies, or procedures governing the handling of classified information. Neither Marotta nor Ream had the authority to resolve classification disputes, this requires an Original Classification Authority (OCA). Federal regulations— including 32 CFR § 2001.14—explicitly prohibit retaliation against individuals who raise classification concerns in good faith, even informally which is explicitly encouraged.

279.     Possible solutions to this problem included (i) do the entire report at a classified level inside a Secure Compartmentalized Information Facility (SCIF) where classified information could be discussed, written and stored; (ii) do a portion of the report at classified level in a SCIF; (iii) meet and clearly define content for the report that avoided Plaintiff's classified information concerns; (iv) not do the task at all; (v) disagree about whether the "vulnerabilities" material is classified or not through a formal classification challenge process involving an "Original Classification Authority" (OCA).

280.     Instead of prioritizing a SCIF meeting to resolve the issue as per normal classified information handling practices, Defendants illegally pressured Plaintiff multiple times to complete the task, including exerting peer pressure:

- **First instruction to perform task**: October 26, 2023, Marotta: *"I look forward to seeing your white paper or slide presentation (you pick the format) on the current STORMBREAKER construct, where the vulnerabilities lie that you have seen, measures to assess (as you alluded to above) and potential alternatives to the approach."*

- **Plaintiff says he can't do the task unclassified**: October 26 2023, Plaintiff replies to Marotta, *"It's very late here on the East Coast and I've tried multiple times to draft a response to this email but every time I feel I run the risk of either "talking around" [roughly: disclosing classified information indirectly] or not properly explaining my position. I am super-careful on security matters and I'm not comfortable that any of my drafts meet this high standard, so here's the bottom line: I can't comprehensively respond to this email UNCLASSIFIED"* and then went on to request a SCIF meeting so they could meet to discuss and resolve the issue as was standard roper DoD protocol: *"I've been begging for a high-side [SCIF] conversation, how can we do it*?" Plaintiff clearly described the source of his issue: *"Whilst I'm confident I could provide the analysis you seek at the UNCLASSIFIED level based on my 30+ years of pre-ArmyAI experience, maybe not everyone would interpret what I write as being based purely on my pre-ArmyAI expertise…"*

- **Second instruction:** Marotta acknowledges Plaintiff's concern: "*I understand the request for a classified discussion however, that will need to happen when you are here on island,*" but Marotta ignores Plaintiff's statement that he can't discuss the topic via email and doubles down on her task instruction without seeking to understand if this resolved Plaintiff's reasonable concerns (it didn't): "*I was not asking you to risk exposing classified information in my request, simply evaluate AI processes, procedures and technologies that might be applicable to STORMBREAKER. We will need to maintain an unclassified version of this capability to work with our partners in theater so using unclassified technologies*

*at this time is most appropriate."* Plaintiff had already stated that he was unable to discuss over unclassified channels, his silence in response to this message from Marotta and future messages—other than reiterate his request for a high-side meeting—is entirely consistent with his security training.

- **Second instruction**: October 26: Marotta repeats the task instruction but does not seek to understand if this resolved Plaintiff's reasonable concerns (it didn't): *"I understand the request for a classified discussion however, that will need to happen when you are here on island. I was not asking you to risk exposing classified information in my request, simply evaluate AI processes, procedures and technologies that might be applicable to STORMBREAKER. We will need to maintain an unclassified version of this capability to work with our partners in theater so using unclassified technologies at this time is most appropriate."*

- **Third instruction**: October 27: Ream next day triples down on the task instruction: *"I'm happy to start the Stormbreaker AI integration knowledge journey with the paper Wendy referred to on Friday: ......white paper or slide presentation (you pick the format) on the current STORMBREAKER construct, where the vulnerabilities lie that you have seen, measures to assess (as you alluded to above) and potential alternatives to the approach."*

- **Fourth instruction**: October 30: Marotta emails many senior members of the Stormbreaker team, apparently seeking to apply maximum peer pressure to Plaintiff *"Last week I also asked Paul Richardson to look at our design/plan for STORMBREAKER to identify any gaps and do an analysis of alternatives where/if needed. I expect he will be coordinating with you both this week for any*

*information on the sim engine/adjudication design/data repository that he might need in order to accomplish this."* Note that semantic sanitizing by substituting the word "gaps" for "vulnerabilities" does not change the tasks legal challenges.

- **Plaintiff says he's waiting for SCIF meeting to resolve classification issues**: in a response to an email from "Principal Creative Director" I.Y.L. (November 1, 2023), Plaintiff writes: *"I've told Wend [sic] et al. that I don't want to comment on any of this stuff until I've had a chance to have a high-side conversation with them in Hawaii so I think the best course of action is for you to review the document to your own satisfaction and go with that. Sorry I can't be more help than that until I receive further guidance."*

- **Marotta makes no effort to facilitate a resolution**: In the lead up to the November 7,8,9 on-island team meeting, Plaintiff prepares his security credentials for a SCIF meeting, but Defendant Marotta makes no attempt to schedule a SCIF meeting, does not expedite his security credential processing, and in fact delays approval of his travel authority to the extent it causes accommodation and logistical problems not experienced by the rest of the team.

- **Senior PACOM official backs Plaintiff actions**: On November 6, 2023, when attending his TS/SCI read-on at Camp Smith. Plaintiff sought guidance regarding the "vulnerabilities" task from a PACOM information security official—later identified by Marotta as the Head of Information Security at Camp Smith. Because Plaintiff was inside a SCIF, he was able to explain the classified basis for why he could not complete the task at the unclassified level. The official described Plaintiff's classification situation as *"the most complex information*

*security question [I've] ever heard,"* and explicitly agreed that informally consulting with an OCA was the appropriate resolution strategy. This validation by PACOM's senior-most information security officer confirms that Plaintiff's action was reasonable, well-founded, legally justified, legally required under the SF312 'read-on' contract he'd just signed, and his actions were completely consistent with DoD resolution policy.

- **Fifth instruction**: November 9, verbally in SCIF meeting, Plaintiff described to Defendant Marotta the TS classified reason why he couldn't complete the vulnerability report at unclassified level. Marotta responded with hostility, ridicule, disparagement and repeated her expectation that Plaintiff would complete the task at unclassified. When Plaintiff responded that he'd sought guidance from the Head of Information Security who agreed with the Plaintiff assessment and proposed resolution, Defendant Marotta changed the subject and never again repeated the illegal instruction (until Plaintiff's termination).

- **Marotta does not resolve, she isolates**: After the November 9 SCIF meeting, Marotta made no effort to resolve the issues blocking Plaintiff's completion of the vulnerabilities task including his request to work within a Camp Smith SCIF. Marotta did not assign alternative tasks, effectively leaving Plaintiff isolated without meaningful work.

- **Plaintiff proposes ArmyAI resolution to Marotta and PACOM official ND**: Plaintiff emails a proposal (January 3, 2024) where his previous DoD employer (ArmyAI) was likely willing to provide SCIF access so he could complete the vulnerabilities report at a classified level, only requiring a formal PACOM request

(which would need to go through PACOM official ND). Marotta instructs Plaintiff to *"hold off on any further actions here until we can discuss,"* Plaintiff responded: *"I'm available anytime, including beyond midnight Eastern Time."* But neither Defendant Marotta nor PACOM official ND responded or explained why they didn't want to implement this reasonable solution.

- **Sixth instruction, acknowledgement of problem, commitment to resolve**: Defendant Ream again asks Plaintiff to complete the "vulnerabilities" task (February 20, 2024), yet when he reminds her there is a classified reason she quickly acknowledges Plaintiff's reasonable belief: *"I know vulnerabilities get into the classified realm REALLY QUICK"* [Ream's emphasis]. Acknowledging that the "vulnerabilities" task cannot be legally performed unclassified, Ream agrees that the solution is to get Plaintiff into a SCIF: *"so let's re-energize that effort because I think your motivation will certainly serve the program well with getting into a secured area [SCIF] where you can really think and talk."* However, this never happens, the next contact Ream makes with Plaintiff is two weeks later to terminate his employment.

- **Seventh instruction and hostility that Plaintiff didn't complete the task**: March 6, 2024, on Plaintiff's termination call with Ream and Landers (HR) in attendance Marotta deceptively asserted: *"the task that we had asked you to do did not involve classified information."*

- **Marotta denies SCIF access:** On his March 6 termination call, Plaintiff's requested to work-out his final 2-3 weeks of employment in a SCIF where he could complete the task – Marotta denied his request.

Page **115** of **267**

281. Defendants, by virtue of their SF312 classified information nondisclosure agreements and annual classified information training, knew that they lacked the authority to override Plaintiff's classification concerns without following established DoD protocols as contemplated under 32 C.F.R. § 2001.14.

282. Plaintiff rightly followed standard resolution protocols by immediately requesting an informal SCIF conversation consistent with 32 CFR § 2001.14(c)(2) and this need was acknowledged by Marotta.

283. Yet on multiple occasions Defendants Marotta and Ream persisted in ordering Plaintiff to conduct the unclassified vulnerabilities task, and escalated it with peer-pressure, thereby exerting pressure to complete a task that Plaintiff reasonably believed would violate federal laws—all without actioning appropriate process to resolve the disagreement. When Plaintiff proposed the creative and reasonable ArmyAI SCIF solution, it was blocked by Marotta and ignored by PACOM official ND though Marotta would later blame PACOM for the decision.

284. Plaintiff's December 11, 2023 email—addressed to Defendants Marotta and Ream, as well as PACOM official ND—explicitly referenced classification concerns raised during the November 9 SCIF meeting. That email may have triggered a formal classification challenge under 32 C.F.R. § 2001.14(a), particularly because Plaintiff had previously asked PACOM official ND (outside PACOM's Camp Smith Headquarters on November 9, shortly before the SCIF meeting) for the contact information of the appropriate Original Classification Authority (OCA), but received no assistance. Plaintiff anticipated following up with PACOM official ND in a high-side setting to clarify his concerns, but no response was ever received. Under 32 C.F.R. § 2001.14(b)(3), Plaintiff should have received an initial written response to his challenge within 60 days. To date, no such response has been provided—indicating that neither

PACOM nor SMX followed the required classification challenge procedures mandated by Executive Order 13526 and its implementing regulations.

285.    On her February 20, 2024 call with Plaintiff, Defendant Ream proposed to resolve the "vulnerabilities" task by getting him into a SCIF where he could produce it classified, this acknowledges (i) that the task was still wanted by Marotta after the SCIF meeting even though she had not repeated it nor made any effort to resolve (ii) that working from a SCIF was a feasible solution worth exploring.

286.    When Plaintiff was terminated two weeks later (March 6, 2024) Defendant Ream was silent while Marotta criticized Defendant for not completing the "vulnerabilities" task at unclassified. This conversation demonstrated that:

- Defendant's refusal to perform the illegal "vulnerabilities" task was still a source of animosity and therefore a potential source of retaliatory motivation for the termination.

- Marotta didn't accept that Plaintiff, by virtue of this SF312 contract, is required to refuse even at the relatively low bar of "uncertain".

- Plaintiff's reasonable belief was validated by the opinion of the Head of Information Security at Camp Smith, but Marotta neglected to acknowledge this.

- Marotta did not accept that her formal organizational seniority does not give her authority over Plaintiff's refusal to perform a classified task he believes to be illegal.

- Marotta did not accept that there is an informal then formal process to resolve these matters, which she failed to follow.

- Marotta didn't really want the task done anyway for fear of further classified protected disclosures: in response to Marotta's criticism about him not completing the task, Plaintiff offered to complete it by working-out his final weeks of SMX employment in a SCIF, Marotta rejected the offer.

287.    Defendants' failure to escalate or resolve the classification challenge—despite being aware of its seriousness—was inconsistent with federal information security protocols and may constitute a prohibited personnel practice under internal DoD policy. It also raises concerns under whistleblower protection frameworks, including 32 C.F.R. § 2001.14, which outlines obligations to refer classification disputes to proper authorities. Defendants' inaction is evidence of willful suppression of Plaintiff's protected refusal to perform a potentially unlawful task.

288.    In its April 2025 letter, the Department of Defense Office of Inspector General (DOD IG) confirmed that Plaintiff's role involved services to an element of the Intelligence Community. Based on this, the DOD IG denied Plaintiff access to protections under 10 U.S.C. § 4701 due to the Intelligence Community carve-out in § 4701(e)(2). The letter included the following language:

> "The provisions of 10 U.S.C. § 4701 do not apply to any element of the Intelligence Community or a disclosure made by an employee of a contractor, subcontractor, or grantee of an element of the Intelligence Community…"
> "You were an employee of a contractor of an element of the intelligence community and your alleged disclosures occurred during services to an element of the Intelligence Community."

*"Please note that this letter only pertains to the closure of the reprisal allegations contained in your DoD Hotline complaint and does not mean that any nonreprisal allegations included in your complaint are closed."*

289.     In the context of CEPA, the DOD IG's letter confirms Plaintiff's heightened legal duty to treat the "vulnerabilities" task with caution. As an SF312-bound contractor operating within the Intelligence Community, Plaintiff could not lawfully comply with Marotta's instruction that the task be completed at the unclassified level—a concern later validated by PACOM's Head of Information Security. Plaintiff's refusal to complete the assignment outside a SCIF, along with his repeated proposals for secure alternatives, were not acts of defiance but legally required steps under federal information security law. The DOD IG's confirmation eliminates any doubt as to the legitimacy of Plaintiff's legal concerns and underscores the unlawfulness of Defendants' retaliatory response.

290.     Plaintiff's designation as a contractor supporting an element of the Intelligence Community (IC) further elevated his legal obligations under federal classified information laws. As clarified in the DOD IG's closure letter, Plaintiff was not merely a defense contractor, but operated within a sensitive intelligence function—triggering more stringent expectations of classified handling discipline, duty to avoid derivative disclosure, and affirmative obligations to report classification concerns. Within the IC, even informal ambiguities around classification carry elevated stakes. Plaintiff's caution, refusal to perform the "vulnerabilities" task without SCIF protections, and repeated attempts to initiate formal classification review reflect this heightened duty of care. Defendants' retaliation for those lawful refusals was therefore not only unlawful under CEPA, but also reckless in light of Plaintiff's specialized obligations as an IC-affiliated employee.

291.   The lack of effort by Defendants Marotta, Ream, and PACOM official ND to facilitate resolution by introduction to an Original Classification Authority (OCA)—despite Plaintiff's explicit request and the validation of that request by PACOM's Head of Information Security—constituted a deliberate obstruction of Plaintiff's legally mandated attempt to resolve a classification concern through the challenge process outlined in 32 C.F.R. § 2001.14. This refusal followed Plaintiff's written escalation to PACOM official ND, a federal civilian official and "public body" under CEPA § 34:19-2(c), and thereby qualifies as a protected disclosure under § 34:19-3(a)(2). The total lack of response from all three individuals—despite Plaintiff's good-faith request—constitutes retaliatory interference with protected activity, further supporting Plaintiff's claims under CEPA and the public policy doctrine of *Pierce*.

292.   The obstruction prevented timely resolution of a serious classification concern. Plaintiff's refusal to complete the vulnerabilities task—based on a good-faith and legally grounded concern that doing so would violate federal classified information laws—constitutes protected activity under CEPA, N.J.S.A. § 34:19-3(a)(1) and (c). Defendants' repeated efforts to pressure Plaintiff into completing the task, despite his statutory and ethical objections and his efforts to propose lawful alternatives, and their ultimate decision to terminate him, constitute unlawful retaliation in violation of CEPA.

## V. PROTECTED DISCLOSURE: ESCALATED DISCLOSURES TO DOD IG

### A. SCIF Meeting, Defendant's Interfered with Plaintiff's Protected Disclosures

293.   Plaintiff's Protected Disclosures were necessarily limited and reactive because they were triggered by external events such as the DIU/CDAO scheduling email from Marotta that triggered the October 26, 2023, disclosure or the unexpected issuance of Executive Order 14110 that triggered the October 30 follow-up. By November 2023 Plaintiff had read a

Page **120** of **267**

considerable amount of Stormbreaker technical documentation and understood that there was an urgent need for a series of clear prepared protected disclosures about Stormbreaker AI model risk and classified information security.

294.    Like the "vulnerabilities" task, Plaintiff assessed that these disclosures required a secure environment. Lacking SCIF access in New Jersey, his only opportunity to communicate them to Marotta was in a SCIF during his next visit to Hawaii.

295.    Therefore, prior to Plaintiff's second Stormbreaker team meeting (TEM) in Hawaii, Plaintiff had multiple communications with Defendant Marotta and Ream to coordinate the requested SCIF meeting:

- August in the first TEM, in first week of Plaintiff's said to Marotta: *"we need to have a talk high-side, it's all crystal clear to me now!"* (conversation recounted in an email to Marotta on October 30, 2023).

- In Plaintiff's September 2023 *"initial impressions"* call Plaintiff requested a SCIF meeting.

- Plaintiff again requested a SCIF meeting in his AI model risk email (October 26) with Marotta acknowledging *"I understand the request for a classified discussion however, that will need to happen when you are here on island."*

- In Plaintiff's EO email thread to Marotta & Ream (October 30) he recommended holding off certain actions: *"until we've had a high-side conversation."*

- On October 30, 2023, Marotta finally (late) approves Plaintiff's travel and writes *"Working overall schedule for the TEM today so hopefully we can plan to have a classified discussion with multiple stakeholders"* setting clear expectations for a SCIF meeting but avoiding Ream's specific question about day/time which was:

> *"[administrative person] is working on SCI read-ins for both Paul and other teammates traveling to the island. Do you have a desired day/time to meet with Paul?"*

- In November, when Plaintiff arrived on island for the team meeting, there were several more communications with Defendants Marotta and Ream regarding organizing travel, security clearances, and date/time for the upcoming SCIF meeting.

296. As a new employee, Plaintiff had invested much effort to get his security credentials in-place so he could have the SCIF meeting with Marotta. Plaintiff's final step was to get TS/SCI "read-on" at PACOM's Camp Smith, but on-island team members had been prioritized over Plaintiff. To resolve this, Defendant Ream offered to swap her November 6 read-on appointment with Plaintiff, as she lived on-island and could reschedule more easily. Plaintiff accepted and completed the read-on, removing the final barrier to a SCIF meeting with Marotta.

297. On October 30, 2023, Plaintiff sent an email to Defendants Marotta and Ream explicitly requesting a high-side conversation to disclose classified concerns in a good-faith effort to help SMX by appropriately identifying and managing risks. In the message, Plaintiff wrote: *"Until we have a chance to have a quality talk on the high-side you've got to trust that I'm not trying to add unnecessary friction or panic… I'm being blunt and direct in an attempt to safely guide [you]"* Plaintiff quotes his August statement: *"We need to have a talk high-side, it's all crystal clear to me now!"* This correspondence clearly conveyed Plaintiff's attempts to be constructive.

298. Despite multiple prior requests and clear coordination efforts from Plaintiff, Defendant Marotta made no meaningful effort to facilitate or schedule the SCIF meeting. Her

conduct reflects a pattern of avoidance that obstructed Plaintiff's ability to deliver protected disclosures in a secure setting:

- Marotta had not committed to a date or time for the SCIF meeting;

- Marotta did not facilitate or prioritize Plaintiff's security processing, despite being in a position to do so;

- Marotta delayed approval of Plaintiff's travel to Hawaii well beyond the timelines granted to other team members, causing uncertainty about whether the trip would proceed. By the time Ream intervened to seek approval (October 30 email), the delay had already caused logistical problems—including limited lodging options and a long daily commute—that other team members did not face;

- When Plaintiff arrived at Camp Smith for his read-on appointment, he unexpectedly encountered Marotta outside the Headquarters building. He asked if they could hold their SCIF meeting afterward; Marotta responded that she was unsure of her availability. Plaintiff said he would wait in his car and did so for several hours, but Marotta never called to confirm or decline, nor did she call or email to schedule a future time.

- On November 7,8,9 Plaintiff attended the Stormbreaker TEM meeting, but Defendant Marotta avoided all contact with Plaintiff.

- By November 9, which was the final day of the TEM meeting and Plaintiff's last day in Hawaii, Marotta still had not committed to a time for the requested SCIF meeting.

- Finally, at around midday on November 9, 2023, Defendant Marotta approached Plaintiff and specified a time to meet at PACOM Headquarters Camp Smith's for the SCIF meeting.

- Prior to the appointed time Plaintiff arrived outside the PACOM Camp Smith SCIF and waited for Defendant's Marotta and Ream, who arrived about one hour late.

299.    Upon information and belief, by November 9, 2023, Defendant Marotta fully expected that Plaintiff would make several weighty protected disclosures during the SCIF meeting—disclosures that, unlike his earlier unclassified warnings, would be detailed, explicit, and backed by classified evidence and legal arguments. Taken together, Marotta's delays in approving Plaintiff's travel, her failure to facilitate security credentialing, and her repeated refusal to schedule the SCIF meeting—despite multiple prior requests—reflect a deliberate effort to obstruct Plaintiff's ability to deliver those disclosures in a secure setting.

300.    After passing through building security, Plaintiff understood he was now within the SCIF, he followed Marotta and Ream as they led him to a meeting room:

- Plaintiff, disconcerted by the lack of classified signage in the area, sought multiple times to clarify that they were in a SCIF and each time Marotta explicitly confirmed it was a SCIF and Ream did not dispute Marotta's assertions.

- Defendant Marotta led Plaintiff to a meeting room where a person waived them in and said they could meet if they didn't mind her doing some administrative work in the corner, Marotta was about to enter the room but Plaintiff rejected the meeting room *"this is TS we need a private room"* [even if holding the correct security clearances, there is a "need to know" criteria for sharing classified

information]. Defendant Marotta made her displeasure known as she looked for another meeting room.

- As everyone was taking seats in a new meeting room, Plaintiff noticed that the room lacked the classified signage that Plaintiff was accustomed to (e.g. *"this media equipment is classified Top Secret"*) puzzled he asked Marotta *"Is this TS?"* and Marotta again answered affirmatively whilst Ream remained silent.

- Having been led to believe he'd entered a SCIF classified meeting room, Plaintiff meticulously prefaced his statement with *"The following information is TS"* and looked at the Defendant's for their acknowledgement. At this point Plaintiff remembered that Ream had swapped her read-on slot with him. Puzzled at how she managed to get another read-on slot in time for this meeting Plaintiff turned to Marotta *"Is Johanna read-on? This is classified TS."* Marotta (Plaintiff's boss and program director) responded *"She has TS clearance"* then hurriedly/angrily: *"now let's get on with it I don't have much time"*.

301.    During the November 9, 2023 meeting, believing in good faith that the discussion was taking place inside a SCIF, Plaintiff made multiple protected disclosures, including:

- A clear objection to completing the "vulnerabilities" task at the unclassified level, including a Top Secret rationale explaining why doing so would be unlawful—effectively a classification challenge.

- Two additional classification challenges concerning other Stormbreaker information.

- A series of AI/ML model risk disclosures, consistent with his prior warnings from August, September, and October 26 and 30 and later February warnings to Ream

and DOD IG hotline. Plaintiff reiterated that Stormbreaker lacked testing and validation, misrepresented its AI capabilities, lacked qualified personnel, and was "not fit for purpose".

302.    Evidence that these matters were discussed verbally in the SCIF is also partially captured in Plaintiff's December 11 2023 unclassified email where he indirectly references topics discussed in the SCIF, including AI model risk and classified concerns.

303.    Plaintiff's protected disclosures were explicit, professional, and detailed—yet were interfered with my Defendant Marotta's frequent dismissal with hostility, ridicule, or disparagement, while Ream remained silent. For example, when Plaintiff warned that a Stormbreaker AI model failure could result in "body bags," Marotta did not engage with the safety concern. Instead, she fixated on his phrasing, criticized him for causing offense, and launched into a lengthy emotional response—thereby entirely sidestepping the grave magnitude of Plaintiff's disclosure. This pattern of deflection recurred throughout the SCIF meeting, confirming that the issue was not tone, but Marotta's refusal to confront the substance of Plaintiff's warnings.

304.    During the November 9 SCIF meeting, Plaintiff observed that Defendant Marotta appeared unfamiliar with basic modeling concepts critical to Stormbreaker's AI claims, including foundational terms such as: *"ground truth," "objective function",* and *"error metric"*. Without a clearly defined "objective function," it is fundamentally impossible to meaningfully design or validate an AI/ML system, making the "objective function" concept critically important for any legitimately "AI-enabled" project.

305.    Although Defendant Marotta possessed extensive military operations experience, she appeared to lack formal training, professional credentials, or relevant expertise in artificial

intelligence, modeling methodologies, or AI/model risk governance. For context, senior quantitative risk professionals working at institutions such as Bank of America, addressing similar complex modeling challenges, typically hold advanced credentials—including a Ph.D. or multiple graduate degrees—and substantial professional experience specifically in real-world systems modeling. Defendant Marotta's evident knowledge gap likely contributed materially to Stormbreaker's deficient AI governance, raising significant concerns regarding oversight, procurement integrity, and gross mismanagement.

306.    These SCIF disclosures—materially consistent with Plaintiff's prior warnings but now explicitly linked to AI model governance and the law—were met not with inquiry, investigation, or remediation, but with hostility, avoidance, and escalating marginalization. Importantly, this was not a situation in which Plaintiff's concerns were acknowledged and debated in good faith or where technical disagreements arose about model risk. There was no engineering dialogue. At every stage, Plaintiff's efforts to raise legitimate concerns were met with frustration. Defendants Marotta and Ream did not attempt to understand the technical basis of Plaintiff's risk assessment or engage with his proposed solutions.

307.    The November 9 SCIF meeting—which should have provided a secure setting for open discussion—was instead characterized by deflection: it never reached the level of a substantive engineering exchange because Plaintiff was denied any meaningful opportunity to explain Stormbreaker's AI model risk and compliance gaps. Moreover, because the disclosures occurred verbally inside a SCIF, Plaintiff was procedurally prevented from creating a contemporaneous written record that would have clearly documented the nature, seriousness, and legal basis of the protected disclosures he discussed in the meeting. Defendants' conduct during and after the SCIF meeting therefore not only confirms retaliatory motive and willful

suppression of protected disclosures, but also obstructed the formation of an evidentiary record that would otherwise have supported Plaintiff's legal position beyond dispute.

## B. SCIF Deception: Coercive Setup

308.    Plaintiff later learned—and expects discovery to confirm—that at PACOM's Camp Smith, all true SCIF meeting rooms are located on the lower levels of the building, while the upper-level rooms are standard unclassified conference rooms. Plaintiff was unaware of this distinction at the time, as he was unfamiliar with the facility's layout.

309.    Defendants Marotta and Ream were very familiar with the PACOM facility and must certainly have been familiar with its unusual SCIF architecture. Once within building security, Defendants led Plaintiff to the upper-level meeting rooms.

310.    Based on available information, Plaintiff now believes the meeting took place in a regular unclassified conference room—not in a properly designated SCIF.

311.    Marotta and Ream appear to have exploited Plaintiff's unfamiliarity with the facility to create the false impression that the meeting was occurring in a secure classified setting.

312.    Plaintiff further believes that Ream could not have obtained another TS/SCI read-on appointment in time for the November 9 meeting after giving her slot to Plaintiff. If she was not read-on, she was not authorized to participate in a true SCIF meeting and could not lawfully receive Plaintiff's disclosures.

313.    Plaintiff intends to seek discovery confirming (i) whether the upstairs meeting room was a certified SCIF; (ii) whether Defendant Ream held active TS/SCI clearance at the time of the meeting; and (iii) whether Defendant's openly planned the deception.

314.    Upon information and belief, and subject to confirmation by discovery, the deception by Marotta and Ream appears intentional:

- Plaintiff was expecting a SCIF meeting and for this purpose alone expedited efforts to get security credentials in place in time for his Hawaii travel.

- Marotta and Ream were aware of Plaintiff's multiple requests for a high-side [SCIF] meeting.

- Ream's only reason for swapping the read-on appointment was so that Plaintiff could have a SCIF meeting with Marotta.

- An unclassified meeting—and secret level under certain conditions—could have been held anywhere at the TEM venue, requiring no travel and much less effort.

- All parties travelled to PACOM Headquarters at Camp Smith separately and solely for the purpose of entering a SCIF for the classified meeting.

- Plaintiff now understands that Camp Smith has many available SCIF's *downstairs*, but Marotta and Ream exploited Plaintiff's lack of familiarity with the building layout by immediately leading him *upstairs*.

- Marotta invited Ream to the SCIF meeting at Camp Smith, even though she knew that Ream was not read-on and would not be able to enter a true SCIF.

- Ream traveled to Camp Smith, knowing that she would be unable to enter a true SCIF, knowing that the meeting would be unclassified, and knowing that they didn't need to travel to Camp Smith for an unclassified meeting.

- If SCIF's were unavailable, then the meeting could have taken place on another day. Defendants did not go downstairs to seek available SCIF meeting spaces that in all likelihood would have been available at that time of day.

- If SCIF's were unavailable, why had Marotta not scheduled one knowing Plaintiff's time on-island was very limited? (as she had acknowledged)

- In 2025 Defendant SMX were asked to confirm that Ream was read-on, and that the meeting room was a true SCIF, but given multiple opportunities refused to provide this simple factual information.

- In 2025 Plaintiff remembered that Ream had to go into the security office prior to entering the PACOM headquarters, was this an indicator that she was not read-on?

315.    In summary, the available facts strongly suggest that Marotta and Ream deliberately staged a SCIF deception. They exploited Plaintiff's lack of familiarity with Camp Smith's layout, entered a secure building under the pretext of needing a SCIF, and knowingly misrepresented the room's classification status. When Plaintiff prefaced his disclosures as Top Secret, Defendants did not correct his understanding—despite knowing that Ream may not have been read-on. The deception was never corrected, even after Plaintiff's termination.

316.    If discovery confirms that the meeting was not held in a true SCIF, then Marotta and Ream knowingly induced Plaintiff to disclose classified information in an unauthorized facility to an unauthorized individual. Their conduct may constitute violations of federal classified information handling laws, including 18 U.S.C. §§ 793 and 798.

C. SCIF Deception: Criminal Coercion as Retaliation, Civil Conspiracy

317.    While the SCIF deception could be framed as mere carelessness, convenience, or logistical confusion—Marotta and Ream arriving at Camp Smith and automatically proceeding to the upstairs meeting rooms—the surrounding facts suggest something far more deliberate. The totality of circumstances and subsequent behavior indicate a calculated preplanned scheme

intended to create a coercive threat environment tied to a fabricated security violation. Three details in particular indicate that the deception was intentional.

318.    The first evidence of this is that Marotta instructed the group to meet at PACOM's Camp Smith Headquarters and the only logical purpose of this travel from their current venue was so they could meet in a SCIF. A discussion at the unclassified or even Secret level (under certain conditions) could have been conducted in a private room at their existing venue. Marotta asked Ream to attend the meeting even though, upon information and belief, Marotta knew that Ream was not read-on and would not be able to physically pass security to enter a true SCIF. This is clear evidence of preplanning and intent, that exploited Plaintiff's lack of familiarity with the unusual mixed unclassified/classified architecture at PACOM's headquarters.

319.    Secondly, at PACOM's Camp Smith Headquarters, as the group entered through building security, Marotta turned to Plaintiff and said: *"You understand that anything you say unclassified I can share with the rest of the team."*

320.    At the time, Plaintiff found the remark puzzling because the rules determining legal handling of unclassified information were self-evident and irrelevant to their entire purpose of being at Camp Smith. Later, after realizing the SCIF meeting was a deception, Plaintiff then understood Marotta's words to be a coercive threat: classified information that he revealed while believing he was in a SCIF, Marotta could later claim was discussed unclassified in an unclassified meeting room and that she had no reason to treat it as protected—with Ream's corroboration this would fabricate a persuasive Espionage Act violation by Plaintiff.

321.    The inescapable conclusion is that Defendants knowingly orchestrated a deceptive scenario to falsely lead Plaintiff into believing he was in a secure SCIF, thereby coercing him

into making classified disclosures in a facility unauthorized for classified disclosures to a person not authorized for hearing those classified disclosures (Ream not read-on as was represented).

322.    By intentionally engineering this situation, Defendants placed Plaintiff under a continuous threat of being falsely accused of violating federal classified information laws, including 18 U.S.C. §§ 793, 798 (Espionage Act), which carries severe criminal penalties.

323.    The direct threat issued by Marotta as they entered what Plaintiff understood to be a SCIF took on full force when Plaintiff realized the deception. The threat immediately chilled his protected disclosures as the stress of being 'framed' for a crime took over his thoughts. This satisfies multiple provisions of New Jersey's criminal coercion statute, N.J.S.A. 2C:13-5(a)(1), (a)(3), and (a)(7).

324.    Thirdly, by failing to correct the deception, and by conspiring to continue the deception across multiple future communications, Defendants reinforced the deception and perpetuated the coercive threat. In early 2025, as Plaintiff attempted to negotiate a settlement with SMX, the deception and coercive pressure was preserved, despite explicitly being informed of the medical and legal harm being caused and multiple requests for relief.

325.    Plaintiff did not violate the Espionage Act because he never knowingly disclosed classified information in an unauthorized setting. Any improper disclosure—if it occurred—was caused solely by Defendants' deception. Subject to discovery, it may be confirmed that the room was a true SCIF, in which case there would be no violation at all.

326.    Upon information and belief, Marotta anticipated with certainty that Plaintiff would make multiple protected disclosures during the SCIF. Marotta's inclusion of Ream—a subordinate with limited subject matter knowledge—appears calculated to create a compliant witness, enabling Marotta to later deny the content or even existence of Plaintiff's disclosures,

much as she had done previously through the use of a parallel email thread to obscure his October 26 warnings. Should there be a dispute about facts, Ream could be relied upon to cooperate with Marotta therefore stacking any future factual dispute in favor of two long-term PACOM insiders against a single outsider from New Jersey.

327. The threat worked. Plaintiff's disclosures ceased immediately. The psychological impact was immediate and profound: fear of being "framed" for a federal crime created a chilling effect on all future disclosures and triggered a sustained period of emotional and physiological distress.

328. After returning to New Jersey, Plaintiff attempted to report the potential classification violation to PACOM's Information Security Office at Camp Smith. No one answered, and his voicemail was never returned. Plaintiff recalled Marotta's earlier comment in the SCIF: *"I know him VERY WELL" (her emphasis)*—a remark referring to the Head of Information Security.

329. PACOM's failure to respond to Plaintiff's good-faith attempt to report the suspected SCIF deception was either a serious internal lapse—or an indication of insular "small-island" relationships intentionally shielding Marotta from scrutiny. Either way, Plaintiff's sense of retaliation and stress escalated further as he realized he had little chance of receiving a fair investigation into the fabricated crime. This markedly increased Plaintiff's stress to levels well beyond a normal case of workplace retaliation.

330. The SCIF deception was not only psychologically traumatizing—it contributed to Plaintiff's physical harm. Blood pressure data from the days following the event show a hypertensive spike. Medical imaging from April 2025 confirmed multiple prior "silent strokes," which treating physicians linked to sustained hypertensive stress during Plaintiff's employment

at SMX. The deception therefore caused not only psychological harm, but permanent, medically verified neurological injury directly linked to the retaliation.

331.     Taken together, the SCIF deception reflects a deliberate and coordinated effort to intimidate Plaintiff, suppress his protected disclosures, and manufacture the appearance of criminal misconduct. It constitutes criminal coercion under N.J.S.A. § 2C:13-5, unlawful retaliation under CEPA, and—when viewed alongside Ream and Marotta's coordinated conduct—supports a claim for civil conspiracy to suppress whistleblower activity, obstruct lawful reporting, and maintain a chilling coercive threat beyond Plaintiff's termination.

### D. SCIF Deception: Compact Timeline and Coercive Retaliation Conclusions

332.     On November 9, 2023, upon information and belief, Plaintiff was misled by Defendants Marotta and Ream into disclosing Top Secret information in what he reasonably believed to be a SCIF at PACOM's Camp Smith Headquarters. The deception created severe coercive pressure, risk of criminal liability, and obstructed Plaintiff's ability to exercise his rights under federal classification policy and CEPA.

333.     Upon information and belief, and subject to discovery, what follows is a summary of the events establishing the SCIF deception and resulting coercive threat.

334.     Pre-meeting preparation and setup:

- Plaintiff repeatedly requested a SCIF meeting to discuss classified model risk concerns and his legal inability to complete the "vulnerabilities" task. Marotta acknowledged this request in writing, stating: *"I understand the request for a classified discussion however, that will need to happen when you are here on island."*

- Prior to traveling to Hawaii, Plaintiff secured TS/SCI read-on status, obtained building access, and coordinated directly with Ream, who helped facilitate the read-on appointment. These actions were undertaken solely to prepare for the expected SCIF meeting.

- As a result of multiple email communications on the subject, Defendants Marotta and Ream were fully aware of Plaintiff's preparations for a SCIF meeting and expectations of it occurring in the week he was on-island.

- During the Hawaii visit, Plaintiff, Marotta, and Ream departed a team event and traveled separately to PACOM's Camp Smith for a "high-side" meeting.

- If the meeting was to be unclassified, then an unclassified meeting room at the team meeting venue would have been satisfactory, and much more efficient.

- Marotta, upon information and belief, must have known that Ream was not yet read-on and wouldn't be able to meet in a true SCIF.

335.   Deceptive affirmations during the meeting:

- While entering the building, Marotta issued an unusual warning: *"You understand that anything you say unclassified I can share with the rest of the team"* At the time, this made no sense to Plaintiff, who believed they were entering a SCIF for the explicit purpose of exchanging TS information.

- Inside the building, Defendants immediately led Plaintiff to upper level meeting rooms via the elevator and searched for an empty meeting room, indicative that no SCIF meeting room had been reserved in advance.

- Plaintiff, concerned about the lack of classified signage in the meeting rooms he was led to by the Defendants, sought confirmation that it was a SCIF 3-4 times,

for example asking *"Is this TS?"* and *"Is Johanna [Ream] read-on, this is classified TS?"* and each time Marotta answered affirmatively and Ream did not challenge Marotta's answer.

- Plaintiff prefaced his disclosure with: *"The following information is TS"* which neither defendant challenged.

336.    Post-meeting suppression and harm:

- After returning to New Jersey, Plaintiff became suspicious he may have been deceived about the meeting room's classification and Ream's read-on status.

- Plaintiff's attempts to report the incident to PACOM Information Security were ignored, and voicemail follow-up yielded no response.

- Plaintiff recalled Marotta saying that she knew the head of information security at PACOM's Camp Smith *"VERY WELL"* [her emphasis].

- A veteran later affirmed Plaintiff's fear that PACOM had *"accidently on purpose"* deleted his voicemail.

- Plaintiff recalled Marotta's prior comments about how Microsoft had failed to retain the Stormbreaker contract because: *"It's a very small island, everyone knows everyone, and Microsoft don't understand island politics."*

- As this point, Plaintiff because extremely fearful that he was being framed for a crime with major consequences, that Defendants Marotta and Ream were actively conspiring, and that he would not get an unbiased investigation from PACOM. Plaintiff realized he needed to gather his own exculpatory evidence.

- Over the next few months, over one written and two recorded conversations, Defendants continued to affirm that classified material had been exchanged in a SCIF, thus confirming their deception, and furthering it to present day.

- In hindsight, Plaintiff now recognizes that the coercive threat *"You understand that anything you say unclassified I can share with the rest of the team"* was extremely sophisticated, it's significance not becoming apparent to him until *after* he realized he'd been deceived. If his suspicions hadn't led him to realize the deception, he would not have been able to gather exculpatory information, making the trap inescapable.

- Based on recent reliable sources—including an ArmyAI colleague familiar with the facility who expressed certainty that the upstairs level meeting rooms are not SCIFs—Plaintiff is now confident that the meeting occurred in a regular unclassified room and was therefore a deception.

- SMX has refused to provide exculpatory information clarifying the room's classification, Ream's clearance status, or whether the deception was intentional, even when clearly informed of the ongoing medical and legal harm being inflicted on Plaintiff by this coercive threat.

- Marotta and Ream were long familiar with the Camp Smith facility and its unusual interior mix of SCIF and non-SCIF areas.

- Marotta & Ream intentionally exploited Plaintiff's unfamiliarity with the facility to stage the meeting—indicating premeditation and intent.

- Plaintiff lacked familiarity with the Camp Smith facility layout and relied on the representations of Defendants, especially as Marotta was his superior.

- This deception chilled Plaintiff's future disclosures and formed the basis of a sustained retaliatory campaign culminating in his termination.

- Plaintiff continues to suffer medical and legal harm as a result of the ongoing coercive threat and though SMX could easily provide valuable simple factual information that could potentially reduce the harm they have refused to do so.

337.    Based on all available evidence—including Defendants' sustained silence and refusal to clarify the meeting room's classification or Ream's clearance status—the only reasonable inference is that these actions were not the result of confusion, negligence, misunderstanding, or convenience, but rather a deliberate material misrepresentation. Defendants intentionally traveled to PACOM's Camp Smith headquarters, fully aware that its unusual internal mix of SCIF and unclassified rooms could be exploited to mislead Plaintiff about the room's classification status. Most notably, despite the logistical effort to convene at Camp Smith, Marotta brought Ream—whom she knew lacked the clearance to enter a true SCIF—further confirming that the deception was not improvised, but pre-planned.

338.    Defendants' conduct created the false appearance that Plaintiff had violated federal classified information laws—an act punishable by imprisonment under the Espionage Act. The resulting fear was not theoretical: it immediately chilled Plaintiff's protected disclosures, triggered medically documented harm, and continues to deter legal representation while causing ongoing severe emotional and psychological harm.

339.    Upon information and belief, Defendants' motivation was twofold: first, to create a coercive threat to punish Plaintiff for prior protected disclosures; and second, to prevent future disclosures. The SCIF deception and coercion succeeded in both respects.

340.    These events constitute one of the most egregious and malicious forms of retaliatory conduct addressed by CEPA: the deliberate use of deception to induce a potentially criminal act, then weaponize that act to chill future protected disclosures. The SCIF deception meets the definition of adverse action under CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c), as it both punished prior objections and prevented future ones. It also supports liability under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), as the conduct violates core public policy principles concerning truthfulness, national security, and the rights of employees to raise good-faith legal concerns without retaliation.

### E. Adverse Inference: SMX's Refusal to Clarify Critical Facts Has Prolonged Harm

341.    Plaintiff explicitly incorporates by reference Appendix A, section (v): "Adverse Inference: SMX's Refusal to Clarify Critical Facts Has Prolonged Harm," which documents Defendants' repeated refusals to clarify critical factual information about the November 9, 2023, SCIF meeting and related classified disclosures. Despite clear and explicit requests—made in good faith to mitigate ongoing medical and legal harm—Defendants have continued their silence, thus perpetuating a coercive threat environment.

342.    This refusal strongly supports the inference that Defendants possess exculpatory information they refuse to disclose, thereby compounding harm and obstructing Plaintiff's ability to resolve core factual issues. Such conduct further supports Plaintiff's claims for equitable tolling and reinforces the necessity for targeted early factual discovery, as detailed in Plaintiff's contemporaneous motions.

343.    Defendants' sustained silence creates substantial prejudice, hindering Plaintiff's access to counsel and exacerbating ongoing medical stress, including documented physical injuries directly linked to retaliatory stress. This adverse inference thus serves not only as an

evidentiary presumption but also as additional grounds for granting equitable remedies and immediate procedural relief

344.    In the remainder of this Complaint, Plaintiff proceeds based upon the adverse inference that (a) the November 9, 2023, SCIF meeting was deliberately deceptive because the facility was not a properly certified SCIF, and (b) Defendant Johanna Ream was not properly cleared or read-on for the classified disclosures that occurred. This adverse inference, justified by Defendants' prolonged refusal to clarify these critical facts despite multiple good-faith requests, underpins and informs the factual and legal assertions in subsequent sections.

## VI. RETALIATION AND WRONGFUL TERMINATION

### A. Retaliation Following Plaintiff's Initial Protected Disclosures

345.    On his third day at SMX, during the August 2023 TEM in Hawaii, Plaintiff raised a critical distinction between entertainment-focused AI and real-world predictive modeling—a distinction with major implications for model validation and governance. He immediately encountered hostility by the entire Stormbreaker team, when he described this to Defendant Marotta, she admonished Plaintiff for his terminology rather than engaging with the substance of his concerns.

346.    In September 2023, Plaintiff raised multiple concerns about AI model risk during his "initial impressions" call with Defendant Marotta, which Marotta ended abruptly without subsequent follow-up. Prior to this call, Marotta had sent Plaintiff a recurring invitation to weekly leadership calls, leading Plaintiff reasonably to understand this was not limited to the initial call but rather intended as an ongoing inclusion in leadership meetings due to his position within the Stormbreaker leadership team—a fundamental condition of his employment explicitly reflected in the October 16, 2023, Organization Chart. Consequently, Plaintiff joined the

leadership call on October 2, 2023, expecting normal participation. Instead, he was tersely instructed to leave by a peer, Van Sikorsky (Marotta had not joined the call). Plaintiff immediately emailed Marotta seeking clarification. Marotta's email response acknowledged confusion but did not clearly resolve the issue, only adding more confusion. Subsequently, and without providing explanation, Marotta removed Plaintiff entirely from future recurring Stormbreaker leadership meetings, contradicting the explicit terms and conditions of Plaintiff's employment and his documented role on the leadership layer of the organization chart.

347.    On October 26, 2023, Plaintiff again raised serious AI model risk concerns. Defendant Marotta responded by admonishing him for two unrelated matters and ignoring the substance of his concerns. On that same email thread, she then assigned Plaintiff to complete a "vulnerabilities" report—a task she knew or should have known could post difficulties for him to complete at the unclassified level. Plaintiff immediately objected, citing classification concerns, and properly requested a SCIF meeting to resolve the issue. Rather than taking steps to facilitate this resolution, Defendants repeated the unlawful tasking multiple times. Their failure to initiate proper resolution procedures, combined with their subsequent rejection of Plaintiff's ArmyAI SCIF proposal in January 2024, reflects a pattern of obstructive retaliation designed to pressure Plaintiff into silence or compliance.

348.    On October 30, 2023, Plaintiff explicitly linked Executive Order 14110 to the AI model risk concerns he had raised four days earlier, on October 26. Rather than leverage Plaintiff's deep expertise and demonstrated insight into Stormbreaker's AI governance failures, Defendants created a parallel email thread that had the effect—and likely the intent—of obscuring Plaintiff's disclosures from PACOM official ND and the broader Stormbreaker team. Defendant Marotta further retaliated by excluding Plaintiff from all leadership discussions about

the EO's implications, despite her prior assurance that he would hold a leadership role, as reflected in the October 16, 2023 organizational chart. The ultimate slight-of-hand was that Marotta was credited as the source of the EO-related disclosure that had actually been made by Plaintiff while simultaneously Plaintiff was marginalized and retaliated against for the very same disclosure which linked to his prior disclosures.

349.    On November 1, 2023, in response to a request for proposed topics at the next team meeting, Plaintiff offered to present on "Model Risk Management" and "AI regulatory requirements" at the upcoming 2024 TEM. Despite the direct relevance of these topics to his prior disclosures and technical role, Plaintiff was excluded from the meeting—both in-person and virtually. The agenda, dates, and discussion materials were concealed from him. Upon information and belief, all Plaintiff's leadership-level peers attended the event and the critical topic for discussion was modeling/simulation and AI agents—all highly relevant to Plaintiff's expertise, model risk warnings, and 'vulnerabilities' task. Plaintiff's exclusion further evidences Defendants' ongoing effort to suppress his protected activity, marginalize his role, and isolate him from key team communications and decision-making processes.

350.    On December 6, 2023, Plaintiff emailed SMX inquiring about his relocation bonus, which had not yet been paid. The payment was approximately four months overdue—spanning nearly eight pay cycles—and required at least five additional follow-up emails before it was finally issued on December 29. The delay is unexplained in the record and raises a legitimate question for discovery as to whether the withholding was administrative negligence or related to Plaintiff's escalating protected disclosures from August through December.

351.    These early acts of hostility, marginalization, and exclusion—beginning within days of Plaintiff's initial protected disclosures—reflect classic retaliation under the New Jersey

Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3. Plaintiff objected to unlawful

and unsafe practices involving the mishandling of AI model risk and classification concerns, and

he raised these concerns both internally and externally. In response, Defendants engaged in a

pattern of punitive conduct: isolating Plaintiff from leadership, excluding him from critical

discussions, assigning him tasks likely to induce unlawful behavior, and attributing his protected

disclosures to others. These actions constitute adverse treatment under CEPA, specifically under

subsections (a)(1), (a)(2), and (c), and further support a retaliatory motive under the public policy

doctrine established in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980).

## B. SCIF Deception and Criminal Coercion as Retaliation

352.    On November 9, 2023, Defendants Marotta and Ream intentionally deceived

Plaintiff into believing he was in a Secure Compartmented Information Facility (SCIF), causing

him to unknowingly disclose Top Secret (TS) information concerning his inability to complete

the "vulnerabilities" task. In reality, the meeting occurred in a location not authorized for TS/SCI

discussions and in the presence of an unauthorized individual (Ream). Upon information and

belief, this setup was engineered in retaliation for Plaintiff's prior protected disclosures and in

anticipation of the weighty disclosures he was expected to make during the SCIF meeting.

353.    This SCIF deception—combined with a coercive threat made by Marotta upon

entry into the building—created the false impression that Plaintiff had committed a federal

classified information handling offense. That threat was legally baseless: Plaintiff did not, and

would not, knowingly disclose classified material in an unauthorized setting. If any disclosure

occurred, it was solely the result of Defendants' misrepresentations.

354.    Defendants' conduct was not the product of carelessness, convenience, innocent

mistake, or misunderstanding. Rather, the surrounding events—including the meeting logistics,

room selection, and Defendants' repeated confirmation of its classification level—demonstrate premeditated intent. The deception was later sustained across at least three separate communications, extending its coercive effect well beyond the initial encounter.

355.    The coercive threat itself was both simple and sophisticated: by deceiving Plaintiff into disclosing classified information in what he believed was a SCIF, Defendants manufactured a legal vulnerability. Marotta's comment—that anything said in an unclassified setting could be shared with others—reinforced this threat. The immediate effect was chilling: Plaintiff's internal protected disclosures sharply declined and then ceased altogether, demonstrating the power and precision of the intimidation.

356.    PACOM's subsequent refusal to respond to Plaintiff's good-faith efforts to report the SCIF deception compounded the retaliation. During the November 9 meeting, Marotta emphasized that she knew the Head of Information Security at PACOM *"VERY WELL" (her emphasis)*—a statement that later took on menacing significance. When Plaintiff attempted to report the deception, no one answered his call and his voicemail was never returned. Plaintiff reasonably believed any resulting investigation would be biased, manipulated, or suppressed— fears that were confirmed when PACOM's Inspector General dismissed his complaint in four weeks, finding that it was not within their purview. The retaliatory threat environment persists, and Plaintiff continues to fear that PACOM actors may retaliate further.

357.    This was retaliatory conduct of extraordinary severity. It was potentially criminal in nature and caused Plaintiff extreme psychological and physiological harm. Independent blood pressure monitoring shows acute hypertensive spikes that correspond closely with major retaliatory events, including the SCIF deception. Audio recordings of Plaintiff's calls with the DOD Inspector General further reflect his distress and confirm the emotional toll.

358. At the time of the SCIF deception, Plaintiff was already recovering from a prior minor stroke that had required hospitalization. This made him especially vulnerable to stress-induced recurrence. Defendants' actions significantly elevated his blood pressure, increasing his stroke risk to a medically dangerous level. His treating physicians later confirmed that the stress from these events materially contributed to a second, medically verified stroke in 2025—resulting in permanent neurological injury and MRI imaging revealed multiple "silent strokes" likely associated with sustained hypertensive episodes stemming from the coercive threat.

359. This conduct—involving deliberate deception, the manufactured risk of felony prosecution, and the suppression of future disclosures through intimidation—falls squarely within CEPA's broad prohibition against retaliation. Under N.J.S.A. 34:19-3(a)(1), (a)(2), and (c), retaliation includes not only termination, but also threats, coercion, and any adverse action taken in response to an employee's good faith refusal to violate the law or objection to policies that violate public policy. Defendants' scheme to induce a classified disclosure under false pretenses and weaponize it against Plaintiff reflects a uniquely severe form of retaliatory misconduct—one that caused documented medical harm and lasting emotional injury. This episode not only illustrates a pattern of escalating retaliation, but also exemplifies the type of conduct CEPA and *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), were designed to deter.

## C. Coordinated Obstruction of Plaintiff's Lawful SCIF Solution by PACOM & SMX

360. To resolve the classification issue blocking completion of the "vulnerabilities" task, Plaintiff proposed a lawful, feasible solution on January 3, 2024 to Defendants Marotta and PACOM official ND. Drawing on his prior role at ArmyAI, Plaintiff offered to complete the task at their SCIF facility, using appropriate classified systems and drawing on expert resources. This

solution would have satisfied federal law and the stated task objective. Plaintiff was cooperative and flexible—offering to discuss the proposal at any time, even *"beyond midnight."* However, Marotta responded with a vague instruction to "hold off," and neither she nor PACOM official ND followed up. No explanation was ever provided.

361.    Two months later, during Plaintiff's March 6 termination call, Marotta revealed the reason for the rejection seemingly to retroactively justify the prior silence in front of HR representative Landers. Marotta stated the following on the March 6 call:

> *"Because Paul your clearance can access classified materials held by SMX and the government who is the sponsor of the program has not allowed for a relationship with ArmyAI or for us to go and advocate or work otherwise from the Stormbreaker program that holds your clearance so if the government says they do not want us you know going and doing working especially classified then they're the ones who determine our need to know and that's what we have to follow is what the government guidance is. And they [PACOM] said unequivocally No, they are not interested in us as SMX pursuing that relationship or that engagement with ArmyAI."*

362.    This rationale was never communicated in response to Plaintiff's proposal. Had Plaintiff received this explanation in January, he would have challenged it immediately. The rejection contradicted Stormbreaker's role as a Joint Operational Planning Toolkit (JOPT) intended to support interagency and even foreign allied collaboration, including with Australia. In multiple presentations, Marotta had emphasized that Stormbreaker was open to collaboration with any interested agency—even foreign allies. It made little sense that ArmyAI—a core U.S. Army intelligence entity—would be off-limits.

363.    This unexpected explanation on March 6 strongly suggests that the rejection of Plaintiff's SCIF-based proposal was not based on feasibility or policy, but on PACOM and SMX's mutual desire to avoid more classified-level protected disclosures from Plaintiff and especially written ones expanding on his November 9, 2023 SCIF disclosures—which included concerns about misrepresentation, fraud, and gross mismanagement.

364.    Defendant Marotta asserted—both in connection with Plaintiff's ArmyAI proposal and later regarding his "Lack of Work" termination—that these decisions originated solely with PACOM. However, SMX did not merely acquiesce to PACOM's determinations; it actively facilitated and endorsed them. SMX failed to question the decisions' propriety, declined to negotiate reasonable alternatives, and withheld all information from Plaintiff—a coordinated non-response that deprived him of any opportunity to object or protect his role. This tacit but deliberate alignment with PACOM, despite the evident flaws in its actions, constitutes a "smoking gun" admission. It underscores the existence of a tightly coordinated decision-making process between SMX and PACOM regarding Plaintiff's termination, and strongly supports the inference that the purportedly "independent" LOW justification was pretextual

365.    PACOM official ND's involvement further reveals that this coordination was deliberate. PACOM official ND was directly involved in both the December 11 escalation of Plaintiff's protected disclosures and the January 7 SCIF access proposal—and participated in a coordinated non-response to both. His silence, despite being well-positioned to facilitate a lawful and constructive solution, undermines the narrative that PACOM acted as a neutral third party. It instead suggests either active complicity in the retaliatory scheme or gross indifference to Plaintiff's protected activity.

366.   Discovery is expected to reveal communications coordinating these responses and clarifying whether Marotta misrepresented Plaintiff's disclosures to PACOM leadership.

367.   Taken together, these facts reinforce Plaintiff's allegation of gross mismanagement and support the inference that SMX and PACOM personnel cooperated to obstruct Plaintiff's lawful remediation efforts in order to suppress further protected disclosures and engineer Plaintiff's termination. Under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3(a)(1), (a)(2), and (c), this deliberate obstruction—including failure to consider or respond to a legally viable proposal—constitutes actionable retaliation and a clear violation of CEPA's core protections. It also supports liability under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), which prohibits adverse employment consequences resulting from an employee's objection to practices contrary to public policy.

D. Demotion Reveals Prior Retaliatory Planning, Implicates PACOM

368.   On December 11, 2023, Plaintiff escalated his protected disclosures to PACOM official ND in an email. No one responded to the email or to Plaintiff's offer of a classified follow-up discussion, creating the strong appearance of a coordinated non-response.

369.   Just two days later, on December 13 (according to PowerPoint metadata), Defendant Marotta edited the Stormbreaker organizational chart—removing Plaintiff from the leadership layer at the top, repositioning him at the bottom, and stripping all reporting lines, leaving a standalone box with only his name and title. In January 2024, apparently unaware of Marotta's changes, Ream circulated the updated chart to the Stormbreaker team—publicly illustrating Plaintiff's "orphaning" without explanation.

370.   Plaintiff believes, subject to discovery, that PACOM civilian officials—including PACOM official ND—were consulted or informed prior to the December 13 edit, based on its

proximity to Plaintiff's December 11 email, PACOM's known role in Stormbreaker staffing decisions, and the appearance of a coordinated non-response from all recipients. Discovery is also likely to reveal that Marotta had earlier briefed PACOM official ND on Plaintiff's November 9 SCIF disclosures in a manner that distorted both the nature of the concerns and Plaintiff's proposed solutions, thereby contributing to PACOM's silence and the subsequent retaliatory acts.

371.    On February 13, 2024, Defendant Ream sent Plaintiff a confusing email stating: "*You may have already seen in ADP, but Wendy has made some adjustments to our contract supervisory assignments. I'll now be your supervisory for SMX ADCON related items (timecards, support etc.). Wendy will be still be tracking your contributions, but this change will help better support supervisor-employee actions and provide you an additional touchpoint*".

372.    This email appeared to retroactively reframe the December 13, 2023 "orphaning"—Plaintiff's stealthy removal from the leadership team and all supervisory connections—as a demotion under Ream. At the same time, the use of the phrase *"additional touchpoint"* created ambiguity: it suggested a split in supervisory structure, with Ream overseeing administrative matters (*"ADCON"*) and Marotta continuing to supervise Plaintiff's substantive contributions—though no such reporting lines appeared on the organizational chart.

373.    Ream indicated she would schedule a call to discuss the change. Plaintiff promptly responded, expressing his willingness to engage, but no follow-up occurred. After several days without a response, Plaintiff proactively sent a calendar invitation proposing February 20, 2024, which Ream accepted. During the February 20 call, Defendant Ream confirmed that Plaintiff had been removed from the leadership layer and clarified that she would now serve as his sole supervisor.

374.    In hindsight, and subject to discovery, Plaintiff believes that his December 13 "orphaning" by Marotta reflected that a decision had already been made to terminate him—likely in coordination with PACOM shortly after Plaintiff's December 11 protected disclosures. This visual "orphaning"—carried out without explanation, reporting structure, or reassignment—was not a routine demotion, but an intermediate step in a broader plan to remove Plaintiff from the organization. The absence of any reporting line to Ream or anyone else suggests that Defendants had no intent to integrate Plaintiff into a continued role. Instead, this structural isolation functioned as a purgatory—removing Plaintiff from the leadership team while avoiding a formal termination that might appear retaliatory. The February 13 email from Ream, with its vague language and confusing supervisory structure, appears to have been a rushed attempt to retroactively justify the earlier action by framing it as a demotion and routine reassignment. The sequence of events—including the February 20 confirmation that Ream was now Plaintiff's sole supervisor, followed just two weeks later by Plaintiff's termination—supports the inference that the termination plan had already been set in motion by mid-December, just two days after a significant protected disclosure to SMX and PACOM.

375.    The "orphaning" of Plaintiff, functionally equivalent to a demotion or reassignment to a "bench" status, stripped Plaintiff of all meaningful duties and left him professionally adrift. In practice, it constituted effective termination, even though the formal separation would not occur until March. The proximity—just two days—between this escalation and the adverse action provides direct temporal evidence of retaliatory motive.

376.    Taken together, these actions reflect deliberate concealment and retaliation—a coordinated effort to suppress Plaintiff's protected disclosures and isolate him from leadership and decision-making. This conduct falls squarely within the scope of CEPA, N.J.S.A. 34:19-

3(a)(1), (a)(2), and (c), and further supports liability under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980).

E. Plaintiff's "Lack of Work" Termination, PACOM is Not a Neutral Third Party

377.    On February 20, 2024, Defendant Ream formally advised Plaintiff that he was now demoted from the leadership team and would report to Ream. During the call, Ream committed to making changes—most notably, helping Plaintiff gain access to a SCIF so he could complete the "vulnerabilities" task at a classified level. However, Plaintiff did not hear from Ream again for the next two weeks.

378.    On March 6, 2024, Defendant Ream scheduled a same-day call with Plaintiff—a timing that appeared unusually abrupt following two weeks of complete silence. This turned out to be Plaintiff's termination meeting with Defendants Marotta, Ream, and HR representative Landers. Defendant Marotta informed Plaintiff that he was being terminated pursuant to a "Lack of Work" (LOW) directive from PACOM that instructed Stormbreaker to scale-back its AI/ML efforts. Plaintiff's last day of employment was to be March 29, 2024.

379.    Defendant Marotta characterized the LOW as an independent decision made solely by PACOM—one she claimed was beyond Defendant SMX control, allegedly arising from October 2023 budget issues, which Marotta claimed Plaintiff had prior knowledge of. Marotta further stated that "four-star generals" at PACOM had attempted to resolve the issue, but were unsuccessful, and therefore the decision was final. This justification was not only inconsistent with SMX's prior representations to Plaintiff, but directly contradicted the contemporaneous evidence of ongoing hiring and classified task planning.

380.    Plaintiff was not aware of any Stormbreaker budget issues arising in October 2023. In fact, just weeks earlier, during pre-hire discussions, Defendant Marotta had assured him

that Stormbreaker's 2024 budget had already been approved—a claim also supported by an October 2023 PACOM document. She emphasized that Stormbreaker was a strategically supported, ongoing program. These assurances were backed by claims that SMX was constructing a dedicated SCIF for Stormbreaker (indicating a very long-term commitment), and by the offer of retention bonuses contingent on a minimum two-year term of service.

381.    Only two weeks earlier, Plaintiff had been informed that he was removed from Stormbreaker's leadership layer and demoted to a position under Ream. However, Ream had also made undertakings to get Plaintiff into a SCIF where he could work on the "vulnerabilities" task. Upon information and belief, SMX and PACOM did not want that task completed at a classified level because they anticipated it would contain many protected disclosures, as well as repeating Plaintiff's earlier disclosures from the classified November 9 SCIF meeting.

382.    Plaintiff's March 6 termination also came just two weeks after his protected disclosure to the DOD IG hotline. Acting upon DOD IG's guidance, Plaintiff did not disclose the call to SMX, however it is reasonable to assume Plaintiff may have escalated his protected disclosures to DOD IG given the context. Subject to discovery, Plaintiff suspects that Defendants could have identified web browsing history or other indication that he was researching the DOD IG complaint process. On February 15, two days after Ream's confusing demotion email, Plaintiff's laptop suspiciously seemed to have data scraped by SMX (sufficiently suspicious that he was prompted to take a photograph of this laptop screen) and this could have revealed further evidence of his DOD IG contact. Although Plaintiff has no direct proof that SMX accessed this information, the suspicious February 15 data scrape—sufficiently unusual that Plaintiff took a screenshot—coupled with SMX's subsequent behavior, supports the inference that SMX may have discovered his protected activity through improper means.

383.     Most significantly, the LOW was described as an independent decision by PACOM, but this contradicts the December 11, 2023, protected disclosures and January 3, 2024, proposed ArmyAI SCIF emails that both included PACOM official ND. The apparently coordinated non-response to both emails was suspicious, and especially so for the December 11 email given the weighty protected disclosures and Marotta's stealthy "orphaning" of Plaintiff just two days later (December 13). Altogether leaving a strong indication that this was a coordinated decision between SMX Defendants and John/Jane Doe(s) at PACOM to terminate Plaintiff's employment in the future via the "Lack of Work" (LOW) order.

384.     Discovery is expected to reveal communications between Marotta, Ream, and PACOM personnel—including PACOM official ND—regarding the handling of Plaintiff's December 11 and January 3 proposals. The absence of any response to these proposals, coupled with the subsequent LOW justification, supports the inference of coordinated planning.

385.     Taken together, these facts support the conclusion that Plaintiff's termination was substantially motivated by his protected activity—including objections to unlawful conduct, disclosures to public bodies, and refusal to violate federal law governing classified information. These actions are expressly protected under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3(a)(1), (a)(2), and (c), and are further supported by the public policy doctrine articulated in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980). Defendants' retaliatory planning—including the coordination with PACOM, the shifting LOW narrative, and the abrupt abandonment of reassignment efforts—provides strong circumstantial evidence that Plaintiff's termination was not the result of budgetary necessity, but rather an unlawful effort to suppress protected whistleblowing activity.

## F. Defendants' Retaliatory Animus Toward Plaintiff's Protected Activity

386. During the March 6, 2024, termination call, Plaintiff offered to use his remaining employment time to complete the "vulnerabilities" task by working from a SCIF. Defendant Marotta declined that offer and expressed clear displeasure that Plaintiff had not performed this task: *"...the task that we had asked you to do did not involve classified information."* This admonishment prioritizes Marotta's desire for the document to be written without classified information over Plaintiff's reasonable—and later validated—legal concern that completing the task unclassified would violate federal law given his prior knowledge and TS/SCI clearance. If Marotta disagreed with Plaintiff's assessment, she had the opportunity in November 2023 to resolve this through proper procedures but didn't.

387. Plaintiff's refusal to complete the "vulnerabilities" task at the unclassified level was a protected action, grounded in his reasonable and good-faith belief that doing so would violate federal classified information laws. Marotta lacked authority to adjudicate or override classification concerns and was obligated to address them in good faith. Instead, she actively blocked Plaintiff's repeated efforts to resolve the issue through proper classified channels, suggesting her real intention was to prevent the task's completion, presumably to prevent further protected disclosures at the classified level.

388. Although Defendants did not cite Plaintiff's refusal to perform the "vulnerabilities" task as a formal cause for termination, their negative commentary and mischaracterization of that refusal—particularly in the presence of HR representative Landers—constitutes strong circumstantial evidence of retaliatory motive. This is sufficient under CEPA's mixed-motive standard, which recognizes retaliation even where protected conduct is only one substantial motivating factor.

389.    Defendants' retaliation against Plaintiff for refusing to violate federal classified information laws is precisely the kind of protected activity CEPA was enacted to safeguard. The March 6 termination call, including Marotta's continued animus toward Plaintiff's refusal, supports the inference that his termination was substantially motivated by protected activity. That Defendants did not list the "vulnerabilities" task as an official cause is immaterial under CEPA's mixed-motive framework. What matters is that Plaintiff's lawful refusal—and his effort to resolve the issue through proper legal channels—was met with hostility, distortion, and ultimately termination. This sequence reflects clear retaliatory intent and actionable misconduct in violation of N.J.S.A. 34:19-3(a)(1) and (c).

### G. Coercive Threat Interfering with Employment

390.    During the March 6, 2024 termination call, after expressing frustration with Plaintiff's refusal to perform the "vulnerabilities" task unclassified, Defendant Marotta warned Plaintiff that returning to work at ArmyAI could violate SMX's Non-Disclosure Agreement (NDA) and intellectual property (IP) obligations. Marotta hired Plaintiff and knew that his prior place of work, ArmyAI, is a federal agency, not a private contractor, and therefore no NDA or IP conflict could plausibly apply. Marotta's statements appear designed to intimidate Plaintiff discouraging his reemployment at ArmyAI, and possibly made in an attempt to deter him from classified systems where he could report wrongdoing. When Plaintiff challenged the threat and sought clarification, Marotta reaffirmed her position.

391.    Plaintiff was sufficiently concerned about this legal threat to reemployment at ArmyAI that it caused him to review his SMX contract documents for restrictions. When he could find no legal barrier he became concerned that perhaps he was missing a contract document, so he emailed Landers to identify the source of Marotta's alleged employment barrier.

After some back and forth correspondence, Plaintiff realized the root of the problem was that Landers didn't realize ArmyAI was government, upon which Landers acknowledged there was no legal barrier to employment: *"I was not aware it [ArmyAI] was government and not a contractor."* Plaintiff reasonably believes that this confusion originated from Marotta—either through her termination call statements or other internal discussions about why Plaintiff's January 3 ArmyAI proposal was rejected.

392. This threat to Plaintiff's reemployment with ArmyAI—a federal entity—was a coercive and baseless attempt to interfere with his lawful rights and professional opportunities. It exemplifies Defendants' broader pattern of using intimidation and misinformation to punish Plaintiff for his protected disclosures, including his efforts to perform the "vulnerabilities" task lawfully from a SCIF. By falsely invoking legal restrictions and mischaracterizing inter-agency collaboration as an NDA or IP violation—despite knowing that no such legal barrier existed— Defendants sought to interfere with Plaintiff's ability to resume lawful federal employment. Such conduct constitutes actionable retaliation under CEPA, which prohibits adverse employment actions, threats, or interference in response to an employee's good faith objection to, or refusal to participate in, unlawful conduct, as codified in N.J.S.A. 34:19-3(a)(1), (a)(2), and (c).

## H. Post-Termination Obstruction and Bad-Faith Reassignment by SMX

393. Immediately following Plaintiff's March 6 termination call, Defendants inaccurately documented Plaintiff's employment record as a voluntary 'resignation,' rather than an involuntary termination due to "Lack of Work." Plaintiff discovered this misclassification and had to take proactive steps to formally correct his employment record. This intentional or reckless misrepresentation compounded Plaintiff's distress by increasing financial harm, including improperly triggering an obligation to repay earned bonuses and risking denial of

unemployment benefits. This improper documentation further evidences Defendants' bad faith providing additional indications of retaliatory motive.

394.    During the March 6, 2024, termination call, SMX represented that they would undertake efforts to reassign Plaintiff to other open roles within the company and scheduled follow-up activities for this purpose. Soon after this call, Plaintiff found several directly relevant and open firm-funded positions at SMX, one of which ("Data Scientist AI Lead") he immediately flagged in an email to Landers—but received no response.

395.    On March 15, 2024, Plaintiff spoke with SMX HR representative Julie Farasy who asserted that SMX roles listed on their internal website as 'firm funded' meant: *"we have the funding, we can fill it, and start someone as soon as possible"* and added that 'firm-funded' meant that candidates were being actively sourced and interviewed. She emphasized that all 'firm funded' roles listed on the site were actively open and that inactive positions would be promptly removed.

396.    When Plaintiff pointed out that the "Data Scientist AI Lead" was a good fit, Farasy confirmed that the role was "firm funded" and therefore available, but said she had no record of Plaintiff's earlier email to Landers expressing interest in that role. Farasy undertook to connect Plaintiff with the recruiter responsible for the role. Despite Plaintiff's excellent fit for the role, existing employment with SMX, and availability for immediate start, Plaintiff was never contacted by the recruiter—not for an interview, nor even to acknowledge or reject either of his two expressions of interest. This suggests that SMX efforts to reassign Plaintiff were not made in good faith.

397.    As Plaintiff went through available "firm funded" roles together with Farasy, he identified an AI/ML modeling/simulation role in Hawaii for which he was an excellent fit. When

Plaintiff gave Farasy the internal job ID for this active "firm funded" SMX role, Farasy was silent for a long time, then awkwardly revealed that this role—and several other "firm funded" openings—were on Stormbreaker. Farasy appeared to immediately understand the implication: this these active listings directly contradicted SMX statements that Plaintiff's LOW termination was allegedly due to budget difficulties requiring a scale back on project Stormbreaker including Plaintiff's skillset—yet here were multiple active listings.

398.    Farasy claimed these roles were active in error, and needed correction, but could offer no coherent explanation for their active 'firm funded' listing other than suggesting that they were 10 month old "pipeline" roles that should have been removed—thereby contradicting her earlier statement saying they would have been removed immediately if not available.

399.    These active job listings for Stormbreaker together with Farasy's statements provide strong evidence that SMX was actively hiring for Stormbreaker contemporaneously with Plaintiff's LOW termination—fatally undermining SMX's "Lack of Work" defense, and supporting the inference of retaliatory pretext.

400.    If we were to accept Farasy's explanation that the roles were 10 month old "pipeline' roles that should all have been removed, then the fact that these roles recruited AI/ML skills 10 months earlier further supports the conclusion that AI functionality was embedded in Stormbreaker from its inception, not an aspirational future goal as other job advertisement from that era demonstrate.

401.    Additionally in a January 10 2024 email from Ream, six new Stormbreaker employees are announced and Plaintiff believes, based on contemporaneous hiring announcements, that a seventh employee with AI/ML modeling or simulation expertise was also added in that same timeframe.

402.    Altogether these hiring decisions raise multiple questions, for example:

- If the LOW was due to budget problems originating in October 2023 as alleged by Marotta on Plaintiff's termination call, why did SMX proceed to hire six or more employees in January, including skills overlapping with Plaintiff's?

- Why did PACOM allow this ongoing recruitment whilst grappling with October budget problems?

- If the LOW required a scale back due to budget problems and/or a decision to not pursue further AI developments, then why was SMX still actively hiring for multiple people including those who overlapped with Plaintiff's (unneeded, terminated) skill set?

- Why did PACOM issue a LOW that directly contradicted new hiring that it had authorized?

403.    This active Stormbreaker hiring—for roles overlapping Plaintiff's exact skill set—not only contradicts the LOW narrative but also supports a strong inference that Plaintiff's termination was not driven by budget constraints, but by retaliatory intent. The hiring activity further suggests coordinated decision-making between SMX and PACOM, particularly given PACOM's role in approving Stormbreaker staffing and its simultaneous silence in response to Plaintiff's protected disclosures. These facts directly undermine Defendants' claim that the LOW was the result of an impartial third-party decision and instead point to a jointly executed plan to remove Plaintiff in retaliation for his whistleblowing.

404.    On his final day of work, Plaintiff had been led to expect a formal TS/SCI read-off by video meeting, consistent with his SF312 obligations. As he frantically tried to ensure this was completed, SMX informed him that it was no longer needed as it would be done

Page **159** of **267**

"administratively". Concerned about this last-minute change Plaintiff asked for a copy of his "read-off" SF312 contract but SMX did not comply. Plaintiff ultimately contacted the DOD IG hotline to report that SMX had not provided proper offboarding information—including procedures for CAC card and Camp Smith ID return—and to document the mishandled TS/SCI read-off. These failures raise more questions about SMX's precision in respectfully following classified information and security protocols.

405.    Collectively, these post-termination actions—taken by SMX and occurring in the shadow of PACOM's silent participation—including the misclassification of Plaintiff's departure as a resignation, the failure to pursue promised reassignment in good faith, the contradictory hiring activity for roles matching Plaintiff's skill set, and the mishandling of Plaintiff's classified offboarding—further support the conclusion that Plaintiff's termination was retaliatory.

406.    This post-termination conduct not only undercuts Defendants' stated justification for the "Lack of Work" order, but also exposes PACOM's claimed impartiality as untenable—reinforcing the appearance of coordinated retaliation between SMX and PACOM. Under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3, retaliation includes both termination and any subsequent action taken to discourage, punish, or interfere with an employee's exercise of their rights. These facts provide additional support that Defendants acted with retaliatory intent in violation of CEPA.

I. Plaintiff Gathered Exculpatory Evidence, Escalates Complaint to DOD IG

407.    Between December 2023 and January 2024, Plaintiff became increasingly concerned that he was being set up for a fabricated federal crime involving unauthorized disclosure of classified information. He feared that in any future investigation, the word of two long-term PACOM staff would outweigh that of a recently hired mainland contractor. He

anticipated that any internal investigation—particularly one led by PACOM—would be biased or obstructed. These concerns were later validated when PACOM's internal IG review of his complaint was closed within a month, finding no wrongdoing.

408.    The earliest evidence capturing Plaintiff's account of the November 9, 2023, SCIF meeting events was on December 11, 2023, when Marotta sent an email about the company Strategy Robot. In Plaintiff's reply he referenced the November 9 SCIF meeting and referred to TS discussions on information classification and AI model risk issues. Neither Marotta nor Ream challenged Plaintiff's recollection of the meeting being in a SCIF or discussing classified content.

409.    Recognizing the seriousness of the threat and the need to preserve exculpatory evidence, Plaintiff made a conscious and legally justified decision to record calls—aiming to capture, without leading the witness, two key admissions: (i) that Defendants acknowledged hearing Top Secret information; and (ii) that they acknowledged being in a SCIF at the time. Together, these admissions would address all foreseeable coercive threat scenarios.

410.    Plaintiff's first opportunity to preserve exculpatory evidence occurred during his February 20, 2024, demotion call with Defendant Ream. Plaintiff explicitly asked whether she remembered the Top Secret rationale he had shared during the November 9 SCIF meeting for why the vulnerabilities task could not be completed at the unclassified level. He raised the issue several times. Ream avoided direct answers—responding once with *"hmm"* and again with *"sure"*—but ultimately acknowledged hearing Plaintiff's rationale, replying *"yes, I remember."* Although evasive, Ream eventually acknowledged that she remembers the classified information that was discussed. Her continuance of the deception reinforced the deception and coercive

threat, and deepened Plaintiff's belief that he was facing a coordinated and potentially criminal conspiracy.

411. On February 21 and again on February 23, 2024, Plaintiff called the DOD IG hotline to report his concerns. He referenced the False Claims Act and 18 U.S.C. § 798 (Espionage Act). On the second call, he raised concerns about cooperating witnesses and having lost faith in SMX. The hotline advised Plaintiff that he was not required to report these concerns to SMX, and that escalation to the DOD IG was appropriate given his loss of trust in the company.

412. Plaintiff's second opportunity to record exculpatory evidence came on March 6, 2024—the day of his termination. On this call which included Ream and Landers, Marotta explicitly confirmed the SCIF setting and acknowledged hearing Plaintiff's Top Secret disclosures, while Ream remained silent and did not dispute those acknowledgments:

- **0:08:08 Plaintiff**: *"Mindful this is an unclassified call, you recall our Top Secret Conversation right? And I described there the reasons why I was somewhat constrained on some of the work tasks you'd asked me to do right? So you recall from that Top Secret conversation that ... I have other [classified] experience in this domain right?"*

- **0:08:40 Defendant Marotta**: *"Yes, and I, Johanna [Ream] and I both were you know part of that discussion and um and as part of that discussion we also talked about the task that we had asked you to do did not involve classified information."*

- **0:08:55 Plaintiff**: *"well, but Wendy they did, right? I mean I told you in the Top Secret call what the issue was, the Top Secret conversation in the SCIF at Camp*

*Smith I told you right? You remember what the issue was with me doing that work unclassified right? Do you remember the reason that I told you?"*

- **0:09:20 Marotta**: *"Yes, yes, I do Paul, very well."*

413.    Marotta's explicit confirmation—and Ream's silence—on the March 6 termination call confirm that: (a) Defendants induced Plaintiff to disclose classified information under false pretenses in an unclassified facility; (b) after the disclosure, they failed to inform Plaintiff of the deception or report the incident to Information Security; and (c) they perpetuated the SCIF deception across three subsequent communications, including this final call.

414.    The demotion and termination call recordings—together with Plaintiff's December 11 email—provide essential evidence that Plaintiff believed he was in a SCIF, and that Defendants Marotta and Ream actively created and sustained that belief. These communications demonstrate that the SCIF deception—and the associated coercive threat—was not a one-time misunderstanding, but a coordinated narrative maintained by Defendants across at least three interactions and continuing through the present.

415.    A second critical feature of the March 6 termination call is how Defendant Marotta framed her response to Plaintiff's question about the Top Secret disclosures made during the November 9 SCIF meeting. Rather than directly answering, Marotta invoked Ream's presence by saying: *"I, Johanna and I both were… part of that discussion."* This rhetorical choice served to align Ream with Marotta in real time, implying shared memory, and mutual responsibility. Marotta then emphasized *"both"* and *"we,"* implicitly signaling to HR representative Landers — also present — that Marotta and Ream shared a unified and corroborating account of events. Ream's silence further reinforced the impression that her account aligned with Marotta's. Plaintiff reasonably interpreted this as a deliberate tactic to

intimidate by presenting two PACOM-affiliated insiders against a single, recently hired mainland contractor—a dynamic that deepened the coercive threat by suggesting that in any future investigation, their version would be accepted over his.

416.    This perception was not isolated. It reinforced Ream's earlier mischaracterization of the November 9 SCIF meeting during the February 20 call. At that time, Ream stated: *"I took some notes just to keep everything straight in my head and my take was that Wendy had asked for some things that had not yet been delivered […] that was my take."* The language chosen by Ream, and her mischaracterization of what happened at this meeting, greatly troubled Plaintiff. The language a person would typically use when referring to their meeting notes would be *"according to my notes…,"* but Ream said *"I took some notes just to keep everything straight in my head a phrase often associated with informal narrative construction—as in: "to get the story straight."* Ream's repeated use of *"my take was"* suggested a personally constructed narrative, not an objective record of events.

417.    Even if the linguistic signals were unintentional, Plaintiff was most alarmed by the substance of Ream's framing—implying that Plaintiff had insubordinately failed to complete an assigned task: *"Wendy had asked for some things that had not yet been delivered."* This directly contradicted the actual explanation he gave on November 9: that he could not legally complete the "vulnerabilities" task at the unclassified level, and a key purpose of that SCIF meeting was to resolve those task classification issues in accordance with proper DoD protocols—critical omissions that raised serious concerns about the accuracy and intent behind Ream's notes.

418.    Plaintiff attempted to clarify this during the February 20 call, stating: *"Let me provide context on this… [Wendy] said she was astounded… that I said 'no,' but I had not said no*

*— I'd said I can't do that unclassified."* Ream remained silent. Plaintiff reiterated: *"So I had not refused to do work, I'd said I can't do it unclassified, right?"* Ream's noncommittal responses— including silence, 'hmm,' 'sure,' 'okay,' and 'yes, I remember' —further supported the inference that she was aware of the legal issue but avoided explicitly acknowledging it. Ream's responses led Plaintiff to conclude that Ream was aligning her story with Marotta to portray his refusal as insubordination—despite knowing the legal basis for his objection.

419. These interactions convinced Plaintiff that Ream was not a neutral witness. She had been present during the SCIF deception, remained silent in the aftermath, and was now offering a distorted narrative that omitted Plaintiff's documented efforts to follow classification protocols — including advice from PACOM's Head of Information Security. Plaintiff reasonably concluded that Ream was actively participating in a coordinated attempt to reshape the record, reinforcing the same narrative Marotta later advanced. This interpretation was further supported by what appeared to be a similar retroactive justification used to reframe his December 11 "orphaning" as a formal demotion.

420. Plaintiff was so disturbed by this sequence — particularly the perception that Ream and Marotta were coordinating their story to create a false record — that on February 21 and again on February 23, 2024, he contacted the Department of Defense Inspector General hotline. Audio from the calls captures Plaintiff in obvious psychological distress, stating: *"Things have happened that have caused me to lose faith in the company. In particular, it seems that two people are coordinating their story—which has scared the hell out of me, because it's like two people against me ... this conversation [Nov 9 SCIF meeting] fried my brain for eight weeks."* These calls correspond with some of the highest hypertensive peaks in Plaintiff's

medical records and a neurological expert is expected to link this acute stress response to the "silent strokes" later confirmed by imaging, which resulted in permanent neurological injury.

421.    Taken together, Ream's February 20 mischaracterization of Plaintiff's refusal to complete the "vulnerabilities" task, and Marotta's March 6 *"both"* and *"we"* reinforcement of a coordinated version of events, presented a unified, retaliatory narrative. The psychological effect on Plaintiff was acute: he reasonably believed that he was being framed by a coordinated effort between SMX leadership. The coercive threat was not a figment of Plaintiff's imagination — it was actively sustained, medically damaging, and central to Plaintiff's inability to secure legal counsel.

422.    Plaintiff's February 20 call with Ream ended with Ream saying *"…lots of words and I'm trying to distill it down to your key takeaway here which is that you want to do this work that Wendy asked you for, but you need a SCIF to do it in and you can do it [at ArmyAI]."* And Ream finishes the call saying *"Absolutely, we'll talk soon."* Two weeks later Ream scheduled a call with Plaintiff where Marotta and Landers terminated his employment. Ream was silent for the whole call.

423.    Plaintiff consistently complied with federal law and DoD policy in handling classified information. In contrast, Marotta and Ream may have violated federal classified information handling protocols. Their conduct—upon discovery—may implicate 18 U.S.C. §§ 793 and 798, as well as both criminal and civil conspiracy statutes.

424.    Plaintiff's reporting of the SCIF deception and related coercive conduct to the Department of Defense Inspector General on February 21 and 23, 2024, constitutes protected whistleblowing activity under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3(a)(2). In those calls, Plaintiff specifically raised concerns about classified

information mishandling, retaliation orchestrated by Defendants, and the broader scheme to suppress protected disclosures through deception and coercion. These communications to a federal oversight body were made in good faith and with the intent to prevent further violations of federal security protocols and whistleblower protections.

425.    Just two weeks later, March 6, 2024, Plaintiff was unexpectedly terminated, further reinforcing the inference of retaliatory motive and temporal proximity. These reports are explicitly covered under CEPA's protections for employees who disclose suspected legal violations to public authorities. Even if SMX was unaware of the DOD IG reports at the precise time of termination, their legal significance remains: they reflect an ongoing pattern of protected whistleblowing activity and support Plaintiff's reasonable belief that misconduct had occurred.

# COORDINATION WITH PACOM, PRETEXT, BAD FAITH

### I. PACOM WAS NOT A NEUTRAL THIRD PARTY

426.    On Plaintiff's March 6, 2024, termination call, SMX portrayed PACOM as an independent, neutral, and disinterested third party that solely issued the "Lack of Work" (LOW) order—citing this as the exclusive cause for Plaintiff's termination. However, closer examination reveals substantial evidence of coordination between PACOM and SMX that calls into question the assertion that PACOM was uninvolved in retaliatory activity against Plaintiff.

427.    The following section consolidates evidence showing that PACOM and SMX acted jointly, or at least with parallel retaliatory intent. Their conduct before, during, and after Plaintiff's employment demonstrates more than mere oversight or indifference. Instead, it

reflects a pattern of coordinated or mutually reinforcing behavior that directly rebuts SMX's claim that PACOM served as a neutral third party in Plaintiff's termination.

428.    The evidence falls into three phases: pre-hire alignment, post-hire coordination, and post-termination obstruction—all of which undermine the narrative of PACOM's neutrality.

## A. Evidence of Pre-Hire PACOM–SMX Alignment

429.    Subject to discovery, the following pre-hire events are suggestive of an unusually close relationship between PACOM and SMX:

- After cancelling Microsoft's Stormbreaker contract, PACOM re-awarded the project to SMX without clear public documentation of the procurement process— despite normal federal transparency requirements. SMX's website, which regularly announces new contract wins, never publicly acknowledged the Stormbreaker award.

- SMX lacked obvious qualifications compared to other defense contractors, and Marotta was not an apparent choice to lead a complex AI-heavy project—raising further questions about PACOM's selection process.

- Marotta told Plaintiff, shortly after his hire, that Microsoft's contract had been canceled due to their failure to understand island politics: *"It's a very small island, everyone knows everyone, and Microsoft don't understand island politics"*—suggesting that PACOM's contracting environment was driven more by personal relationships than competitive merit.

- Multiple elements of the PACOM and SMX relationship raise suspicions about the procurement process for Stormbreaker suggesting potential gross mismanagement, procurement fraud, or both.

Page **168** of **267**

## B. Evidence of Post-Hire PACOM–SMX Alignment

430.     Subject to discovery, the following post-hire issues are suggestive of an unusually close relationship between PACOM and SMX:

- Upon realizing the SCIF deception, Plaintiff left a voicemail with PACOM's SSO to report concerns. No response was ever received. A veteran later agreed the voicemail was likely *"accidentally deleted on purpose"*.

- During the November 9 SCIF meeting, Marotta said that she knew PACOM's Head of Information Security *"VERY WELL" [her emphasis]* reinforcing her personal connections within the organization.

- PACOM official ND never responded to Plaintiff's December 11 protected disclosure or the January 3 ArmyAI SCIF proposal, reinforcing the appearance of a coordinated non-response. Two days after escalating his December 11 disclosure to PACOM official ND, Plaintiff was "orphaned" on the organizational chart— suggesting a decision to terminate had already been made. This pattern of coordinated silence, culminating in Plaintiff's orphaning on the December 13 organizational chart, strongly suggests that PACOM and SMX jointly agreed on Plaintiff's removal.

- PACOM's December 2023 announcement that Stormbreaker had reached Initial Operational Capability (IOC) contradicts Plaintiff's internal warnings that the system lacked testing, and to his knowledge, key functional "AI" components remained entirely non-functional until well into Q1 2024. Logic implies that either SMX fraudulently misrepresented Stormbreaker's AI functionality to

PACOM (suggesting possible FCA), or PACOM and SMX jointly misrepresented AI capability indicating closely aligned interests.

- At a high-level demonstration, SMX's Marotta and PACOM official ND misrepresented Stormbreaker's current and future AI capabilities, while omitting Plaintiff's repeated warnings that the system, without validation, was unfit for purpose and potentially dangerous.

- When Plaintiff proposed resolving the vulnerabilities task via classified work at ArmyAI, neither Marotta nor PACOM official ND engaged. Marotta later admitted the proposal had been rejected by PACOM. SMX did not dispute PACOM's obstruction or inform Plaintiff of the outcome—"smoking gun" evidence of coordinated decision.

- The LOW order issued by PACOM was vaguely worded, enabling SMX to selectively apply it to just two individuals—one of whom was Plaintiff. But at the same time PACOM either authorized or acquiesced to SMX hiring for overlapping roles before and after applying the LOW order to Plaintiff. It is implausible that PACOM was unaware SMX was terminating and recruiting for the same skill sets simultaneously.

## C. Evidence of Post-Termination PACOM–SMX Alignment

431.    Subject to discovery, post-termination conduct further reinforces the conclusion that PACOM and SMX continued to operate in coordination:

- Plaintiff requested that his DOD IG complaint be handled by mainland investigators unaffiliated with PACOM. Nevertheless, PACOM's Inspector General rapidly closed the matter within approximately 30 days, stating it was

*"not within our purview."* The DOD IG hotline later described this closure as *"premature"* and assumed control of the investigation—implying concern about PACOM's handling of the matter. If such concern proves warranted, it suggests that premature closure benefited both PACOM and SMX by minimizing scrutiny into potential coordination or misconduct.

- Plaintiff submitted FOIA requests to PACOM for the LOW order and Stormbreaker contract—specific, readily identifiable documents that should qualify as "simple" FOIA requests qualifying for faster processing (agencies are encouraged to process within 20 working days or faster). Despite the importance of these documents for due process, PACOM refused to expedite the requests for any reason, suggesting an estimated wait of 300+ days. With NJ CEPA statute of limitations of one year, this delay functioned as a protective barrier against CEPA for Defendants.

- After ISCAP advised that FOIA could be used to obtain information needed for classification challenges, Plaintiff again requested expedited release from PACOM on national security grounds. The first request was denied; a second request to a different official was also denied. A third follow-up seeking clarification was ignored. PACOM's refusal to expedite, even on national security grounds, further obstructed Plaintiff's ability to pursue lawful remedies and further act to protect SMX.

- ISCAP formally identified PACOM as the agency responsible for handling Plaintiff's classification challenges under 32 C.F.R. § 2001.14—directly

contradicting PACOM IG's position that no part of Plaintiff's complaint fell within their purview.

- Based on 2024 LinkedIn profiles, Stormbreaker appears to have been prematurely canceled for a second time—again without delivering the AI capabilities publicly claimed by PACOM and still advertised by SMX as of April 2025. This supports the inference of ongoing misrepresentation, gross mismanagement, and possible False Claims Act violations, while also vindicating Plaintiff's 2023 model risk disclosures.

- Plaintiff's September 2023 *"initial impressions"* call warned that Stormbreaker was being built as a game platform rather than a real agent-based simulation, noting: *"We should be building an agent model, not a game platform ➔ totally different problem requiring totally different solution architecture implemented by totally different skill sets (Did Microsoft realize this—is this why they fired everyone?)."* Marotta abruptly ended the call following this comment. On information and belief, Stormbreaker failed under SMX for the same reasons it failed under Microsoft—pointing to PACOM as the constant actor and suggesting a shared interest in concealing this outcome.

- Upon information and belief, Marotta has left SMX and is now employed by PACOM—further underscoring the small, interconnected nature of the Hawaiian defense contracting environment and reinforcing the appearance of mutual protection.

## D. Legal Synthesis

432.    The events described above establish a compelling pattern indicating that one or more PACOM officials coordinated closely with SMX in a retaliatory effort to suppress Plaintiff's protected disclosures, conceal the second premature cancellation of Stormbreaker, and obstruct lawful avenues of redress. SMX's assertion that the LOW order originated from a neutral, independent third party—PACOM—is contradicted by both direct and circumstantial evidence. PACOM official ND was directly involved in at least two key incidents of coordinated non-response to Plaintiff's protected disclosures, and may have been aware of others. Defendant Marotta explicitly attributed the rejection of Plaintiff's ArmyAI SCIF proposal to PACOM, while SMX concealed that fact from Plaintiff and failed to dispute its legitimacy—further reinforcing the appearance of joint decision-making.

433.    This record, combined with the broader pattern of PACOM–SMX alignment, fatally undermines SMX's core defense that Plaintiff was terminated based solely on an independent PACOM directive. The totality of the evidence demonstrates that PACOM was not disinterested, not neutral, and not independent. Rather, PACOM's conduct—before, during, and after Plaintiff's employment—reflects a consistent alignment of interests with SMX that cannot be squared with the claim of neutrality on which SMX's legal position relies.

434.    Plaintiff anticipates that discovery will reveal that PACOM officials—upon receiving Plaintiff's December 11, 2023 escalation—recognized the legitimacy of Plaintiff's AI model risk concerns. Rather than address them, PACOM and SMX appear to have coordinated—or at a minimum engaged in parallel conduct to terminate Plaintiff and dissolve Stormbreaker in a manner that concealed procurement irregularities, possibly implicating the False Claims Act (FCA), gross mismanagement, and fraud.

435.    If discovery confirms direct coordination or conspiracy between PACOM and SMX to retaliate against Plaintiff, such actions may not only violate CEPA and *Pierce*, but also rise to the level of a criminal conspiracy to interfere with federally protected rights under 18 U.S.C. § 241 and may warrant criminal referral if confirmed.

436.    PACOM's cooperation with SMX—particularly regarding the unresolved SCIF deception—continues to impose a coercive threat on Plaintiff. This unresolved risk has contributed to sustained legal and psychological pressure, as further detailed in the section addressing the ongoing threat environment.

437.    SMX has characterized PACOM as a neutral third party in its termination defense. However, upon information and belief, SMX is actively coordinating with PACOM legal personnel—either directly, through shared counsel, or via intermediaries—in developing its litigation strategy. This coordination undermines the claim of neutrality and supports Plaintiff's allegation of retaliatory conspiracy. Such communications, if they occurred, are expected to be the subject of targeted discovery and may further demonstrate collusive conduct designed to obscure unlawful retaliation.

## II. PACOM's "LACK OF WORK" IS OBVIOUSLY PRETEXTUAL

### A. LOW Timing and Context Reveal Retaliatory Pretext

438.    Even if there were no direct evidence of coordination between PACOM and SMX, the timing and surrounding context of the March 6, 2024 "Lack of Work" (LOW) termination order is so suspicious that it strongly supports an inference of pretext. Multiple facts undermine Defendants' claim that the LOW was issued by a neutral third party and based on genuine budgetary constraints:

- On the termination call, Defendant Marotta claimed that budget issues arising in October 2023 triggered the LOW. Yet only weeks earlier, Plaintiff had accepted the SMX role based on Marotta's express assurances that FY2024 funding was already approved—an assertion corroborated by a PACOM public document dated October 12, 2023, which confirmed Stormbreaker's funding for FY23 and FY24. Either Plaintiff was fraudulently induced to join under false assurances, or the budget shortfall was fabricated post hoc to justify LOW termination.

- The March 6, 2024 termination came just two weeks after (i) Plaintiff's February 20 call with Ream, during which he made multiple protected disclosures under CEPA, and (ii) Plaintiff's February 21 and 23 calls to the Department of Defense Inspector General, where he reported multiple issues. These were Plaintiff's final attempts to escalate concerns through both internal and external channels. Their proximity to the LOW order fatally undermines any defense that Plaintiff's termination lacked causal connection to his protected activity.

- Despite allegedly knowing of budget issues as early as October 2023, and despite knowing Plaintiff was preparing to relocate his family to Hawaii, Marotta withheld any mention of job risk for nearly five months—until the day of termination—showing reckless disregard for the personal and financial impact of the decision

- SMX was actively hiring for Stormbreaker roles throughout this period. On January 10, 2024, just eight weeks before Plaintiff's termination, SMX announced at least six new Stormbreaker hires. Multiple Stormbreaker job listings remained posted—including AI-related positions—immediately after Plaintiff's termination.

This ongoing recruitment contradicts any narrative of systemic cutbacks or eliminated roles.

- SMX's own HR representative confirmed that listed roles marked "firm funded" meant immediate funding, active sourcing, and imminent hiring. The fact that Stormbreaker roles remained open and were discussed with Plaintiff just days before his termination fatally undermines SMX's claim of a genuine lack of work.

- Coincidently, the supposed independent LOW from PACOM ended Plaintiff's employment just two days before Plaintiff was scheduled to earn a $10,000 retention bonus. The March 29 termination date appears deliberately timed to avoid this obligation, further suggesting retaliatory motive.

- SMX rejected Plaintiff's no-cost proposal to resolve the "vulnerabilities" task using SCIF access at ArmyAI—a solution that would have allowed him to fulfill the assignment without any financial burden. If the LOW were truly motivated by budget, this proposal should have been accepted. The rejection instead suggests an intent to prevent further classified disclosures.

- From November 2023 through March 2024, Plaintiff's assigned task—the vulnerabilities' report—was in limbo. Plaintiff was not assigned alternative work or meaningful supervision, but Plaintiff remained capable of performing other Stormbreaker roles in data science, modeling/simulation, AI/ML, administration, and other areas. Nevertheless, SMX failed to reassign him to any such role in Stormbreaker, even while hiring others with overlapping skills—confirming that Plaintiff was being systematically isolated.

- In a National Defense article titled *"Indo-Pacific Command to Harness AI for Operational Planning"* PACOM's Army Maj. Gen. Joshua Rudd is claimed to have said that Stormbreaker's initial capabilities were starting to be delivered as of March 2024 describing those capabilities as *"some modeling and simulation capabilities that take existing data — so threat data, friendly data, operational plans — and then looks through an AI/machine learning lens to assess and then generate output"* clearly indicating the central role of AI/ML modeling and simulation and that it was not a future goal but part of (allegedly) delivered functionality.

- Admiral Aquilino described Stormbreaker's AI capabilities in even more ambitious terms than ever before (March 20, 2024): *"STORMBREAKER, an AI-based gaming and simulation capability … that will include advanced data optimization capabilities, machine learning, and artificial intelligence to support planning, war gaming, mission analysis, and execution of all-domain, operational level course of action development."* The Admiral's statement is noteworthy for two reasons: firstly, it uses future tense for AI capabilities Defendants claimed were at Initial Operational Capabilities (IOC) three months earlier, and secondly, future tense claims of expanded AI capabilities directly contradicts SMX's claim that PACOM's LOW was to scale-back AI/ML activities.

- As of June 2025, SMX's marketing brochure continued to promote Stormbreaker's AI functionality as a core feature built upon modeling and simulation technology and promising future improvements that *"will drastically reduce the time from plan inception to decision-making while simultaneously*

*increasing the fidelity, accuracy, and number of high-confidence options for the Commander."*

439.  Taken together, these contradictions reveal a pattern of semantic manipulation of the term "AI," strategically adjusted depending on the intended audience. Internally, SMX and PACOM minimized AI's operational role—portraying it as exploratory or insignificant—to justify Plaintiff's termination, dismiss his risk disclosures, and explain away the "Lack of Work" order. Externally, however, the same actors continued to promote Stormbreaker as an AI-enabled decision-support platform, citing enhanced fidelity, accuracy, and high-confidence recommendations in public statements, marketing brochures, and milestone declarations like Initial Operational Capability (IOC). This deliberate inconsistency is precisely the pattern of deceptive AI positioning Plaintiff warned about in his protected October 26, 2023 disclosure.

440.  The combination of Plaintiff's protected activity, the vagueness of the LOW order, its selective application to Plaintiff, and the immediate proximity to his retention bonus strongly support the conclusion that the LOW was not a neutral, budget-driven action by an independent third party—but rather a pretextual mechanism to eliminate Plaintiff in retaliation for his disclosures.

441.  Despite SMX's claim during termination that it intended to find another assignment for Plaintiff, discovery will show that a suitable *"Data Scientist Lead"* role—matching Plaintiff's expertise—was open, firm-funded, and actively being recruited for. Plaintiff twice expressed interest in this role, which SMX HR representative Julie Farasy confirmed was available, yet SMX never interviewed him or even acknowledged his candidacy. This failure to act—despite Plaintiff's qualifications and availability—strongly suggests that SMX had no intention of honoring its stated plan to reassign Plaintiff—further exposing the LOW as pretext.

## B. Even if the LOW was Genuine, Plaintiff's Selection is Suspicious

442.    Even if the PACOM-issued "Lack of Work" (LOW) order was genuine and motivated by legitimate budgetary constraints, the manner in which SMX selected Plaintiff for termination was highly arbitrary, inconsistently applied, and strongly indicative of pretext. Upon information and belief, key evidence includes:

- On the organizational chart, Plaintiff's title initially included "AI/ML," but following his demotion and at the time of termination, his official job title in the HR system was "Data Scientist"—consistent with his hiring letter for *"Principal Data Scientist."* Yet he was terminated as part of an AI workforce reduction, even though no other Data Scientists were impacted by the LOW.

- SMX applied the LOW to only two individuals—both with "AI" in their titles—despite having entirely different roles, qualifications, and placements in the organization. One of them, according to Marotta's pre-hire conversations with Plaintiff, had already drawn internal criticism. Discovery is expected to reveal several independent reasons why SMX sought that person's removal, suggesting the LOW served as a convenient pretext for both terminations.

- SMX appears to have exploited the broadest possible interpretation of "AI" to justify the selection of two employees for termination, despite their very divergent responsibilities and skillsets. This semantic latitude allowed SMX to cast a wide net for potential targets while maintaining a veneer of neutrality.

- The PACOM-issued LOW order itself was vaguely worded, granting SMX broad discretion over implementation. Coupled with Defendants' shifting internal definitions of "AI," this semantic ambiguity enabled SMX to selectively target

Page **179** of **267**

nearly anyone on Stormbreaker—especially Plaintiff, whose history of protected disclosures made him particularly vulnerable.

- Meanwhile, similarly or less qualified employees—including data scientists and modeling/simulation engineers—were retained, newly hired, or actively recruited into firm-funded Stormbreaker roles that Plaintiff was well-qualified to perform. Notably, Plaintiff was the only employee with 35+ years of experience in AI model risk governance, and the only one who repeatedly raised concerns about it. Upon information and belief, SMX terminated its most senior and most outspoken AI model risk expert.

- This is exactly the kind of semantic manipulation Plaintiff warned about in his October 26, 2023, protected disclosure. The selective application of the LOW to employees with "AI" in their job *titles*—while SMX continued hiring for roles involving "AI," "modeling/simulation," and "mod/sim" in their job *descriptions*—further demonstrates Defendants' pattern of definitional abuse and validates Plaintiff's original warnings.

## C. Retaliation is the Only Explanation for Plaintiff's Termination

443.    Defendants fabricated "Lack of Work" rationale collapses entirely when measured against Plaintiff's unblemished performance record, internal evaluations, and subsequent re-employment in a sensitive national security role. Supporting facts include:

- Plaintiff's references from prior employers are full of praise for Plaintiff's technical expertise, responsiveness, and professionalism.

- Plaintiff's last SMX performance review by Ream on March 28, 2024 stated in full: *"Paul Richardson has been a positive part of the team. However, his skills*

*were not able to be effectively put to use due to Lack of Work requirements from the customer. Unfortunately, Paul's position is being brought to an end on 28 March 2024."*

- Plaintiff's conduct at SMX was consistently professional and without any record of complaint, disciplinary action, or formal performance concerns.

- Plaintiff was never counseled, written up, or warned, and was never accused of insubordination or improper conduct.

- Plaintiff raised protected concerns regarding classified information handling (the "vulnerabilities" task), misrepresentation, engineering failures, and public policy violations related to AI model risk—all delivered professionally and in good faith and without receiving any allegations of insubordination or improper conduct.

- The decision to demote and then terminate Plaintiff followed closely on the heels of these protected disclosures, supporting a clear inference of retaliatory motive.

- Plaintiff was welcomed back to his prior workplace at ArmyAI, a defense environment, reinforcing the government's continued trust in his capabilities and judgment.

- Plaintiff's restored role at ArmyAI, including work in AI/ML modeling and simulation, indicates that other arms of the U.S. government had no concerns with his performance, integrity, or security fitness.

## D. Legal Synthesis

444.    Even if PACOM's "Lack of Work" (LOW) order were genuinely independent and budget-driven, SMX's selection and treatment of Plaintiff fails both factually and legally. Under

CEPA and *Pierce,* an employer's stated rationale is pretextual if its timing, implementation, or surrounding context reveals retaliatory motive.

445.     Even setting aside direct evidence of coordination between SMX and PACOM, the circumstances surrounding Plaintiff's termination are sufficient to defeat Defendants' claim that it was driven by neutral business considerations. Three independent lines of evidence support the inference of pretext:

- The timing and context of the LOW strongly suggest retaliation.

- SMX's implementation of the LOW was inconsistent and targeted.

- There was no independent performance-based rationale for Plaintiff's termination.

446.     Discovery is expected to confirm that the LOW was not a bona fide reduction in force, but a pretextual instrument jointly developed or strategically exploited by SMX and PACOM officials to eliminate Plaintiff in retaliation for his protected activity. Relevant discovery targets include:

- Internal communications between Marotta, Ream, and PACOM.

- PACOM's internal budget rationale and LOW drafting records.

- SMX's internal selection methodology for LOW terminations.

- Stormbreaker hiring records showing contemporaneous recruitment for Plaintiff's skillset.

447.     These facts are more than sufficient to support a prima facie case of retaliation under CEPA and *Pierce*. SMX's stated rationale—"Lack of Work"—is undermined by contradictory budget explanations, ongoing AI hiring, and evidence of selective enforcement

targeting the only employee with deep model risk expertise and a documented history of protected disclosures.

448.    At the pleading stage, Plaintiff is not required to prove retaliation conclusively, but only to present facts sufficient to raise a plausible inference of pretext. The allegations set forth herein meet and exceed that threshold and justify discovery into the true purpose and development of the LOW order.

449.    Taken together, these facts support a finding of unlawful retaliation under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3(a)(1), (a)(2), and (c), as well as the public policy doctrine articulated in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980). The pretextual nature of the LOW order—in both its substance and application— renders SMX's justification legally insufficient, and reinforces the inference that Plaintiff was terminated for his protected activity.

## III. SMX BAD-FAITH CONDUCT: BEFORE, DURING, AFTER

450.    On Plaintiff's third day of employment, after raising concerns about the distinction between entertainment-focused "AI" models and predictive "AI" used for real-world decision-making, he was met with immediate hostility. As Plaintiff continued to identify red flags and raise additional concerns, Defendants escalated their retaliation—culminating in his termination. SMX exhibited a consistent pattern of bad-faith conduct, including avoidance, denial, isolation, and increasingly severe reprisals.

451.    Defendants may attempt to characterize this misconduct as the actions of "rogue employees," such as individual Defendants Marotta and Ream. However, post-termination interactions with SMX have revealed the same obstructive and retaliatory behaviors emanating from other parts of the organization. This continuity suggests that the adverse treatment Plaintiff

experienced was not the result of isolated actors, but reflective of a broader institutional culture—one that appears to be tolerated, encouraged, or directed by SMX corporate leadership.

452.    In Plaintiff's recent efforts to negotiate and mediate a resolution with SMX, senior management and legal counsel have displayed the same evasive tactics and suppressive posture that typified Marotta and Ream's conduct during Plaintiff's employment, reinforcing the conclusion that SMX's misconduct is systemic.

## A. Plaintiff's Demonstrated Pattern of Good-Faith

453.    Defendants' lethargy, disinterest, and apparent disregard for matters such as timely communication, AI safety, and classified information security stand in stark contrast to Plaintiff's conduct.

454.    Plaintiff consistently acted with urgency, professionalism, and good faith in handling high-stakes matters, including:

- Promptly requesting and remaining logistically flexible for an "urgent debrief" on his third day at the TEM.

- Appropriately handling a classified information concern regarding the "vulnerabilities" task—later validated by PACOM's Head of Information Security.

- Persistently organizing a SCIF meeting to lawfully address classification and AI model risk concerns.

- Volunteering to brief the Stormbreaker team on AI model risk and emerging regulatory obligations.

- Creatively proposing the ArmyAI SCIF solution and remaining available even past midnight to facilitate rapid progress.

- Taking initiative to clarify Ream's confusing February 2024 email when she failed to follow up.

- Proactively following up on classification challenge issues first raised in November 2023 that were otherwise overlooked.

- Offered to work the last 2-3 weeks of SMX employment in a SCIF to complete the "vulnerabilities" task.

- And many other examples demonstrating good-faith behavior prioritizing professional ethics, transparency, productivity, and proper handling of classified information.

## B. SMX's Pre-Hire Bad-Faith Conduct

455.    In contrast, before Plaintiff's hire, SMX's bad faith actions begin, including:

- Multiple materially false representations forming the basis of fraudulent inducement, including misstatements regarding project funding, Plaintiff's role on leadership team, and Stormbreaker's AI capabilities.

- Pressuring Plaintiff to resign early from his prior workplace, ArmyAI, under the pretense of urgency that later proved misleading, and that had the effect of locking him into his SMX employment making it much more difficult to return to ArmyAI.

## C. SMX's Bad-Faith Conduct During Employment

456.    During Plaintiff's employment, SMX's pattern of deception, misrepresentation, and bad-faith continued and escalated:

- **Aug 2023**: In Plaintiff's first week, SMX refused to hold an urgent debrief despite his early AI model risk warning.

- **Sep 2023**: "Initial impressions" call was abruptly terminated after Plaintiff raised protected disclosures.

- **Oct 26/30, 2023**: Defendants dismissed model risk concerns, assigned a legally questionable "vulnerabilities" task, and initiated a "faux" parallel email thread that excluded Plaintiff.

- **Nov 2023**: In the SCIF meeting, Defendants reacted with hostility to Plaintiff's classified disclosures, issued a coercive threat to deter further protected activity, and isolated Plaintiff from the team and supervision.

- **Dec 2023**: SMX leadership coordinated a non-response to Plaintiff's escalation to PACOM; two days later, Plaintiff was orphaned on the org chart; an active effort began to exclude him from the next Hawaii team meeting.

- **Jan 2024**: Plaintiff's proposal to resolve work-blocking issues via SCIF access at ArmyAI was rejected without explanation.

- **Feb 2024**: On the demotion call, Ream assured Plaintiff he would be enabled to work productively in a SCIF, but he was terminated two weeks later.

- **Mar 2024**: Plaintiff was terminated without prior performance warnings under a suspicious and inconsistently applied "Lack of Work" justification.

- **Mar 2024**: SMX claimed it would pursue alternative assignments for Plaintiff, but failed to follow up after he identified a viable open role.

D. SMX's Post-Termination Retaliation and Obstruction

457.    After Plaintiff's termination, SMX's pattern of bad-faith conduct continues, undermining any assertion that the retaliation was limited to employment-related decisions of "rogue" employees:

- **Post-Termination (2024)**: SMX falsely classified Plaintiff's departure as a *"resignation"*; Plaintiff was never formally read off or provided access to his executed SF312 non-disclosure agreement, raising concerns about both procedural irregularity and classified access status.

- **February 2025**: SMX legal counsel, Mr. Schultz, initially agreed to execute a tolling agreement for SMX but refused to coordinate parallel tolling for the individual defendants—despite Plaintiff's request. Counsel then stalled, allowing the statute of limitations to approach expiration. Plaintiff requested a change in counsel; a tolling agreement was signed with only days remaining.

- **March 2025**: Schultz responded to Plaintiff's request for Stormbreaker documentation needed to enable ISCAP to evaluate the November 9, 2023, classification challenges. An ISCAP analyst later acknowledged that Schultz's response appeared "knowingly unproductive," further obstructing Plaintiff's efforts to address unresolved classified matters that had been ignored by SMX, PACOM, and the DoD IG.

- **April 2025**: SMX entered mediation, but when it concluded abruptly, exhibited no sincere intent to resolve the dispute, for example SMX was not interested in understanding the substantial information asymmetry responsible for the divergent settlement positions. Nonetheless, mediation was effective in one

respect: it pushed the individual defendants beyond the CEPA statute of limitations

- **March–April 2025**: SMX refused multiple good-faith opportunities to clarify exculpatory facts regarding the SCIF deception and thereby mitigate Plaintiff's ongoing legal and medical harm.

- For additional documentation and chronology, see **Appendix A**.

458.    SMX's simultaneous posture—offering to continue negotiations while refusing to provide even minimal factual clarity—rendered mediation structurally coercive and procedurally compromised. The company's refusal to confirm or deny basic facts materially influenced Plaintiff's risk assessment and negotiation position. Had SMX acted promptly after receiving Plaintiff's blood pressure data and medical warnings, Plaintiff's second stroke in April 2025 may have been avoidable. This, too, underscores Defendants' systemic risk management failures and their indifference to Plaintiff's health and legal exposure. These facts further support Plaintiff's claims under CEPA, his request for equitable tolling, and claims of intentional infliction of emotional distress.

## E. Legal Synthesis

459.    This sustained pattern of bad-faith behavior by SMX reveals a coordinated effort to suppress protected disclosures, avoid accountability, and disregard national security and classification integrity—while systematically obstructing Plaintiff's access to legal remedy under New Jersey law and failing to take small actions to remove ongoing medical harm. This was not the product of "rogue actors," but an entrenched culture of concealment and coercion, not merely tolerated, but reflective of a broader institutional culture encouraged, or at minimum condoned, by SMX senior leadership.

460.    This pattern of behavior supports Plaintiff's request for equitable tolling, his pending Motion for Judicial Stay and Interim Relief, and the Court's consideration of punitive damages. Plaintiff incorporates the accompanying Motion by reference, as it relies in part on the facts set forth herein.

# LEGAL SUMMARY OF PROTECTED ACTIVITY, RETALITORY MISCONDUCT

461.    Plaintiff's termination was not the result of poor performance, lack of funding, or project changes—it was the foreseeable outcome of a sustained and coordinated retaliation campaign that began immediately after his protected disclosures. This section summarizes the timeline of protected activity under CEPA § 34:19-3(a)(1), (a)(2), and (c) and the retaliatory actions that followed. From Plaintiff's first August warnings, to his November 9 disclosures in the SCIF meeting, to his December 11 escalation to PACOM official ND, to his final internal and external disclosures in February 2024, each warning was met not with investigation or engagement, but with silence, marginalization, obstruction, and ultimately, termination. The sequence of protected activity and adverse actions provides clear, proximate, and legally sufficient evidence of retaliatory motive.

462.    On December 11, 2023, Plaintiff escalated his protected disclosures—while also referencing his earlier November 9 SCIF disclosures—directly to PACOM official ND. The total non-response to this escalation, including Plaintiff's offer to provide further details in a classified discussion, strongly suggests a coordinated silence. Just two days later Defendant Marotta edited the Stormbreaker organizational chart, removing Plaintiff from the leadership layer and placing

Page **189** of **267**

him at the bottom with no reporting connections. This was only four weeks after his November 11 SCIF disclosures. Plaintiff was visually and functionally "orphaned" from the team, effectively reassigned to a bench-like status with no duties, organizational affiliation, supervision, or mission.

463.    This act of "orphaning" Plaintiff marked the point at which termination became a foregone conclusion. Plaintiff was marginalized, his "orphaning" recast as a demotion for administrative reasons, and that isolation continued until he was formally terminated under PACOM's "Lack of Work" (LOW) order on March 6, 2024. The close proximity between Plaintiff's November 9 and December 11 escalations, the coordinated non-response, and "orphaning"—an effective termination—constitutes direct temporal evidence of retaliatory motive.

464.    PACOM official ND was a direct recipient of the escalation and an active participant in the coordinated non-response; PACOM therefore cannot credibly be described as an independent, neutral third party uninvolved in Plaintiff's termination. This inference is further supported by Marotta's later comments, in which she attributed the obstructive rejection of Plaintiff's ArmyAI SCIF proposal to PACOM—a decision that SMX neither questioned nor corrected, but instead affirmed through coordinated silence—further evidencing the joint nature of the retaliation.

465.    Defendants' justification for terminating Plaintiff under a "Lack of Work" (LOW) order cannot withstand scrutiny. PACOM was not a neutral third party: PACOM official ND, was directly involved in Plaintiff's protected disclosures and key retaliatory decisions were made by SMX or with SMX's active participation or knowing acquiescence.

466.     The LOW order itself was selectively applied, semantically manipulated, and is the logical extension flowing from Plaintiff's "orphaning" just two days after his December 11 escalation. SMX's own conduct, particularly by Marotta, reflects a broader institutional pattern of deception, obstruction, and retaliation that undermines the credibility of any claimed lawful motive. These facts reinforce that Plaintiff was targeted not for performance reasons, but because his disclosures threatened to expose unlawful conduct and reputational risk.

467.     Even if PACOM initiated certain retaliatory measures, Defendant SMX cannot escape liability under CEPA. SMX was not a passive implementer of federal directives—it was a knowing participant in the retaliatory process. Rather, it actively participated in, affirmed, and concealed retaliatory conduct against Plaintiff, despite knowing the disclosures were protected. As Plaintiff's direct employer, SMX had an independent legal obligation under CEPA to prevent retaliation—not to collaborate in it. Its consistent failure to intervene, coupled with its own acts of marginalization, deception, and post-termination misconduct, renders SMX fully liable under CEPA regardless of PACOM's role.

468.     In any case, Plaintiff's final internal protected disclosures occurred on February 20 during a 90-minute call with Ream. The following day, he reported his concerns to the Department of Defense Inspector General's hotline. Both events occurred just two weeks before the March 6 LOW termination, establishing direct temporal proximity and undermining any claim that causation was lacking.

469.     In addition to the November 9, December 11, and February 20 disclosures detailed above, Plaintiff engaged in a broader series of protected activities under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3—including refusals, objections, and disclosures grounded in federal classification laws, security protocols, and

government contracting integrity. These also implicate the public policy doctrine articulated in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980). These included:

- Repeatedly raising concerns about the absence of AI model governance required by federal law, Executive Order 14110, and industry standards;

- Refusing to complete the "vulnerabilities" task at the unclassified level based on a good-faith and legally grounded belief that doing so would violate federal law governing the handling of classified information—including 18 U.S.C. §§ 793 and 798 (Espionage Act)—and in direct compliance with Plaintiff's obligations under his SF312 nondisclosure agreement;

- Disclosing to SMX, PACOM, and the DOD IG that Stormbreaker's AI capabilities were being misrepresented in ways that violated procurement integrity rules, posed national security risks, and potentially constituted fraud under the False Claims Act;

- Initiating a formal classification challenge by requesting access to the Original Classification Authority (OCA) under 32 C.F.R. § 2001.14(a), and disclosing the obstruction of this process to PACOM official ND—a public body under CEPA § 34:19-2(c);

- Proposing a lawful, SCIF-based resolution through ArmyAI to complete the disputed task in compliance with classification protocols, which was rejected without explanation—reinforcing Defendants' intent to suppress Plaintiff's protected concerns rather than resolve them;

- Reporting concerns about coercion, retaliation, and FCA violations directly to the Department of Defense Inspector General.

470.    Plaintiff's disclosures were made in accordance with the ethical and legal obligations set forth in his TS/SCI classified information handling agreements (SF312), the IEEE Code of Ethics, and the Simulationist Code of Ethics. Each was made in good faith, and was both statutorily and ethically protected.

471.    In response to these protected activities, Defendants engaged in a deliberate and escalating campaign of retaliation. This included:

- Isolating Plaintiff from Stormbreaker leadership, despite having recruited him into a leadership role;

- Assigning Plaintiff to a task that could not lawfully be completed at the unclassified level, refusing to resolve the issue through appropriate channels, and obstructing Plaintiff's multiple good-faith efforts to comply;

- "Orphaning" Plaintiff on the organizational chart without explanation, signaling planned termination, and later retroactively characterizing it as a demotion;

- Deceiving Plaintiff into disclosing Top Secret information in what appeared to be a SCIF, then sustaining the deception across multiple communications to create a coercive legal threat;

- Making a second coercive legal threat at termination—falsely warning that reemployment at ArmyAI could violate SMX's NDA and IP restrictions;

- Falsely classifying Plaintiff's termination as a resignation, risking denial of unemployment benefits and creating a reputational red flag;

- Failing to respond to Plaintiff's interest in reassignment, despite public claims that firm-funded positions were available;

- Rejecting Plaintiff's lawful SCIF access proposal through ArmyAI, and later admitting PACOM had coordinated that rejection—despite SMX's claims of being merely a passive implementer of a LOW;

- Suppressing classification challenge efforts, including SMX's refusal to provide necessary GCA contact information to ISCAP and PACOM's denial of expedited FOIA processing;

- Continuing to misrepresent Stormbreaker's AI functionality in public-facing documents long after citing "AI scale-back" as the rationale for Plaintiff's removal;

- Sustaining the retaliatory threat even after termination, including refusing to confirm whether the SCIF meeting room was secure—prolonging both legal and medical harm.

472.    Taken together, these retaliatory acts reveal a deliberate and escalating pattern of misconduct—not limited to workplace marginalization, but extending into legal threats, obstruction, and career sabotage. Among these, the SCIF deception stands out as especially malicious: a premeditated act designed to induce Plaintiff into disclosing classified information by falsely assuring him that the meeting room was secure. Defendants chose to hold the meeting at PACOM's Camp Smith facility—a location with an unusual mix of SCIF and unclassified rooms—and brought Ream, whom Marotta knew lacked the clearance to enter a real SCIF. This logistical setup confirms the deception was not accidental, but engineered. The resulting false appearance of a federal crime carried career-altering and life-altering consequences. The ongoing threat—and Defendants' refusal to clarify the deception even after being informed of its legal and medical impact—was not merely negligent, but malicious in both intent and effect. It served

to reinforce the coercive pressure, suppress further disclosures, and inflict lasting harm on Plaintiff's health, reputation, and access to legal remedy.

473.    These retaliatory acts were not undertaken by SMX alone. PACOM—particularly through PACOM official ND—was directly involved in the apparently coordinated non-response to Plaintiff's protected disclosures, the obstructive rejection of his ArmyAI SCIF proposal, and the vague LOW order used to justify his removal. This interagency coordination fatally undermines Defendants' claim that PACOM was a neutral third party. Taken together, the timeline reflects a clear retaliatory motive, with each action designed to suppress Plaintiff's disclosures, isolate him from leadership, and engineer his eventual termination or suffer career-ending consequences. More than a series of isolated incidents, the conduct described above forms a deliberate and malicious campaign of coercion, misrepresentation, and career sabotage.

474.    Plaintiff's December 11, 2023 disclosure to PACOM official ND—in which he also refers to disclosures in his November 9 SCIF meeting—qualifies as protected activity under CEPA § 34:19-3(a)(2), as PACOM official ND—a Department of Defense civilian employee—constitutes a "public body" under CEPA's statutory definition. This disclosure, made in good faith, triggered immediate retaliatory action and therefore satisfies both the content and timing requirements of the statute.

475.    Altogether these actions violated CEPA's protections against retaliation for: CEPA § 34:19-3(a)(1) refusing to engage in unlawful conduct; CEPA § 34:19-3(a)(2) reporting misconduct to a public body (PACOM official ND, DOD IG hotline); and CEPA § 34:19-3(c) objecting to violations of law or public policy.

476.    In the alternative, and independent of CEPA, these actions also violated the public policy principles set forth in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), which

prohibits adverse employment actions taken in retaliation for an employee's lawful and ethical objections. Plaintiff's objections included: (1) the unsafe deployment of unvalidated Artificial Intelligence (AI) systems in national security operations, and (2) the gross mismanagement and potential procurement fraud surrounding the Stormbreaker program—both of which implicate core public policy concerns requiring judicial protection under *Pierce.*

# HOSPITALIZATION UPDATE

477.     On April 4, 2025—just days before the scheduled DOD IG mediation—Plaintiff's received a disturbing and highly personal message referencing his home address, contact information and an implied reference to his current legal action. The message appeared to be linked to a series of cyber-intrusions that began shortly after Plaintiff's termination from SMX and are now the subject of separate criminal referrals and outlined to the court in a separate sealed motion because of their highly personal nature and current investigation status.

478.     Just after midnight the same day (on April 5) Plaintiff experienced acute stroke symptoms while working on this complaint in preparation for his upcoming DOD IG mediation, which was just days away. At the hospital emergency room, medical imaging confirmed it was a stroke. Plaintiff was hospitalized for three days in New Jersey and at the time of writing is undergoing rehabilitation. Plaintiff has been placed on medically mandated leave and referred to neurological rehabilitation and long-term neurological monitoring.

479.     Plaintiff had previously suffered a minor stroke in 2022 and monitored his blood pressure daily with data stored by independent third-party platforms. Plaintiff's historical data clearly illustrates that his blood pressure was relatively stable over 2023, then after his employment at SMX, in August 2023, it starts to climb.  Significant retaliatory events by

Defendants are clearly connected with step-increases in blood pressure which continues to climb reaching a peak with his termination in March 2024. These stress-inducing events materially elevated Plaintiff's risk of recurrent stroke.

480. Plaintiff included his blood pressure record in his 2024 DOD IG written complaint and in an early 2025 email to SMX as evidence of the acute psychological and physiological stress caused by Defendants' retaliations, along with a theoretical statement about the impact this stress had on significantly elevating his risk of stroke. After this April 2025 stroke recurrence, this was no longer theoretical.

481. Additionally, diagnostic imaging performed during the recent hospitalization revealed evidence of further strokes likely connected with the 2023-2024 hypertensive record. Specifically 2025 MRI imaging could be compared to Plaintiff's 2022 MRI records and revealed evidence of multiple prior "silent strokes" that also caused permanent neurological damage, just not noticed at the time. These "silent strokes" can accumulate into diseases such as dementia.

482. "Silent strokes" are widely recognized in medical literature as caused by sustained periods of elevated blood pressure—exactly the hypertensive conditions Plaintiff experienced during the most intense phases of SMX's retaliatory conduct. Plaintiff's treating physicians drew a direct causal relationship between retaliatory events, Plaintiff's increased blood pressure, and the silent strokes. Expert neurology and neuropsychological testimony is likely to reach the same conclusion.

483. The physical harms Plaintiff risked due to Defendant's stressful retaliatory actions are no longer theoretical probabilities or intangible emotional or psychological trauma. They are 'silent strokes' objectively verified by MRI, coincide with documented blood pressure spikes that coincided with retaliation events, and have permanently affected Plaintiff's health and

professional capacity. In addition, Plaintiff suffered a documented recurrent stroke—a non-silent event requiring hospitalization—in April 2025 while actively working on his NJ CEPA claim, something he was doing because Defendant's coercion threat forced him to pursue his CEPA case *pro se*. Third-party cloud-storage records shows that Plaintiff was working on his claim at the time of his stroke onset and for several hours earlier, blood pressure then demonstrates extreme elevations, and he was in hospital one hour later.

484.    The MRI findings and strong third-party data records connecting the silent strokes to hypertensive blood pressure events connected with SMX retaliatory actions take this beyond normal claims of emotional and psychological trauma into documented, irreversible physical harm, specifically: (i) evidence of silent strokes medically consistent with SMX retaliations during his period of employment; (ii) recurrent stroke while working on NJ CEPA claim in preparation for mediation with SMX; (iii) required to personally work on CEPA claim *pro se* because of the impact of Defendant's coercive threat on Plaintiff's ability to get legal representation.

485.    In advance of mediation proceedings with SMX, Plaintiff submitted his blood pressure records and explained that the persistent legal threat from the unresolved SCIF deception posed an ongoing medical and legal harm. He warned that continued exposure to that coercive stress—compounded by his 2022 stroke history—placed him at elevated risk of recurrence. Plaintiff explicitly tied that physiological risk to SMX's refusal to clarify basic factual questions about the SCIF status and Ream's read-on status. Despite this, no clarification was provided. While working *pro se* on his CEPA claim in preparation for mediation, Plaintiff suffered a medically confirmed recurrent stroke and was hospitalized. Instead of being able to recover, Plaintiff was forced to continue legal preparation *pro se*. Following the mediation,

despite multiple requests, SMX took no action to reduce Plaintiff's ongoing medical or legal harm and declined to resolve the factual questions that could have alleviated the coercive threat environment.

486.    SMX chose to preserve the coercive threat. Had SMX taken action to resolve the factual questions surrounding the SCIF status and Ream's clearance—or removed the threat altogether by affirmatively stating that Plaintiff had not violated classified information handling protocols (as he repeatedly requested before mediation) then two consequences would almost certainly have followed. First, Plaintiff would likely have been spared the ongoing psychological stress of a looming federal security violation. Second, he likely would have been able to retain legal counsel, rather than being forced to draft a complex legal filing *pro se* while managing the trauma of reliving retaliatory events. The combined stress of these two avoidable conditions— known to SMX in advance—significantly contributed to Plaintiff's recurrent stroke. In other words, the stroke was a direct and foreseeable result of SMX's decision to preserve the coercive threat. Discovery is expected to confirm that SMX had (or could easily have obtained) sufficient information—including Ream's read-on status and the meeting room classification—to issue a good-faith statement of innocence, which may have prevented this permanent neurological damage.

487.    As a direct and foreseeable consequence of Defendants' unlawful retaliation, Plaintiff now faces not only reputational and professional damage, but permanent health consequences, reduced earning capacity, and a diminished quality of life. As a result of both the silent strokes and the April 2025 event requiring hospitalization, Plaintiff now faces a medically increased risk of developing dementia. This development significantly heightens the compensatory and punitive damages attributable to Defendants' conduct under CEPA,

particularly in light of their continued failure to resolve the underlying harms or acknowledge the health risks their conduct created.

488.     Plaintiff's physical harm entitles Plaintiff to compensatory damages supporting a claim for tax-exempt recovery under IRC § 104(a)(2).

489.     Additional medical documentation, including a formal neurological report, will be submitted as it becomes available. Plaintiff reserves the right to amend or supplement this Complaint with further medical evidence supporting the causal link between the Defendants' conduct and his stroke recurrence, cognitive impact, and diminished quality of life. Plaintiff reserves the right to amend or supplement this Complaint to change language referring to risk of physical harm (for example due to high blood pressure) to fact of physical harm (for example MRI evidence of multiple healed silent strokes).

490.     The gravity of this harm justifies both compensatory damages and procedural accommodation. A judicial stay is essential not only to prevent conflicting administrative and judicial determinations, but to allow Plaintiff time for neurological rehabilitation and the recruitment of appropriate counsel. Plaintiff's MRI-confirmed injury constitutes more than emotional distress—it is a physically debilitating condition causally tied to Defendants' coercive acts, necessitating interim relief. Without this relief, Plaintiff's capacity to fully engage in litigation is severely compromised—both medically and procedurally.

# ONGOING THREAT, MEDICAL AND LEGAL HARM

491.     The SCIF deception orchestrated by Defendants Marotta and Ream—inducing Plaintiff to disclose classified information under the false belief that he was in a secure facility with cleared individuals—has created an ongoing and unresolved threat of federal criminal

exposure. This deception, which Defendants reinforced across multiple communications, remains uncorrected. While Plaintiff did not "knowingly" mishandle classified information, he remains vulnerable to false or mistaken allegations arising from the engineered appearance of wrongdoing.

492.    This threat is not hypothetical. It stems from the possibility that PACOM—whether through misrepresentation or unaware of exculpatory information—could pursue criminal action against Plaintiff for allegedly mishandling classified information. On information and belief, the SCIF deception was intended to create this precisely this coercive threat.

493.    This coercive threat is compounded by evidence of SMX–PACOM coordination and procedural irregularities: PACOM's Information Security Office failed to respond to Plaintiff's SCIF incident report; PACOM FOIA declined to prioritize a "simple" due-process-based request; and PACOM IG closed-out Plaintiff's complaint within one month, stating it was "not within our purview." These actions raise a credible concern that PACOM—either to protect SMX or its own interests in Stormbreaker—may pursue retaliation using a misrepresented version of events.

494.    In his DOD IG complaint, Plaintiff offered exculpatory audio recordings in which Ream, and later Marotta, continued to affirm Plaintiff's belief that the meeting occurred in a SCIF. At no point did they clarify that the room was unclassified—sustaining, and thereby proving, the deception. DOD IG has not requested these recordings. In a call to DOD IG just prior to his 2025 stroke recurrence, DOD IG refused to provide any information that might contain exculpatory findings or statement to clear Plaintiff of wrongdoing.

495.    Similarly, in April-May 2025, Plaintiff made multiple separate requests to SMX seeking clarification of basic facts—specifically, whether Ream was read-on and whether the

meeting room was a SCIF. On no occasion did SMX cooperate, despite Plaintiff making clear this was not a discovery request, but a good-faith effort to resolve the ongoing threat. Plaintiff's last request received no response from SMX.

496.    This persistent coercive threat has materially impaired Plaintiff's ability to retain legal counsel. Multiple New Jersey contingency-fee attorneys initially expressed strong interest in the case, conducted detailed factual reviews, and then abruptly declined—often without explanation. Eventually, one advisor identified the likely cause: the unresolved risk of federal criminal exposure, the apparent entanglement of PACOM, and the possibility of PACOM initiating counter-litigation made the matter too risky for firms not licensed in federal court. These concerns were compounded by the financial burden of defending against PACOM's virtually unlimited litigation resources, which deterred further representation and forced Plaintiff to proceed *pro se*.

497.    The psychological toll of this threat is significant. Plaintiff has lived with the fear that any legal step could trigger a criminal referral or clearance revocation—placing his job, reputation, and career at risk. Given Plaintiff's recent stroke, the continuing stress presents a clear and medically recognized risk of recurrence.

498.    SMX and the Department of Defense Inspector General continue to withhold simple factual clarifications—such as whether the November 9, 2023, meeting room was a certified SCIF, and whether Defendant Ream was properly authorized to receive the information disclosed. Disclosure of such information would immediately resolve the ambiguity surrounding Plaintiff's classification-related disclosures, eliminate ongoing legal and medical harm, and allow Plaintiff to streamline this Complaint by removing all allegations related to the SCIF deception and coercive threat. Despite knowing this, SMX has repeatedly declined to provide

these clarifications. This refusal has prolonged the harm originally triggered by Marotta and Ream, obstructed good-faith resolution efforts, and allowed SMX to continue benefiting from a coercive threat it did not initiate, but has chosen to preserve.

499.    In addition, since Plaintiff's termination from SMX, he has experienced a series of highly improbable cyber-intrusions—initially considered isolated but now appearing to reflect a pattern of soft deterrence. For example, Plaintiff was unexpectedly debanked by Bank of America two months after termination—a bank where he was both a former senior employee and 17-year customer. The incident had the effect of delaying his NJ CEPA legal action by months—a significant period in a complicated case with only 12 month statute of limitations. Recent threats have established the disturbing possibility of a connection with Plaintiff's legal actions, for example incidents included hacking the email of a lawyer considering his NJ CEPA case. These matters are now part of a separate criminal referral and are documented in a sealed memorandum, referenced here solely in support of Plaintiff's request for a judicial stay and equitable tolling.

500.    Taken together, these facts present a compelling case for equitable tolling and judicial stay. The SCIF deception created an unresolved and credible threat of federal prosecution. Defendants' ongoing refusal to clarify basic facts—combined with PACOM's procedural stonewalling—has caused documented medical harm, chilled Plaintiff's legal representation, and delayed his ability to assert his rights. This is precisely the type of coercive environment that justifies tolling under CEPA and merits judicial intervention to ensure procedural fairness.

# EQUITABLE TOLLING

501.     This section applies to all three litigation tracks, as Plaintiff's delay in filing was not track-specific but was caused by a combination of overlapping coercive, procedural, and medical barriers imposed by Defendants.

## I. Ongoing Coercive Threat Prevented Timely Access to Counsel

502.     Following Plaintiff's protected disclosures, Defendants Marotta and Ream orchestrated a coercive scheme centered on the intentional misrepresentation of a classified SCIF meeting, inducing Plaintiff to disclose Top Secret information in what he later discovered was likely an unclassified setting. This deception manufactured the false appearance of a federal criminal violation—potentially under the Espionage Act—and initiated an ongoing threat environment.

503.     As a result, Plaintiff reasonably believed—and continues to believe—that he remains at risk of federal counter-action by PACOM, due to Defendants' misrepresentation of the meeting circumstances and PACOM's potential lack of awareness of exculpatory evidence collected by Plaintiff.

504.     This sustained fear materially impacted Plaintiff's health and legal position, culminating in a medically confirmed stroke recurrence in April 2025 late at night while working *pro se* on his legal claim document. The unresolved threat continues to obstruct Plaintiff's ability to secure legal representation and pursue relief in New Jersey.

505.     On initial review, this case presents with significant legal complexity: whistleblower retaliation, procurement fraud, national security classification, and multiple federal and state jurisdictions. Immediately after termination, Plaintiff retained New Jersey

CEPA counsel, who reviewed voluminous evidence over several months. A senior CEPA trial attorney extensively 'interrogated' Plaintiff in person and afterwards requested further documentation. After months of apparent interest, the firm unexpectedly declined, recommending that Plaintiff consult a federal legal firm specializing in whistleblower reprisal and FCA matters.

506.    The first federal firm reviewed Plaintiff's materials and expressed strong interest, but stated they had no availability that month. Plaintiff waited, but further engagement was repeatedly deferred. He then retained another federal firm, which conducted a thorough review and ultimately responded: the retaliation appears egregious, we recommend you pursue CEPA— but we are not licensed to assist in New Jersey.

507.    With this guidance, Plaintiff re-engaged his original NJ CEPA counsel. However, one day after reconnecting, Plaintiff learned the firm's email account was being spoofed by hackers and he was not actually communicating with his CEPA lawyer, the resulting chaos at the law firm took them out of consideration with the CEPA statute of limitations (SOL) looming.

508.    Subsequent outreach to other NJ firms followed the familiar pattern: initial enthusiasm, detailed engagement, then abrupt rejection—one stating in their rejection letter: *"we do believe you have potential claims…"* As the SOL loomed, a senior partner at a major NJ firm declined while scolding Plaintiff for initiating contact so close to the deadline—despite Plaintiff's consistent efforts. Around this time, Plaintiff was explicitly warned that PACOM-related federal legal exposure made the case too risky for contingency-fee firms. Left with no viable counsel, Plaintiff started acting *pro se* and immediately secured a 180-day tolling agreement with SMX with just days before the limitations period expired.

509.     Plaintiff and SMX attempted to negotiate resolution through the DOD IG's Alternative Dispute Resolution process. While this succeeded in extending the limitations window for independent defendants beyond March 29, 2025, it failed to resolve core factual disputes. SMX repeatedly refused to clarify simple matters about the SCIF meeting and the associated coercive threat—information that could have reduced Plaintiff's medical and legal exposure. Given the ongoing PACOM threat, Plaintiff advised that he could not meaningfully participate in negotiations, describing the process as equivalent to negotiating under 'duress.'

510.     In early 2025, Plaintiff contacted DOD IG to request release of exculpatory information concerning the SCIF meeting and Ream's clearance status. The IG declined to release any information or escalate the request within DOD IG.

511.     Defendants' failure to resolve the classification ambiguity surrounding the November 9, 2023, disclosures has materially obstructed Plaintiff's ability to file this Complaint without coercive overhang. Despite repeated requests, SMX and PACOM-affiliated personnel have withheld key clarifications regarding the SCIF status of the meeting room and Defendant Ream's authorization—information solely within their control. This calculated ambiguity prolonged the chilling effect of the original coercive threat, impaired Plaintiff's access to counsel, and delayed timely filing. The resulting legal paralysis, traceable to Defendants' sustained posture, constitutes a continuing wrong and supports equitable tolling of all statutory limitations periods—across CEPA, Pierce, and tort-based claims.

512.     Plaintiff recognizes the legal risks of proceeding *pro se* in a matter of this complexity. However, left without viable alternatives and mindful of the need to minimize reliance on tolling, Plaintiff was compelled to file this Complaint *pro se*, together with a motion for judicial stay. The stay request seeks necessary time to secure appropriate legal representation

and to allow completion of related investigations—including those underway with the Department of Defense Office of Inspector General and any associated criminal inquiry.

## II. Diligent Efforts to Seek Legal Representation and Preserve Claims

513.    Plaintiff exercised consistent and diligent efforts to obtain legal representation from multiple law firms—including attorneys specializing in New Jersey CEPA litigation, federal whistleblower protections, False Claims Act enforcement, and national security law. Despite the unique complexity of the case—including classified information handling, retaliation involving defense contractors, and potential Espionage Act exposure—Plaintiff persisted in pursuing legal avenues to vindicate his rights.

514.    In parallel with these efforts—and despite extraordinary obstacles created by Defendants' coercive conduct and PACOM entanglement—Plaintiff took affirmative and timely steps to preserve his claims:

- *Pro se* Preparations: As the CEPA statute of limitations approached without securing counsel, Plaintiff proactively began preparing to file *pro se* to preserve his legal rights.

- Tolling Agreement with SMX: Plaintiff entered into a formal written CEPA tolling agreement with Defendant SMX in good faith, enabling time for pre-litigation mediation and resolution efforts.

- Whistleblower Disclosures to DoD IG: Plaintiff submitted detailed, well-documented protected disclosures to the Department of Defense Inspector General of the retaliatory conduct protected by 10 U.S.C. § 4701, 41 U.S.C. § 4712, 31 U.S.C. §§ 3730(h), and 32 C.F.R. § 2001.14.

- Efforts to Include Individual Defendants: Plaintiff requested that tolling be extended to individual Defendants Marotta and Ream; however, SMX—despite acting as their employer—refused to coordinate or facilitate those agreements, preventing Plaintiff from aligning all parties under the tolling framework.

515.    These actions collectively demonstrate Plaintiff's diligence in asserting his rights and his good-faith reliance on legal counsel, formal whistleblower reporting mechanisms, and pre-litigation dispute resolution. Under well-established equitable tolling principles, Plaintiff's efforts satisfy the standard of reasonable diligence, especially in light of the extraordinary coercive threat environment and the chilling effect documented in preceding sections.

### III. Bad Faith Negotiations for Tolling Agreement and Mediation

516.    Plaintiff explicitly incorporates herein the Appendix: May 2025 Update – SMX's Repeated Bad-Faith Conduct and Procedural Obstruction as additional factual support demonstrating Defendants' systematic bad-faith conduct, procedural obstruction, and ongoing exacerbation of medical and legal harm. This documented conduct unequivocally substantiates Plaintiff's request for equitable tolling.

517.    SMX's conduct during tolling and mediation negotiations further supports equitable tolling. In the weeks before the CEPA statute of limitations, SMX delayed execution of the tolling agreement—finalizing it only on March 4, 2024—and only after Plaintiff threatened imminent filing and requested substitution of counsel.

518.    SMX proposed a settlement at a "nuisance value" level and declined to meaningfully engage with Plaintiff's position. The net effect was procedural gamesmanship that allowed the limitations period to expire for independent Defendants Marotta, Ream.

519.     While SMX expressed a willingness to continue negotiations outside of mediation, no substantive movement occurred. SMX repeatedly declined or ignored Plaintiff's requests for simple factual clarifications—such as whether Ream was formally read-on as of November 9, 2023—that could have reduced the medical harm and legal disadvantage in negotiations caused by the unresolved threat.

520.     Upon information and belief, SMX may later attempt to challenge the tolling agreement itself—asserting procedural defects, lack of consideration, or ambiguity in scope—as part of a broader litigation strategy to escape liability. This risk further compounds the prejudice to Plaintiff, who relied on the agreement in good faith and delayed filing based on SMX's representations.

521.     This pattern of delay, non-cooperation, and strategic obstruction mirrors the broader coercive conduct outlined throughout this complaint—including the SCIF deception, retaliatory threats, ArmyAI reemployment interference, and manipulation of internal dispute processes. These actions materially interfered with Plaintiff's ability to file in a timely manner and directly support the application of equitable tolling as to all Defendants—including those who evaded coverage due to SMX's strategic refusals.

## IV. Equity Favors Tolling to Prevent Injustice

522.     Equitable tolling is warranted where a plaintiff, despite diligent efforts, is prevented from timely filing due to extraordinary circumstances outside their control—including deception, coercion, or reasonably induced legal fear. Here, Plaintiff's delay was not due to inattention or neglect, but to a sustained pattern of retaliatory conduct that included fabricated criminal exposure, deliberate refusal to reduce legal and medical harms, and procedural manipulation of tolling and mediation processes.

523.    Absent equitable tolling, Plaintiff would be punished for exercising precisely the kind of caution expected of a national security-cleared whistleblower facing ambiguous and potentially criminal allegations. CEPA was enacted to protect employees who raise public safety and compliance concerns in the face of organizational pressure. Plaintiff's inability to file earlier, in a complex context involving classified material, Espionage Act risk, and PACOM-linked retaliation, was both reasonable and legally compelled.

524.    Moreover, it would violate basic principles of fairness to allow Defendants to benefit from a delay they actively engineered—through bad-faith tolling tactics, manipulation of mediation timing, the SCIF deception, and the chilling effect of potential counter-litigation.

525.    New Jersey courts have long held that equitable tolling applies where a defendant's misconduct or intimidation has materially interfered with timely filing. *Binder v. Price Waterhouse & Co.*, 393 N.J. Super. 304 (App. Div. 2007), supports tolling under such circumstances, especially where a plaintiff's delay arises from good-faith reliance on the defendant's representations in connection with mediation.

526.    Plaintiff only discovered the full scope of his neurological injury on April 7, 2025, following an acute, hospitalization-requiring stroke and subsequent diagnostic imaging. These tests revealed not only a recent stroke, but also multiple prior "silent strokes" and progressive small vessel disease—directly linked by Plaintiff's treating physicians to prolonged hypertensive stress caused by Defendants' conduct. This newly diagnosed, latent physical injury justifies independent tolling under New Jersey's discovery rule, which applies where the harm was not reasonably knowable until confirmed by medical evaluation.

527.    Plaintiff's sudden and unexplained account termination ("debanking") by Bank of America in June 2024 imposed a severe administrative burden during a critical period for

attorney outreach and case preparation. While causation remains circumstantial and unproven at present, the timing and administrative disruption reinforced the coercive threat environment and support tolling based on exceptional circumstances.

528.    Taken together, these circumstances—retaliatory coercion, procedural obstruction, and delayed medical discovery—present a textbook case for equitable tolling. Denying tolling here would reward tactical misconduct, penalize legally compelled caution, and allow retaliatory behavior to escape scrutiny solely because it was successfully weaponized. The interests of justice, deterrence, and public policy all support allowing Plaintiff's claims to be head on the merits.

## V. Request for Tolling

529.    Plaintiff has acted with diligence and in good faith under extraordinary and compounding obstacles—including a fabricated Espionage Act threat, ongoing refusal by Defendants and the DOD IG to clarify material facts, systemic retaliation, difficulty securing CEPA legal counsel, delayed medical discovery of permanent neurological injury, and the need to prepare this claim for timely filing while still in recovery from a stroke that occurred while actively working on this same document. These conditions materially impaired Plaintiff's ability to obtain legal counsel and assert his rights within the ordinary limitations period. Equitable tolling is not merely appropriate in this context—it is essential to ensure that Plaintiff's claims are heard on their merits and that Defendants do not profit from obstruction, intimidation, or procedural gamesmanship.

530.    Accordingly, Plaintiff respectfully requests that this Court equitably toll all applicable statutory deadlines—including the CEPA filing period—as to all named and unnamed Defendants, including John/Jane Does 1 through 10.

531.    In further support of judicial economy, Plaintiff notes that equitable tolling of the CEPA filing deadline would allow for procedural streamlining of this litigation. Depending on the outcome of early-stage factual discovery—particularly confirmation of the November 9, 2023 SCIF deception—Plaintiff may elect to consolidate certain non-CEPA claims into the statutory CEPA framework. However, if equitable tolling is not granted as to the individual defendants, the resulting posture may warrant division into the three-track structure set forth earlier in this Complaint:

- **Track 1:** SCIF deception and coercive tort liability (all defendants);

- **Track 2:** Pierce-based wrongful termination and public policy retaliation (all defendants); and

- **Track 3:** CEPA statutory retaliation claims (SMX, and individual defendants if tolling is granted).

532.    Plaintiff preserves flexibility for the Court to structure proceedings in accordance with the facts as they develop and the three-track litigation framework set forth above.

533.     Plaintiff's conditional pleading of non-CEPA counts preserves all rights under N.J.S.A. 34:19-8 and ensures no waiver occurs while tolling and threshold discovery issues remain unresolved. This approach promotes judicial efficiency and preserves flexibility for the Court to structure proceedings in accordance with the facts as they develop.

# CAUSES OF ACTION

## COUNT I. EQUITABLE TOLLING (STATUTORY PRESERVATION OF CEPA & RELATED CLAIMS)

534.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

535.    Plaintiff's final day of employment with Defendant SMX was March 29, 2024. Absent tolling, the statutory deadline to file a claim under the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 et seq., would have been March 29, 2025.

536.    Defendant SMX executed a written agreement tolling the CEPA statute of limitations as to itself. However, SMX declined to coordinate or facilitate tolling for individual Defendants Wendy Marotta and Johanna Ream, despite their central roles in the retaliatory conduct. Plaintiff made diligent efforts to obtain a unified tolling agreement from all parties, but was unsuccessful due to Defendants' non-cooperation.

537.    In addition to SMX's partial tolling agreement, Plaintiff is independently entitled to equitable tolling of the statute of limitations for all Defendants—both corporate and individual—due to extraordinary circumstances that materially impaired his ability to file in a timely manner.

538.    These circumstances include, but are not limited to:

- A deliberate and coercive threat issued by Defendant Marotta, falsely implying that Plaintiff could be criminally prosecuted for disclosures she had orchestrated—thereby creating persistent psychological, physiological, and legal duress;

Page **213** of **267**

- Documented medical incapacity, including a stress-induced stroke and MRI-confirmed silent strokes, which treating physicians directly linked to Defendants' retaliatory conduct;

- A chilling effect on legal representation in New Jersey due to perceived federal entanglement and risk of criminal liability;

- Ongoing obfuscation by Defendants, including refusal to clarify exculpatory facts regarding the SCIF meeting that could materially reduce Plaintiff's legal exposure and allow simplification of this Complaint;

- Governmental stonewalling, including PACOM's failure to respond to classification concerns, 300+ day FOIA delays, and the DOD IG's refusal to release exculpatory information;

- Plaintiff's financial debanking and medically confirmed stroke recurrence—both of which severely limited the time and capacity available for Plaintiff to prepare this Complaint *pro se*.

- And continued procedural manipulation by Defendants during mediation and internal reassignment efforts, apparently calculated to exhaust the statute of limitations while denying Plaintiff a path to resolution or legal clarity.

539.    Plaintiff's delay in filing was not the result of inattention or neglect, but rather the product of a sophisticated coercive and obstructive campaign designed to chill whistleblowing and deny Plaintiff access to redress. Throughout the tolling period, Plaintiff acted with diligence and good faith, including:

- Early and sustained engagement with multiple law firms;

- Filing a formal complaint with the Department of Defense Inspector General;

- Proposing and initiating mediation with Defendants;

- Preserving contemporaneous documentary, audio, and medical evidence;

- Repeatedly requesting legal and factual clarification from Defendants and federal officials;

- And ultimately initiating this action *pro se*, despite ongoing health impairments directly traceable to Defendants' conduct.

540. New Jersey courts have long recognized that equitable tolling is appropriate where a plaintiff has been "induced or tricked by his adversary's misconduct," or where "extraordinary circumstances" prevent timely filing despite reasonable diligence. *See Freeman v. State*, 347 N.J. Super. 11, 31 (App. Div. 2002); *Binder v. Price Waterhouse & Co.*, 393 N.J. Super. 304, 313–14 (App. Div. 2007).

541. In this case, all such conditions are present. The factual record—including MRI data, medical diagnoses, audio recordings of deception, and repeated, unsuccessful attempts to secure counsel—establishes that tolling is both legally justified and necessary to avoid rewarding Defendants for obstructive conduct.

542. Plaintiff therefore respectfully requests that this Court equitably toll all applicable limitations periods, including CEPA's one-year statute of limitations, as to all claims and all Defendants, including John and Jane Does 1–10, and permit this action to proceed on the merits.

## COUNT II. CRIMINAL COERCION (SCIF COERCION) AS EVIDENCE OF CEPA AND PIERCE RETALIATION

543. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

544.     Under N.J.S.A. § 2C:13-5, a person is guilty of criminal coercion if, with purpose to unlawfully restrict another's freedom of action, they threaten to expose information tending to subject another to criminal liability, or engage in conduct calculated to materially harm another person's health, career, legal standing, or safety.

545.     On November 9, 2023, Defendant Marotta arranged to meet Plaintiff at PACOM Headquarters Camp Smith, Hawaii for a Secure Compartmented Information Facility (SCIF) meeting because their team meeting venue had no SCIF facilities. All parties traveled separately. At PACOM's headquarters, Defendants Marotta and Ream led Plaintiff to a meeting room they represented as a SCIF, affirming this designation multiple times in response to Plaintiff's direct questions. Relying on that representation, Plaintiff disclosed classified information, beginning with the Top Secret rationale for why he could not lawfully complete the "vulnerabilities" task.

546.     Plaintiff later realized the room was likely not a certified SCIF, and several months later, Plaintiff found a credible source who stated with certainty that it was not a SCIF. Upon reflection, Plaintiff concluded that Defendant Ream could not have been read-on to the necessary classification level, having swapped her read-on appointment with Plaintiff just days earlier.

547.     Upon recognizing the SCIF meeting as a likely deception, Plaintiff reevaluated a cryptic comment Marotta had made as they passed PACOM building security: *"You understand that anything you tell me unclassified I can share with other people in the team."* At the time, the statement seemed nonsensical—it was self-evident that unclassified information could be shared with the team—and therefore irrelevant as they had travelled to PACOM's headquarters to enter SCIF specifically to discuss classified information. In hindsight, the statement revealed Marotta's intent to treat his classified disclosures as unclassified and share them, thereby fabricating

grounds for a criminal violation. The remark functioned as a coercive threat: Marotta would blame Plaintiff for illegal sharing of classified information: exactly the law he had refused to break by not performing the "vulnerabilities" task at unclassified.

548.    As the reality of the SCIF deception sunk-in Plaintiff came to realize this was a deliberate act of retaliation, and a deliberate coercive threat that could cause him to be falsely implicated in an Espionage Act violation and placing Plaintiff in a state of legal jeopardy.

549.    The SCIF deception was not accidental, improvised, or driven by last-minute logistical necessity. It was not an innocent mistake.  Marotta traveled to Camp Smith knowing that Ream would be physically barred by security from entering a true SCIF due to her read-on status. Marotta deliberately led Plaintiff to an unclassified room, exploiting the facility layout to create the false appearance of secure access. For an unclassified meeting, which Ream was cleared to attend, there was no operational reason for everyone to travel to PACOM headquarters.

550.    The threat was not abstract. It had an immediate chilling effect on Plaintiff's protected disclosures. It placed Plaintiff at risk of being falsely charged with a federal crime with incurring career-ending consequences

551.    The coercive power of the threat was amplified by PACOM's failure to investigate Plaintiff's subsequent reports, and by Marotta's insinuation that she was "VERY WELL" connected to the Head of Information Security and senior PACOM leadership. Plaintiff reasonably feared that any effort to report the deception—or to resist cooperating with Defendants—might trigger a biased investigation that would falsely assign criminal liability to him. That concern was later validated when PACOM IG summarily closed his complaint within one month, citing that it was: *"not within PACOM's purview".*

552.    The risk of retaliatory legal action stemming from the SCIF deception was further heightened by compelling evidence of alignment between SMX and PACOM. Plaintiff reasonably fears that PACOM may initiate counter-action in support of SMX—whether based on a misrepresented factual record or ignorance of exculpatory evidence. SMX was given multiple opportunities to eliminate this risk by providing simple factual clarifications: specifically, whether the meeting room was a certified SCIF and whether Defendant Ream was authorized to receive classified information. Depending upon the answer, such disclosures could have immediately reduced Plaintiff's legal jeopardy, medical harm, and procedural burden—potentially allowing for the withdrawal of this count and significant simplification of the Complaint. Despite knowing the harm-reduction value of clarifying these basic facts, SMX has refused to do so, reinforcing the coercive threat, undermining the possibility of good-faith resolution, and demonstrating that while the coercive threat may have been implemented by Marotta and Ream actions, it is preserved by SMX's recent actions.

553.    Plaintiff therefore focused on collecting exculpatory evidence demonstrating that Marotta and Ream were aware of the SCIF deception and actively furthered the deception on multiple occasions.

554.    This unresolved coercive threat has inflicted continuing harm, including:

- Suppression of further protected disclosures;

- Severe emotional and psychological distress, including sustained fear of criminal prosecution and potential loss of security clearances;

- Physical health deterioration due to prolonged stress, including dangerously elevated blood pressure that increased the risk of recurrent stroke;

- Documented neurological injury, including a medically confirmed stress-induced stroke and MRI evidence of prior silent strokes directly correlated with the coercive event;

- Obstruction of access to legal counsel due to perceived federal criminal exposure, and risk of counter action by PACOM in support of SMX;

- Complication of litigation preparation, requiring Plaintiff to proceed *pro se* under duress and while recovering from stroke;

- Termination from employment under a fabricated "Lack of Work" justification intended to conceal Defendants' retaliatory motives.

555.   Given the deliberate and malicious nature of the deception and coercive threat—including the premeditated misrepresentation of a SCIF environment and the intentional inducement of a fabricated criminal disclosure—Plaintiff asserts that punitive damages are warranted. Defendants' conduct reflects not only unlawful retaliation, but a willful and calculated abuse of authority intended to silence protected disclosures and inflict lasting professional and medical harm.

556.   Defendants' conduct constitutes criminal coercion under N.J.S.A. § 2C:13-5. Plaintiff does not assert this as an independent cause of action, but pleads it as probative evidence of retaliatory motive and unlawful suppression of protected disclosures under:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

557.   This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a

complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT III. CRIMINAL COERCION (ArmyAI LEGAL THREAT) AS EVIDENCE OF CEPA AND PIERCE RETALIATION

558.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

559.    Under N.J.S.A. § 2C:13-5, criminal coercion includes threats calculated to unlawfully restrict a person's freedom of action by exposing them to legal liability or materially harming their employment or career prospects. Defendants' conduct, described herein, satisfies that standard.

560.    During Plaintiff's March 6, 2024, termination call, Defendant Marotta issued a coercive and baseless legal threat: she warned Plaintiff that returning to his former federal workplace, ArmyAI, could violate SMX's Non-Disclosure Agreement (NDA) and Intellectual Property (IP) obligations. This threat was factually and legally groundless. Marotta hired Plaintiff from ArmyAI and knew it to be a federal agency—not a private competitor—and therefore not subject to any plausible conflict with SMX's NDA or IP protections.

561.    Marotta's threat was issued after Plaintiff had already been wrongfully terminated under a pretextual "Lack of Work" justification. It was delivered in the presence of SMX HR representative Landers, who initially appeared to support the statement. When Plaintiff followed up, Landers eventually acknowledged that she had misunderstood ArmyAI's status and confirmed that no legal restriction existed.

562.    Plaintiff reasonably believes that Marotta's statements—both during the termination call and internally to HR—were designed to:

- Intimidate him;

- Retroactively justify the unexplained rejection of his January 2024 ArmyAI SCIF proposal;

- Discourage him from returning to a classified environment where he could potentially document wrongdoing and further protected disclosures;

- And obstruct his ability to resume federal employment where his concerns could receive independent scrutiny or validation.

563.    This threat was not a misunderstanding, but a continuation of Defendants' broader pattern of coercive retaliation. It followed Plaintiff's proposal to complete the blocked "vulnerabilities" task in a SCIF at ArmyAI—a lawful and reasonable solution that Defendants obstructed without explanation and attempted to discredit through fabricated legal concerns.

564.    The legal threat also served a deterrent function: to dissuade Plaintiff from reentering a SCIF-based environment where he might document or disclose misconduct tied to SMX and PACOM. Viewed in the broader retaliatory context, the threat was calculated to isolate Plaintiff from classified workplaces, damage his reemployment prospects, and reinforce the chilling effect of the earlier SCIF deception and ongoing fabricated criminal exposure.

565.    Defendants' conduct meets the legal standard for criminal coercion under N.J.S.A. § 2C:13-5. The threat of legal action—factually unsupported and issued with retaliatory purpose—was intended to suppress Plaintiff's protected conduct, interfere with his federal reemployment, and obstruct future disclosure.

566.    Defendants' conduct constitutes criminal coercion under N.J.S.A. § 2C:13-5. Plaintiff does not assert this as an independent cause of action, but pleads it as probative evidence of retaliatory motive and unlawful suppression of protected disclosures under:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

567. This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT IV. CONSTRUCTIVE DISCHARGE

568. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

569. Under New Jersey law, a constructive discharge occurs when an employer creates working conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign. This standard is met where a pattern of retaliatory, coercive, or marginalizing conduct effectively forces the employee out without explicitly terminating them.

570. Under New Jersey law, a constructive discharge occurs when "an employer creates working conditions so intolerable that a reasonable person subject to them would resign." The standard is an objective one: the conditions must be "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." *Shepherd v. Hunterdon Dev. Ctr.*, 174 N.J. 1, 28–29 (2002).

571. Although Plaintiff was formally terminated on March 29, 2024, the cumulative effect of Defendants' retaliation, isolation, obstruction, and coercive threats rendered continued employment functionally impossible long before that date.

572. Beginning in August 2023 and escalating through March 2024, Plaintiff was subjected to a deliberate pattern of retaliatory actions, including:

- Assigned a task he reasonably and lawfully refused to perform due to classified information handling concerns;

- Retaliated against for protected disclosures including: AI model risk, AI misrepresentations, procurement fraud, gross mismanagement;

- Deceived into disclosing Top Secret information in what he later discovered was an unclassified environment;

- Subjected to a sustained coercive threat environment that caused documented medical harm and obstructed his ability to pursue lawful remedies;

- Visually removed from the leadership layer of the organization chart and "orphaned" at the bottom of the chart with no team and leadership connections;

- Excluded from leadership activities despite being recruited into a leadership role;

- Denied all meaningful supervisory support for extended periods;

- Formally demoted and removed from the leadership layer;

- Terminated under a pretextual "Lack of Work" order, after being structurally isolated on the organizational chart and denied access to SCIF resources necessary for his job;

- Refused reassignment within Stormbreaker or SMX, despite recent employment and open, firm-funded roles matching his skill set.

573. On December 13, 2023—just two days after Plaintiff escalated protected disclosures to PACOM official ND—Defendant Marotta modified the Stormbreaker organizational chart, removing Plaintiff from the leadership layer and placing him at the bottom with no reporting lines or organizational affiliation. Plaintiff was left without meaningful work, without a supervisor, and without communication from leadership—constituting functional

termination. When the revised chart was later circulated, SMX retroactively characterized Plaintiff's removal as a demotion. Plaintiff was formally terminated two weeks later under a pretextual "Lack of Work" order.

574.    Defendants' conduct was not the result of an isolated staffing change or miscommunication. It was part of a sustained and deliberate campaign to marginalize Plaintiff, block his ability to perform his protected duties, and suppress further disclosures.

575.    In effect, and in close temporal proximity to Plaintiff's protected disclosure to a public body, Defendants constructively discharged Plaintiff by placing him in professional "purgatory"—stripping him of duties, role, and supervisory structure—and then formally terminated him shortly before his retention bonus vested, but delayed just long enough after Plaintiff's 2023 protected disclosures to obscure the retaliatory motive behind the March 6 termination. Defendants further claimed that PACOM's "Lack of Work" order originated from a neutral third party, despite substantial evidence of frequent and coordinated decision-making between SMX and PACOM.

576.    Applying the *Shepherd* standard to the facts of this case, Plaintiff's working conditions from December 2023 onward—including his removal from the leadership team, the SCIF deception and coercive threat, the denial of SCIF access, and prolonged silence following his "orphaning"—were so hostile, retaliatory, isolating, and coercive that no reasonable employee in Plaintiff's position could be expected to remain. These circumstances satisfy the legal standard for constructive discharge under New Jersey law.

577.    Accordingly, Defendants' actions constitute a constructive discharge in violation of:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

578. This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT V. CIVIL CONSPIRACY

579. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

580. Under New Jersey law, a civil conspiracy occurs when two or more persons act in concert to commit an unlawful act, or to commit a lawful act by unlawful means, and an overt act is done in furtherance of the conspiracy that causes harm to the plaintiff. See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005).

581. Defendants SMX, Wendy Marotta, Johanna Ream, and one or more John/Jane Does knowingly agreed and acted in concert to suppress Plaintiff's protected disclosures, obstruct resolution of the blocked "vulnerabilities" task, fabricate and sustain a coercive legal threat, and terminate Plaintiff's employment under false pretenses.

582. The conspiracy was furthered by a series of coordinated acts between SMX and PACOM personnel—including but not limited to:

- The SCIF deception on November 9, 2023, which induced Plaintiff to disclose classified information in an allegedly unsecure setting, creating the false appearance of a federal security violation.

- A coercive remark by Defendant Marotta implying Plaintiff could be blamed for that alleged violation—a threat that chilled future disclosures and triggered lasting psychological and medical harm.

- The coordinated maintenance of that deception by both Marotta and Ream, who sustained the false narrative across multiple communications and declined to correct Plaintiff's mistaken belief, despite repeated opportunities.

- The coordinated non-response to Plaintiff's December 11, 2023 protected disclosure to PACOM official ND, which was followed two days later by Plaintiff's removal from the leadership layer, visual "orphaning" or the organization chart, and effective termination.

- The suppression of Plaintiff's January 3, 2024 ArmyAI SCIF proposal, which offered a lawful resolution to the "vulnerabilities" task but was rejected without explanation by Marotta and PACOM official ND—then retroactively attributed to PACOM, with no clarification or objection from SMX.

- The use of PACOM's "Lack of Work" order as a fabricated justification for Plaintiff's termination, despite contemporaneous hiring of individuals with similar skillsets.

- The post-termination conduct of both SMX and PACOM, including FOIA delays, obstruction of classification challenge procedures, and refusal to clarify basic facts capable of mitigating Plaintiff's legal and medical harm—all of which suggest a shared interest in suppressing investigation and discovery.

583.    This conspiracy caused Plaintiff substantial harm, including wrongful termination, reputational injury, emotional and psychological trauma, and medically documented neurological

injury—including a stress-induced stroke and MRI-confirmed silent strokes, causally linked to the coercive threat environment.

584.    Insofar as this coordinated conduct sought to fabricate legal exposure under the Espionage Act, obstruct classification review procedures, or jointly suppress whistleblower activity, it constitutes an agreement to achieve unlawful ends through unlawful means. This coordinated effort caused material harm to Plaintiff and forms one of several predicate acts evidencing a sustained pattern of retaliatory misconduct.

585.    Accordingly, the coordinated conduct by Defendants Marotta, Ream, SMX, and John/Jane Doe actors at PACOM supports a claim for civil conspiracy to suppress Plaintiff's protected activity, obstruct lawful reporting, and fabricate a coercive legal threat. This conduct constitutes probative evidence of retaliatory motive and unlawful suppression of protected disclosures under:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

586.    This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT VI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

587.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

588.     Under New Jersey law, a claim for intentional infliction of emotional distress (IIED) requires: (1) extreme and outrageous conduct by the defendant; (2) intent to cause, or reckless disregard for the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) a causal connection between the conduct and the distress. See Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 366 (1988).

589.     Defendants' conduct—including, but not limited to, Defendants' insistence that Plaintiff complete an unlawful "vulnerabilities" task and the coordinated refusal to resolve the underlying issue; the SCIF deception and associated coercive threat of fabricated Espionage Act liability; the false claim that Plaintiff was legally barred from returning to ArmyAI; the "orphaning" of Plaintiff through removal from the leadership layer, isolation, and denial of supervision; the sequence of retaliatory acts closely tied to Plaintiff's protected disclosures; and the ongoing preservation of a coercive threat environment involving PACOM—far exceeds the bounds of decency tolerated in a civilized society and constitutes extreme and outrageous conduct.

590.     These acts—and others—were not the result of isolated error, carelessness, miscommunication, or rogue employees. Rather, they reflect a deliberate and sustained campaign of suppression and intimidation, executed through calculated deception, coercive threats, obstruction, and repeated refusals to clarify material facts—even after being made aware that Plaintiff's psychological and physiological health was deteriorating as a result. This pattern of retaliatory behavior by SMX continues to the present day.

591.     Plaintiff experienced severe emotional distress, including sustained fear of criminal prosecution, loss of security clearance, and career-ending consequences. These fears were not speculative; they were objectively reasonable in light of Defendants' deliberate creation

of a fabricated Espionage Act threat and the ongoing risk of retaliatory action by PACOM. Given the compelling evidence of PACOM's coordination with SMX in the broader retaliatory campaign, the threat carried heightened credibility.

592.    Plaintiff also experienced documented physiological symptoms of emotional trauma, including acute hypertensive spikes, medically confirmed silent strokes, and a recurrent stroke—all of which can be causally linked to Defendants' conduct, as evidenced by Plaintiff's blood pressure data captured on a third-party monitoring platform. Treating physicians have directly attributed Plaintiff's irreversible neurological injury to stress-related exposure resulting from Defendants' actions. This harm extended beyond medical consequences, obstructing Plaintiff's ability to secure legal counsel and assert his rights. Even after Plaintiff's second stroke, Defendant SMX refused to provide simple factual information that could have mitigated his legal and medical harm. During mediation, SMX offered a near-zero settlement—fully aware that Plaintiff was forced to act *pro se* and was recovering from a medically confirmed stroke, both directly resulting from Defendants' coercive conduct and their sustained refusal to clarify exculpatory facts, even when informed of the harm being caused.

593.    These injuries—particularly the medically confirmed silent strokes and the recurrent stroke suffered while working *pro se* on this Complaint—constitute permanent, irreversible harm that far exceeds the threshold for "severe emotional distress" under New Jersey law. This level of medically documented trauma independently satisfies the standard for intentional infliction of emotional distress (IIED) and supports Plaintiff's right to recover both compensatory and punitive damages.

594.    Defendant SMX's refusal to clarify basic exculpatory facts—even after being explicitly informed of the resulting medical and legal harm—reflects a deliberate continuation of

the coercive threat and demonstrates a company-wide pattern of reckless disregard for Plaintiff's well-being. This was not the conduct of rogue employees acting alone, but part of a broader institutional posture marked by suppression, obstruction, and indifference to the serious harm being inflicted.

595.    Defendants' conduct was not merely negligent or inconsiderate; it was deliberate, malicious, and retaliatory. It was designed to silence protected disclosures, suppress legal recourse, and intimidate Plaintiff into submission—regardless of the resulting human cost. Concerningly, this conduct was perpetrated by a company entrusted with multi-billion dollar federal contracts to safeguard U.S. public safety and national security—a role that demands the highest standards of integrity, accountability, and ethical conduct raises not only civil liability but urgent public policy concerns.

596.    Accordingly, Defendants' conduct—as detailed above—supports a claim for intentional infliction of emotional distress under New Jersey common law. It also constitutes probative evidence of retaliatory motive, escalation of harm, and unlawful suppression of protected activity under:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

597.    This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

COUNT VII. FRAUDULENT INDUCEMENT (SCIF DECEPTION, NDA/IP LEGAL)

598.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

599.    Under New Jersey common law, the elements of fraudulent inducement are:

- a material misrepresentation of a presently existing or past fact;

- knowledge or belief by the defendant of its falsity;

- an intention that the listener rely thereon;

- reasonable reliance thereon by the listener; and

- resulting damage to the listener.

600.    Defendants Marotta and Ream intentionally misrepresented the security and classification status of the November 9, 2023 meeting room by affirmatively representing it to be a certified Secure Compartmented Information Facility ("SCIF") when they knew it was not, and thereby induced Plaintiff to disclose Top Secret information under the false assurance of a protected environment.

601.    Defendant Marotta further misrepresented the legal effect of Plaintiff's disclosures when she cryptically advised—*"anything you tell me unclassified I can share with other people in the team"*—knowing that Plaintiff believed he was entering a true SCIF and that no unclassified sharing risk existed.

602.    Defendants must have known these representations were false: Marotta traveled to PACOM Headquarters aware that Ream had not completed her read-on and that no certified SCIF existed in the upper meeting rooms, and Ream knowingly participated in perpetuating the deception.

603.     Plaintiff reasonably and justifiably relied on these representations in making protected disclosures, believing he was in a secure facility and that no criminal exposure would arise. That reliance was objectively reasonable under the circumstances: Plaintiff directly questioned the SCIF status, and Defendants repeatedly confirmed it.

604.     As a direct consequence of this fraudulent inducement, Plaintiff disclosed classified information in an unsecure environment, and when he realized the deception was thereafter subjected to the ongoing coercive threat of an Espionage Act violation—inflicting severe emotional, physical, and professional harm, including documented strokes, inability to secure counsel, and career derailment.

605.     Additionally, on or about March 6, 2024, Defendant Marotta knowingly misrepresented SMX's NDA and IP restrictions—warning that returning to ArmyAI would violate SMX agreements—when she knew ArmyAI was a federal agency not subject to SMX's private-sector restrictions, and intended Plaintiff to rely on that false representation to prevent him from re-entering classified service.

606.     Plaintiff was sufficiently alarmed by Marotta's misrepresentation to review his SMX contractual documents and follow up with SMX HR representative Landers, who ultimately confirmed that no legal barrier to ArmyAI reemployment existed. Nevertheless, due to the chilling effect of Marotta's threat, Plaintiff avoided returning to ArmyAI for several months out of concern that SMX might pursue legal action. He resumed work at ArmyAI only after exhausting other employment options. This delay materially harmed Plaintiff's career trajectory, prolonged his unemployment, and significantly exacerbated his financial and emotional distress.

607.    Defendants' fraudulent misrepresentations were a proximate cause of all damages suffered by Plaintiff, including but not limited to past and future lost wages, emotional distress, medical expenses, and the irreparable harm to his reputation and security clearances.

608.    Accordingly, Defendants are liable for fraudulent inducement, and Plaintiff is entitled to rescission of any purported agreement or condition procured by these misrepresentations, plus compensatory and punitive damages according to proof.

609.    Accordingly, Defendants' conduct—including material misrepresentations made to induce Plaintiff's initial employment, and later to coerce protected disclosures and obstruct reemployment—supports a claim for fraudulent inducement and further constitutes probative evidence of retaliatory motive and unlawful suppression of protected activity under:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce*.

610.    This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT VIII. FRAUDULENT INDUCEMENT (PRE-EMPLOYMENT)

611.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

612.    Under New Jersey common law, fraudulent inducement occurs when a defendant makes a material misrepresentation of a presently existing or past fact, knowing it to be false,

with the intent to induce reliance, and the plaintiff reasonably relies on that misrepresentation to their detriment.

613.    Defendants cannot avoid CEPA liability by retroactively claiming, for example, that the budget was fraudulently misrepresented as long-term when it was only short-term. If that admission were accepted, the argument would not defeat CEPA—it would confirm that Plaintiff was induced to accept the role through misrepresentations of material fact.

614.    This dynamic underscores a broader principle: Defendants may not use fraud as both a sword and a shield. If they lured Plaintiff into the position with false assurances and then retaliated when he attempted to correct or disclose those same misrepresentations, they are liable under both CEPA and common law fraud. Thus, any effort by Defendants to downplay the importance of funding, AI centrality, or Plaintiff's leadership role—in order to defeat CEPA liability—would only serve to confirm that Plaintiff was fraudulently induced into accepting the position.

615.    In August 2023, during pre-hire discussions, Defendant Marotta made several material representations to Plaintiff that materially influenced his decision to leave his current employment to join SMX. These included:

- That Artificial Intelligence (AI) was central to Stormbreaker's mission—a representation echoed by contemporaneous PACOM and SMX documents that repeatedly describe Stormbreaker as *"AI-enabled"* and highlight its AI-driven capabilities.

- That Plaintiff would be placed in a leadership role with significant influence over Stormbreaker's AI direction—a representation substantiated by his placement on the leadership layer of the October 16, 2023, organizational chart.

- That long-term funding for the Stormbreaker program was secure—citing its strategic importance, Admiral-level sponsorship, the ongoing SCIF buildout, and an already approved FY2024 budget—a claim corroborated by contemporaneous PACOM documentation.

616.    In addition to her representations, Marotta also insisted that Plaintiff resign immediately, citing urgent need for his expertise. Plaintiff had proposed to attend SMX's imminent August 2023 Hawaii event and then return to ArmyAI to complete a professional transition. Instead, Marotta insisted Plaintiff resign immediately and start formally start with SMX, claiming his proposal was not possible due to a conflict of interest with his existing employer. As a result, Plaintiff resigned from his prior employer on short notice—forfeiting his prior role and damaging the possibility of return if SMX's representations proved inaccurate.

617.    Plaintiff reasonably relied on these representations in accepting SMX's offer. However, Plaintiff discovered:

- Stormbreaker lacked the basic AI model risk management and validation processes necessary to fulfill its claimed mission. The project's technical direction and team composition were inconsistent with the AI-related representations made during recruitment.

- Plaintiff was given no meaningful leadership responsibilities, excluded from all leadership meetings, visually and structurally "orphaned" on the organizational chart, formally demoted and removed from the leadership layer, in what appeared to be a retroactive attempt to legitimize his exclusion, and ultimately terminated under a pretextual "Lack of Work" order. Over the course of seven months, Plaintiff was not invited to a single leadership team meeting—directly

Page **235** of **267**

contradicting Marotta's representations that Plaintiff would serve in a senior leadership role.

- At the March 6, 2024 termination meeting, Marotta attributed Plaintiff's removal to budget issues allegedly originating in October 2023—mere weeks after she had assured Plaintiff that Stormbreaker's FY2024 funding was already secured and the program was a long-term strategic priority.

618.    These discrepancies were not the result of future uncertainty, evolving project scope, or changing priorities. Rather, they constitute misrepresentations of existing and material facts—including the status of Stormbreaker's funding, the centrality of AI to the project, and Plaintiff's expected leadership role—that Defendant Marotta either knew were false or made with reckless disregard for their truth at the time they were conveyed.

619.    In the alternative, if these representations were not knowingly false, they nonetheless reflect a level of mismanagement so severe and misleading as to support a finding of gross mismanagement—particularly given the project's national security significance and the professional risks imposed on Plaintiff by relying on them.

620.    Plaintiff's reliance was reasonable under the circumstances. The position involved substantial professional and financial risk and required a costly and disruptive relocation. Plaintiff diligently raised questions to assess these risks during pre-hire discussions with Defendant Marotta. SMX reinforced that reliance by offering a two-year retention bonus vesting in August 2025 and by presenting Stormbreaker as a stable, long-term initiative. At no point did Defendants issue any disclaimer regarding project funding or suggest that Stormbreaker's AI functionality was uncertain or exploratory. To the contrary, "AI-enabled" was consistently

described as a foundational element of the project—a characterization echoed across multiple contemporaneous PACOM and SMX documents.

621.    As a direct result of Defendants' misrepresentations, Plaintiff suffered substantial and foreseeable harm, including loss of employment stability, emotional distress, career derailment, reputational harm, and ultimately termination under a pretextual "Lack of Work" justification after just six months.

622.    SMX's internal conduct—including failure to assign Plaintiff meaningful leadership duties, exclusion from leadership meetings, and immediate hostile and avoidant response to AI model risk governance concerns—supports the inference that Defendants never intended to fulfill the core promises made to Plaintiff as inducements to join. Instead, those promises were used to secure Plaintiff's immediate resignation from his prior position at ArmyAI.

623.    Accordingly, Defendants are liable for fraudulent inducement. Plaintiff is entitled to rescission of any obligations flowing from the original hiring agreement, and seeks compensatory and punitive damages resulting from Defendants' misrepresentations.

624.    This conduct also constitutes probative evidence of retaliatory motive and unlawful suppression of protected activity in violation of:

- CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c); and

- The public policy doctrine articulated in *Pierce.*

625.    This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT IX. WRONGFUL TERMINATION (PIERCE CLAIM)

626.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

627.    New Jersey law recognizes a common-law cause of action for wrongful termination in violation of public policy, as articulated in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980). Courts have consistently reaffirmed that employees are protected not only when they refuse to engage in unlawful conduct, but also when they act in good faith to uphold or investigate compliance with core public policy mandates, including health and safety.

628.    Plaintiff objected to conduct that directly implicated New Jersey and federal public policy mandates, including:

- The unsafe deployment of unvalidated Artificial Intelligence (AI) in national security operations without proper model risk governance.

- The misrepresentation of Stormbreaker's AI capabilities to public and regulatory audiences, in potential violation of procurement integrity and the False Claims Act.

- The pressure placed upon Plaintiff to complete a potentially unlawful "vulnerabilities" task at the unclassified level, in violation of federal classified information handling laws and Plaintiff's obligations under SF312.

- The suppression of Plaintiff's protected disclosures to public officials and oversight bodies, in violation of federal contractor whistleblower protection laws, including: 10 U.S.C. § 4701 (Defense Contractor Whistleblower Protection), 41 U.S.C. § 4712 (Federal Contractor Whistleblower Protections), 31 U.S.C. §

3730(h) (False Claims Act Retaliation Protections), and 32 C.F.R. § 2001.14

(Classification Challenges Protections).

629.    Plaintiff's objections were made in good faith, consistent with his professional

engineering ethics, his legal obligations as a TS/SCI-cleared contractor, and long-standing public

policy principles that protect whistleblowers, require truthful disclosures to government

authorities, and safeguard the public from untested or deceptive AI system deployment.

630.    At no point did Plaintiff raise these concerns for personal gain. His disclosures

were grounded in a consistent, principled effort to prevent harm and to uphold legal and ethical

obligations imposed by federal law, professional codes, and national security standards. Notably,

his proposal to work at an out-of-state SCIF to resolve the "vulnerabilities" task involved a

personal and logistical burden—one he accepted not out of enthusiasm, but in furtherance of his

duty to ensure compliance and minimize institutional risk.

631.    Rather than address Plaintiff's objections in good faith, Defendants undertook a

campaign of retaliation that included: assigning him an unlawful task; coordinating with

PACOM to obstruct proposed lawful alternatives; removing him from the leadership layer and

"orphaning" him from all organizational affiliation and supervisory reporting; marginalizing him

professionally; formally demoting him; and, just two weeks later, terminating him under a

fabricated "Lack of Work" pretext. At no point along this journey did Defendants engage

Plaintiff in a substantive discussion to understand his concerns or evaluate his proposed

resolutions. Their conduct reflects not mere negligence, but a sustained pattern of deliberate

avoidance of accountability—conduct amounting to willful ignorance.

632.    The coordinated nature of Defendants' conduct—particularly the alignment

between SMX and PACOM—underscores that Plaintiff's termination was not the result of

business necessity or performance failure. Rather, it was the foreseeable culmination of a deliberate campaign to suppress Plaintiff's objections and prevent further protected disclosures. Just two days after Plaintiff escalated a protected disclosure to PACOM official ND, Defendant Marotta removed Plaintiff from the leadership layer and visually "orphaned" him on the Stormbreaker organizational chart—an act tantamount to constructive termination. Despite the seriousness of the disclosure and Plaintiff's explicit invitation for a high-side follow-up discussion, no one at SMX or PACOM responded, reinforcing the inference of a coordinated non-response. In the weeks that followed, Plaintiff remained professionally isolated, unsupervised, and confined to a state of functional purgatory—a condition seemingly designed to obscure the causal link between his December 11 protected disclosure and his termination on March 6, 2024. SMX claimed that the termination was based on a "Lack of Work" order originating independently from PACOM, despite substantial evidence of internal coordination between the two entities.

633.    In any case, Plaintiff's March 6, 2024 termination occurred just two weeks after his final protected disclosures—a 90-minute internal call with his supervisor, Defendant Ream, on February 20, and two subsequent reports to the Department of Defense Inspector General on February 21 and 23. Their timing in relation to the LOW order provides strong temporal proximity supporting the inference that Plaintiff's termination was retaliatory in nature.

634.    These disclosures implicated core public policy concerns, including national security risk, procurement transparency, and the safety of engineering systems—areas where courts have consistently recognized protection under *Pierce*. The seriousness and public significance of the conduct Plaintiff sought to expose renders Defendants' retaliatory acts especially egregious.

635.    As the New Jersey Supreme Court explained in *Velantzas v. Colgate-Palmolive Co.*, 109 N.J. 189 (1988), employees are protected from discharge when they act in a manner that promotes important public policies—even in the absence of formal legal proceedings. The Court emphasized: *"Questioning the reasons for a discharge when discrimination is suspected is an activity that has society's imprimatur."* This principle is not limited to discrimination cases. It applies equally to employees who, in good faith, raise concerns about conduct that implicates broader public harms—including national security, procurement integrity, and public safety.

636.    In high-risk technical domains such as Boeing's 737 MAX or the Stormbreaker program, engineers are expected to identify and disclose latent risks before they result in harm, not after. This duty necessarily includes dealing with uncertainty: situations where "this minor issue could happen," or "this catastrophe is unlikely but possible." Plaintiff's refusal to complete the "vulnerabilities" task at the unclassified level embodied this same forward-looking risk management principle—one that is explicitly codified in his SF312 nondisclosure agreement, which prohibits even potentially unlawful disclosures where uncertainty exists. The policy is clear: if uncertainty exists, disclosure must not occur. This is because when a latent risk becomes a certainty, it is too late, the loss has occurred. Plaintiff's conduct thus falls squarely within the category of legally protected actions. His termination for refusing to engage in potentially unlawful or unethical conduct—and for raising serious safety and compliance concerns— constitutes a wrongful discharge under *Pierce* and the body of New Jersey case law that has since affirmed and expanded its protections.

637.    Public policy concerning AI model risk governance is a rapidly developing area, as reflected in numerous U.S. domestic initiatives and international agreements to which the United States is a signatory. The federal government—and particularly the Department of

Defense—has articulated elevated standards for the responsible development and deployment of AI systems through multiple policy instruments, including Executive Orders 13960 and 14110. A core principle in these frameworks is that AI developers must be empowered to raise safety and ethical concerns without fear of retaliation. The failure to protect such voices has led to preventable disasters in analogous engineering contexts, such as the Boeing 737 MAX tragedy. Plaintiff's disclosures fall within this emerging public policy landscape, and this case carries broader significance in ensuring that AI model developers and their supervisors must adhere to emerging safety standards and the public policy mandates that support them, in furtherance of the public interest.

638.    Accordingly, Defendants' termination of Plaintiff violates the public policy doctrine articulated in *Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980)*. Plaintiff is entitled to compensatory and punitive damages for wrongful discharge in violation of clearly established public policy.

639.    This conduct further supports the application of CEPA, N.J.S.A. 34:19-3(a)(1), (a)(2), and (c) and provides independent grounds for liability if CEPA tolling is denied.

640.    This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the CEPA claims. It is not pled in the alternative, but as a complementary legal theory arising from distinct conduct and legal standards. Plaintiff reserves all rights under N.J.S.A. 34:19-8.

## COUNT X. RETALIATION UNDER THE NEW JERSEY CEPA (N.J.S.A. 34:19-3)

641.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

642.    The New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-3, prohibits employers from retaliating against employees who:

- (a)(1) refuse to participate in any activity that the employee reasonably believes is illegal, fraudulent, or in violation of a clear mandate of public policy;

- (a)(2) disclose or threaten to disclose such conduct to a public body; or

- (c) object to or complain about conduct the employee reasonably believes violates the law or public policy.

643.    Plaintiff engaged in protected activity under all three prongs of CEPA. To provide some examples, Plaintiff:

- Refused to perform an assigned task that he reasonably believed would violate federal classified information handling laws, including 18 U.S.C. §§ 793 and 798, and his SF312 non-disclosure obligations.

- Initiated a classification challenge under 32 C.F.R. § 2001.14 and requested escalation to an Original Classification Authority (OCA), which Defendants ignored.

- Proposed a lawful alternative to complete the blocked "vulnerabilities" task in a secure SCIF—a solution that Defendants obstructed without explanation and later referenced with hostility during Plaintiff's termination.

- Disclosed these concerns to multiple public bodies, including PACOM civilian officials and the Department of Defense Inspector General (DOD IG).

- And, for purposes of CEPA, realleges all public policy-based objections and protected activities set forth in Count IX (Wrongful Termination under the *Pierce*

Doctrine), including Plaintiff's objections to the unsafe deployment of unvalidated AI models in military decision-making systems, misrepresentations involving procurement integrity, obstruction of classification challenge procedures, and retaliation for whistleblowing under federal contractor protection statutes.

644.    In response to these protected actions, Defendants Marotta, Ream, and SMX undertook a sustained campaign of retaliation, which included, but was not limited to:

- Assigning Plaintiff an illegal and unresolvable "vulnerabilities" task;

- Deceiving Plaintiff into disclosing Top Secret information under false pretenses in an unclassified room (SCIF deception);

- Issuing coercive threats, including a fabricated Espionage Act liability and a false claim that returning to ArmyAI would violate SMX's NDA or IP terms;

- Isolating and demoting Plaintiff following his disclosures, culminating in his "orphaning" on the organizational chart—accompanied by removal from supervisory reporting, exclusion from leadership functions, and sustained professional marginalization—an act tantamount to constructive termination;

- Refusing to resolve the classification disputes or acknowledge Plaintiff's lawful objections;

- Terminating Plaintiff under a fabricated "Lack of Work" justification, despite active recruiting for roles matching his skills;

- Misclassifying Plaintiff's termination as a resignation and failing to honor repeated assurances of internal reassignment, even though matching positions existed;

- And obstructing post-termination efforts to clarify key facts surrounding the SCIF meeting, thereby deliberately prolonging Plaintiff's legal exposure and likely responsible for documented medical harm resulting from his second stroke.

645.   Plaintiff suffered severe and lasting consequences as a result of this retaliation, including:

- Termination of employment under a pretextual "Lack of Work" (LOW);
- Reputational harm, financial injury, and ongoing emotional distress;
- Inability to secure legal representation due to unresolved criminal threat exposure;
- Multiple medically verified silent strokes causally associated with Defendants' retaliatory conduct, and a recurrent stroke in April 2025 while working *pro se* on this Complaint—resulting in medically documented, permanent neurological damage that treating physicians directly linked to psychological and physiological stress caused by Defendants;
- And a heightened long-term risk of dementia due to irreversible neurological injury.

646.   Defendant SMX cannot rely on PACOM's LOW directive as a defense that it was an independent decision by a neutral third-party. SMX did not act passively or neutrally, but actively facilitated the decision, withheld it from Plaintiff, and failed to advocate for reassignment—despite knowing that PACOM's LOW decision was tainted by prior disclosures to PACOM official ND. Plaintiff effective termination was marked by his "orphaning" from on the organization chart, which occurred just two days later after his December 11 disclosure and

was followed by a coordinated non-response from both SMX and PACOM. Under CEPA, SMX remains independently liable for adopting and implementing a retaliatory third-party directive.

647.    In any case, Plaintiff's March 6, 2024 termination occurred just two weeks after his final internal and external protected disclosures: a 90-minute call with his supervisor, Defendant Ream, on February 20, and two follow-up reports to the Department of Defense Inspector General on February 21 and 23. These events establish direct temporal proximity to the LOW order and strongly support an inference of retaliatory causation under CEPA.

648.    Defendants' retaliatory acts were not only willful and malicious, but calculated to silence Plaintiff, punish him for whistleblowing, and prevent disclosure of unlawful and potentially dangerous conduct. During August 2023 recruitment discussions, Marotta expressly assured Plaintiff that Stormbreaker's FY2024 funding had already been approved and that the project was a top priority for PACOM. Yet on the March 6, 2024, termination call, Marotta stated that budget concerns had existed since October 2023—a fact she never disclosed during recruitment or employment, despite knowing Plaintiff had made life-altering decisions based on her assurances and was working toward selling his New Jersey home. Her failure to disclose material information about funding uncertainty—while continuing to affirm project stability—reflects a deliberate effort to suppress adverse information, avoid scrutiny, and expose Plaintiff to foreseeable personal, financial, and family harm. Defendants' refusal to clarify facts, despite knowing their impact on Plaintiff further supports the finding of malicious intent. This concealment reinforces the retaliatory motive underlying Plaintiff's termination and supports the inference that the "Lack of Work" justification was pretextual.

649.    These actions constitute unlawful retaliation under CEPA, specifically N.J.S.A. 34:19-3(a)(1), (a)(2), and (c). Plaintiff's objections were made in good faith, consistent with his

legal obligations and professional ethics. Defendants' conduct meets the statutory definition of retaliatory adverse action.

650.    Accordingly, Plaintiff asserts a claim for retaliation under the New Jersey Conscientious Employee Protection Act. Plaintiff is entitled to all relief available under CEPA, including but not limited to compensatory damages, punitive damages, injunctive relief, equitable tolling, attorneys' fees, and all other remedies as the Court deems just.

This count is asserted as part of Plaintiff's three-track litigation framework and stands independently of the common-law claims. It is not pled in the alternative, but as a complementary statutory remedy arising from distinct protected activity. Plaintiff reserves all rights under N.J.S.A. 34:19-8 and seeks full relief available under CEPA regardless of the status of related claims.

## COUNT XI. RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT (31 U.S.C. § 3730(h))

651.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

652.    At all relevant times, Defendant Smartronix, LLC ("SMX") was a federal government contractor performing work on the "Stormbreaker" program for the U.S. Indo-Pacific Command ("PACOM") under a contract administered by the U.S. General Services Administration.

653.    The False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., prohibits knowingly presenting false or fraudulent claims for payment to the United States or knowingly making or using false statements material to such claims. Section 3730(h) protects employees from

retaliation for lawful acts done in furtherance of an FCA action or other efforts to stop one or more FCA violations.

## A. Protected Activity

654.    While employed on Project Stormbreaker, Plaintiff engaged in protected activity under § 3730(h) by taking lawful actions to stop one or more violations of the FCA, including actions based on his objectively reasonable belief that SMX was misrepresenting Stormbreaker's AI capabilities and AI compliance status to the United States Government in a manner material to payment.

655.    Such activity included, but was not limited to:

- Between August 29 and December 11, 2023, Plaintiff repeatedly warned SMX management of misrepresentation of Stormbreaker's AI capabilities and unrecognized AI Model Risk — first on August 29 in front of a general Stormbreaker team meeting, then in his September "initial impressions" call with Marotta and Sikorsky, an October 26 email to Marotta and Ream, then in an October 30 follow-up after release of a new AI Executive Order, and culminating in a November 9 "SCIF" meeting where he described the costs, skills, and corrective measures needed, calling the program *"not fit for purpose."*

- On December 11, following on from these disclosures and in reaction to an email from Marotta, Plaintiff sent a written disclosure to senior SMX managers, SMX's Sikorsky, and PACOM official Nathan Dietrich, identifying critical Stormbreaker deficiencies, warning of unavoidable additional costs – *"a big additional investment"* and *"unavoidable whatever the path taken"* – and requesting further discussion in a classified setting.

- Plaintiff reasonably believed that SMX's work and communications to PACOM would misrepresent Stormbreaker's readiness, causing the government to pay for nonconforming work — conduct potentially violating the FCA. As a leadership hire, he raised prima facie fraud concerns, recognizing that these gaps could mislead the government in funding decisions. He sought a SCIF discussion to clarify the issues and prevent SMX from being paid for misrepresented AI capabilities and model risk. Plaintiff did not need to review invoices to suspect an FCA issue but reasonably and responsibly sought further discussion. As a useful analogy from state law, in *Velantzas v. Colgate-Palmolive*, a CEPA case, the court held that merely requesting information that might reveal fraud was protected activity. This is a persuasive comparison here, as Plaintiff, an engineer with a professional duty to investigate material risks, acted on a reasonable belief that significant AI-related risks could result in fraud on the government.

- On February 21 and 23, 2024, Plaintiff reported these concerns to the Department of Defense Inspector General via its hotline, including specific potential violations of the False Claims Act related to government payment for nonconforming or misrepresented work, and seeking protection from what appeared to be a coordinated coercive threat in retaliation for his prior FCA-protected disclosures.

## B. Employer Knowledge

656.    SMX management, including Marotta and Ream, received and reviewed Plaintiff's December 11, 2023 email and were present for the November 9 "SCIF" meeting more formally discussing these same themes, and received his October 26 and October 30 emails,

which raised these same issues in less detail but signaled ongoing concern. On February 20, 2024, Ream referred to the December 11 email as "brilliant," confirming management's awareness of its substance and significance.

657.    By copying PACOM official Dietrich, Plaintiff ensured SMX knew his concerns were communicated to the government customer and implicated contract compliance.

658.    The coordinated failure of all recipients to provide any substantive response, despite the explicit invitation to follow up in a SCIF, reflects a conscious awareness of the legal and contractual implications.

## C. Adverse Actions and Causation

659.    Plaintiff engaged in protected activity under the FCA by raising concerns that fit squarely within its scope — including misrepresentation of deliverables and insufficient resources to meet them — and was retaliated against for doing so.

660.    There was never a response to Plaintiff's December 11 email; however, two days later, on December 13, Marotta unilaterally edited the Stormbreaker organizational chart, removing Plaintiff from the leadership layer, "orphaning" him without legitimate business reason, and isolating him from work.

661.    From December 2023 through March 2024, Plaintiff was further marginalized, excluded from meaningful program activities, and formally demoted.

662.    On March 6, 2024 — just two weeks after Plaintiff's February 21 and 23 DoD IG hotline calls reporting FCA-related concerns and seeking protection from retaliation — SMX terminated his employment, with Marotta citing *"budget challenges"* allegedly dating back to October 2023.

663.    The absence of any legitimate intervening reason between Plaintiff's protected activity and these adverse actions, combined with their close temporal proximity to both the October disclosures and the February hotline calls, supports a strong inference of retaliation in violation of 31 U.S.C. § 3730(h). Such actions are the type that *"might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006),* and thus confirm their retaliatory nature under applicable federal standards.

### D. Harm

664.    As a direct and proximate result of SMX's unlawful retaliation, Plaintiff has suffered lost wages, lost benefits, loss of career opportunities, reputational harm, emotional distress, and other compensatory damages.

665.    SMX's conduct was willful, wanton, and in reckless disregard of Plaintiff's protected rights under the FCA.

666.    **WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant Smartronix, LLC, awarding:

- a. Reinstatement with the same seniority status Plaintiff would have had but for the retaliation, or front pay in lieu of reinstatement;

- b. Two times the amount of back pay, plus interest;

- c. Compensation for special damages, including emotional distress, reputational harm, and litigation costs;

- d. Litigation costs and reasonable attorneys' fees as allowed by 31 U.S.C. § 3730(h)(2); and

- e. Such other and further relief as the Court deems just and proper.

# PRAYER FOR RELIEF

667.    WHEREFORE, Plaintiff respectfully demands judgment and relief as follows:

- Plaintiff brings Counts I through X under a three-track litigation structure, with each track representing an independent legal theory: (1) tort claims arising from SCIF deception and coercion (Counts II, III, V–VII); (2) common-law wrongful discharge and fraudulent inducement (Counts IV, VIII, IX); and (3) statutory retaliation under CEPA (Counts I, X). These claims are not pled in the alternative but as complementary legal avenues arising from distinct factual and legal bases. Accordingly, Plaintiff requests that the Court grant relief consistent with this framework, including compensatory, equitable, and punitive damages as appropriate under each track.

- CEPA Damages: All compensatory damages, emotional distress damages, punitive damages, and attorney's fees authorized under N.J.S.A. 34:19-5.;

- *Pierce* Doctrine Damages: Compensatory and punitive damages for wrongful discharge in violation of public policy.;

- Intentional Infliction of Emotional Distress (IIED): Compensatory damages for physical and emotional harm, including Plaintiff's stroke recurrence and MRI-confirmed neurological injury;

- Civil Conspiracy and Fraudulent Inducement: Compensatory and punitive damages arising from coordinated retaliatory acts, SCIF deception, and concealment of procurement fraud;

- Equitable Relief: If necessary to prevent further retaliation, restoration of Plaintiff's security clearance, and injunctive protection against interference with federal reemployment or classified roles;

- Declaratory Relief: A finding that Plaintiff engaged in protected activity under CEPA and *Pierce*, and that retaliatory acts occurred in violation of law;

- Interim Relief: A judicial stay of proceedings and interim financial support for legal counsel pursuant to Rule 4:42-2, in light of Plaintiff's current neurological disability, pending investigations, and coercive threat environment;

- Case Management Relief: A 90-day status conference update on Plaintiff's legal representation, neurological rehabilitation, and investigative developments;

- Such other and further relief as the Court deems just and proper in the interest of justice.

668. Based on MRI-documented physical injury, Plaintiff's April 2025 stroke recurrence, and expert-documented causation linking the injury to retaliatory conduct, Plaintiff asserts that no less than fifty percent (50%) of any award or settlement constitutes non-taxable physical injury compensation under IRC § 104(a)(2).

669. Plaintiff respectfully submits that this case raises issues of first impression under CEPA, including medically verified injury resulting from retaliation-induced stress, criminal coercion as a mechanism of reprisal, obstruction of legal access, and suppression of protected disclosures in a national security context. These novel and serious public policy concerns warrant heightened judicial scrutiny.

670. Upon information and belief—and supported by adverse inference from Defendants' obstructive conduct—Plaintiff alleges that the retaliation in this matter was not

merely procedural, but malicious and coercive. This included deceptive manipulation of classified security protocols, the creation of felony-level legal exposure, and persistent interference with Plaintiff's efforts to pursue lawful remedies. Accordingly, Plaintiff seeks punitive damages under both CEPA and *Pierce*, to deter future misconduct and vindicate the public interest in protecting whistleblowers and national security disclosures.

671.    Out of respect for individual privacy and ongoing medical care, Plaintiff has withheld from this Complaint detailed allegations related to injuries suffered by a family member. Plaintiff anticipates seeking permission to assert those claims in a sealed or separately structured proceeding at the appropriate stage of this litigation, including the damages phase. This paragraph is included solely to preserve such rights and shall not be construed as waiver.

672.    Plaintiff currently estimates that damages arising from Defendants' retaliation, whistleblower suppression, malicious SCIF deception, and the resulting medically documented neurological injury—together with the need for a significant deterrent to protect future whistleblowers in high-risk AI model environments—may range from $7.5 million to $15 million, subject to discovery, potential bifurcation of claims, and other case developments.

673.    This preliminary estimate encompasses:

- Compensatory damages for lost wages (back pay and front pay);

- Damage to professional reputation and career in national security;

- Medical injuries, including stroke recurrence, silent strokes, and long-term neurological impairment;

- Emotional distress and psychological trauma;

- Substantial punitive damages based on willful and malicious conduct;

- Consequential damages, including reputational harm within the classified community, and interference with access to counsel and due process.

674.   Plaintiff further seeks a declaratory judgment establishing that:

- His disclosures concerning Stormbreaker, including those made on October 26/30, November 9, December 11, and February 20, constituted protected activity under CEPA;

- His refusal to complete the "vulnerabilities" task in an unclassified document was reasonable and legally justified;

- His March 6, 2024 termination was retaliatory in violation of CEPA and New Jersey public policy;

- And, subject to discovery, that the November 9, 2023 meeting room was not a certified SCIF, that Defendant Ream was not read-on to receive Top Secret information, and that Plaintiff reasonably relied on Defendants' representations and was the victim of a deliberate deception regarding the room and Ream's clearance—such that any classified disclosure made during that meeting was unintentional and lawfully excused.

675.   All relief available under Count XI pursuant to 31 U.S.C. § 3730(h), including, but not limited to: reinstatement (or front pay in lieu of reinstatement); two times the amount of back pay with interest; compensation for special damages sustained as a result of the retaliation, including emotional distress and damage to reputation; and reasonable attorneys' fees and costs.

676.   Plaintiff reserves the right to amend these estimates based on discovery, including evidence of procurement fraud, classified misconduct, or conspiracy not yet fully uncovered.

Plaintiff has elected to proceed with a BENCH TRIAL pursuant to Fed. R. Civ. P. 38(d) and 39(a)(1).

# NO OTHER ACTIONS PENDING

677.    CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2:

- I, Paul Richardson, certify that to the best of my knowledge, information, and belief, the matter in controversy is not the subject of any other pending or concluded civil action, arbitration, or administrative proceeding. No other parties should be joined at this time.

- Plaintiff previously submitted an administrative whistleblower complaint to the Department of Defense Inspector General relating to some of the same events described in this Complaint. That administrative complaint has not resulted in any pending adjudication or determination, and no parallel judicial or arbitration proceedings are currently active.

- I certify under penalty of perjury that the foregoing statements are true and correct.

# SIGNATURE

Date: August 12, 2025

Respectfully submitted,

/s/ Paul Richardson

**Paul Richardson, Pro Se Plaintiff**

dr.paul.s.richardson@gmail.com

[Residential address and telephone withheld pursuant to motion for privacy protection]

# APPENDIX A: May 2025 Update – SMX's Repeated Bad-Faith Conduct and Procedural Obstruction

1.      This Appendix supports Plaintiff's equitable tolling arguments across all three litigation tracks, as described in the Litigation Framework.

2.      Plaintiff Paul Richardson submits this appendix documenting the repeated patterns of silence, delay, and procedural bad-faith conduct exhibited by Smartronix, LLC ("SMX") and its representatives during pre-litigation negotiations, mediation, and factual clarification attempts. These actions materially exacerbated Plaintiff's ongoing medical and legal harm and directly support Plaintiff's equitable tolling, judicial stay, and targeted discovery motions.

3.      The essential context for this appendix is the coercive environment under which Plaintiff was operating. Plaintiff was facing an ongoing threat that PACOM or another federal authority might pursue action against him based on falsely constructed Espionage Act allegations. Plaintiff reasonably feared such action might be based on incomplete, mistaken, or deliberately misrepresented information—especially if PACOM, acting in alignment with SMX as previously demonstrated, was unaware of Plaintiff's exculpatory evidence. This credible fear caused ongoing psychological distress and physiological harm, significantly impaired Plaintiff's ability to retain New Jersey-based legal counsel, and exacerbated the harm from SMX's procedural delays, silence, and refusal to mitigate the coercive threat.

### (i) Tolling Agreement and Mediation Negotiation Phase

4.      Beginning in February 2025, Plaintiff proactively initiated dialogue proposing a Tolling Agreement to facilitate good-faith mediation discussions aimed at resolving potential New Jersey Conscientious Employee Protection Act (CEPA) claims. SMX initially expressed willingness but subsequently revised Plaintiff's proposed Tolling Agreement without prior notice, specifically removing key mediation clauses. When Plaintiff requested clarification, SMX engaged in repeated, evasive communications that unnecessarily consumed critical pre-filing time.

5.      Notably, SMX's prolonged stalling and evasive communications ceased immediately after Plaintiff directly escalated the matter by contacting the private equity firm owning SMX to request replacement of internal counsel. Following this external escalation, SMX promptly retained external counsel (Gibson Dunn), who immediately finalized a Tolling Agreement with Plaintiff the following day, underscoring the deliberate and institutional nature of SMX's prior obstruction despite Plaintiff's good-faith efforts to mediate when he could have filed his complaint.

### (ii) Post DOD IG Mediation and Refusal to Mitigate Medical and Legal Harm

6.      After replacement of SMX counsel, Plaintiff engaged in a ~2hr call (March 3, 2025) with SMX and external counsel where Plaintiff detailed the breadth and detail of this complaint. On this call SMX provided zero information to Plaintiff, but they did agree to negotiating a tolling agreement, which was quickly completed.

7.      Prior to this call, Plaintiff had emailed SMX and external counsel a copy of his blood pressure record. On the call, he detailed that after his 2022 stroke he had carefully monitored his blood pressure and the historical data was captured and retained on a third-party

platform. Referring to the historical data he had emailed them, Plaintiff explicitly explained to SMX's counsel the documented hypertensive episodes captured in the blood pressure record and their direct relationship to retaliatory events at SMX. Plaintiff indicated that because of Defendants' actions through this period, he was at an elevated risk of stroke, and the risk of a recurrent stroke, potentially deadly, was increased by SMX's retaliatory actions, in particular the SCIF deception and associated coercive threat. On this call Plaintiff described the coercive threat as egregious and referring to his elevated risk of stroke said: *"I cannot easily forgive this"*.

8.      Plaintiff proposed mediation through a professional mediator, however SMX opted for mediation via the Department of Defense Inspector General (DOD IG), Alternative Dispute Resolution (ADR) mediation facility for whistleblower reprisal complaints. The date for this mediation was set by DOD IG for after statute of limitations expired for individual defendants Marotta and Ream.

9.      Late into the evening on April 4, 2025, Plaintiff was working on this claim document as evidenced by a third-party cloud storage platform. Just after midnight – on April 5 – Plaintiff had a second stroke as confirmed by extremely high blood pressure and emergency admission soon after. He then spent three days in hospital under observation and underwent CAT and MRI imaging.

10.      Medical imaging confirmed that Plaintiff had a recurring stroke and subsequent neurological damage while working on the claim. Unexpectedly medical imaging also revealed multiple earlier healed "silent strokes" that treating physicians said were likely linked to earlier hypertensive episodes.  In other words, the blood pressure record and Plaintiff's explanation of the risk of future stroke that was shared with SMX prior to DOD IG mediation was no longer theoretical: (a) the ongoing stress Plaintiff was under due to the coercive threat and SMX's bad-

faith actions was directly linked to a recurring stroke while Plaintiff was working on the complaint document (b) medical imaging reveals that "silent strokes" – caused permanent neurological damage – are almost certainly caused by the hypertensive period shared with SMX during mediation.

11.     The significant implication is that had SMX immediately engaged in good faith to resolve the dispute, (a) Plaintiff would likely not have suffered a second stroke, and (b) Plaintiff would not have undergone the medical evaluation that led to the discovery of multiple "silent strokes," which treating physicians have attributed to prolonged stress exposure consistent with the timeline of alleged retaliation.

12.     At the DOD IG mediation, Plaintiff informed SMX of the new stroke development, discovery of the "silent strokes", and their linkage with retaliatory events via the blood pressure record. Nonetheless, Plaintiff found the DOD IG mediation extremely unproductive, with SMX's near-zero settlement offer so inadequate that it raised serious doubts about SMX's good-faith intentions. Furthermore the mediation session was abruptly terminated by the mediator without providing an explanation, proposing next steps, offering continued shuttle mediation, or facilitating further exchange of information that could have potentially resolved differences.

13.     Notably, the sole practical outcome of SMX's participation in DOD IG mediation was to take independent defendants past their statute of limitations (SOL), suggesting that SMX's true strategic objective was procedural delay rather than resolution.

14.     Had Plaintiff not pursued mediation discussions in good faith, and instead filed immediately, equitable tolling for independent defendants would have been unnecessary and Plaintiff's second stroke in the lead-up to mediation may not have happened.

15.  Subsequent communications further indicated that SMX was uninterested in removing the coercive threat. Plaintiff made multiple, clear, medically motivated requests for basic factual clarification surrounding the SCIF deception and coercion to mitigate ongoing harm but SMX refused two requests and ignored the third – ceasing all communication related to settlement or mediation pathways entirely.

16.  Plaintiff's repeated warnings of health risks were ignored, and SMX proceeded with procedural obstruction rather than the prompt, good-faith engagement Plaintiff had sought.

17.  Altogether, the coercive threat that inferred with Plaintiff's ability to get legal counsel, SMX's bad faith negotiations, and Plaintiff's hospitalization and rehabilitation are strongly supportive of his equitable tolling claim, motion for judicial stay, and limited discovery.

### (iii) End-of-Tolling Agreement Silence and Final Bad-Faith Conduct

18.  On May 20, 2025, Plaintiff sent formal notice to SMX—via both internal and external counsel—terminating the previously executed tolling agreement. The notice clearly stated Plaintiff's intention to file his CEPA claims on June 4, 2025, absent a pre-litigation resolution, which Plaintiff offered in the same email. Plaintiff explicitly requested acknowledgment of receipt and offered to provide SMX with a courtesy copy of the draft Complaint upon acknowledgment.

19.  Despite this formal notice, SMX failed to respond. A follow-up email sent the next day was also ignored. On the third day, Plaintiff sent a final communication, reiterating his offer to negotiate, again offering the Complaint draft, and expressly warning that continued silence would be construed as deliberate bad faith and procedural obstruction. SMX's external counsel eventually issued a simple acknowledgment of receipt—but did not request the Complaint or engage on his settlement offer.

20.     Under the terms of the tolling agreement, the statute of limitations resumed running 14 days after its termination. At the time of filing, SMX had still not requested a copy of the Complaint or otherwise responded to Plaintiff's settlement overture. SMX's initial delay in acknowledging the tolling termination now appears calculated to avoid triggering Plaintiff's good-faith offer to provide the Complaint draft upon acknowledgement. Altogether indicating a lack of good-faith interest in pre-litigation resolution or engaging in meaningful dialogue.

21.     This posture stands in marked contrast to SMX's own prior conduct during tolling agreement negotiations, when internal counsel refused to proceed without an explanation of the Complaint's subject matter—culminating in a lengthy (~2-hour) phone call (March 3, 2025) before SMX ultimately agreed to tolling. With the tolling agreement terminated, SMX no longer expressed any interest in the written Complaint's detailed content nor in potential resolution—an abrupt procedural reversal that suggests strategic disengagement.

22.     SMX's pattern of silence and disengagement appears designed to preserve procedural ambiguity, frustrate Plaintiff's preparation, and avoid confronting liability. At no point did SMX signal a sincere interest in Plaintiff's settlement proposal or offer alternative negotiation channels. This calculated silence—despite the seriousness of the allegations, Plaintiff's repeated efforts, and SMX's knowledge of the ongoing medical and legal harm— supports an inference of deliberate procedural evasion and concealment of liability. It further underscores the necessity of Plaintiff's request for judicial oversight and supervision of the litigation going forward.

(iv) Additional Historical Context

23.     Plaintiff emphasizes that SMX's documented pattern of silence, delay, and bad-faith procedural conduct began significantly earlier than the tolling and mediation phases

described above. From Plaintiff's first expression of concerns regarding protected disclosures, initially communicated during his third day of employment at SMX in August 2023, the company's consistent response was avoidance, escalating retaliation, and ultimately termination. The pattern of procedural obstruction and bad-faith dealing was thus not the isolated conduct of an individual employee, but indicative of broader institutional complicity.

24.     In February 2024, when Plaintiff reported his concerns to the Department of Defense Inspector General (DOD IG) hotline, he explicitly indicated having *"lost faith in SMX,"* reflecting his realization that SMX and its representatives were actively cooperating to construct a false narrative against him. Critically, this pattern of coordinated bad-faith conduct did not cease upon Plaintiff's termination of employment, but persisted throughout subsequent mediation and settlement negotiations.

(v) Adverse Inference: SMX's Refusal to Clarify Critical Facts Has Prolonged Harm

25.     As of May 2025, despite multiple formal requests, Defendants have refused to clarify material facts regarding the November 9, 2023, meeting at Camp Smith. Specifically, Plaintiff requested confirmation as to (i) whether the meeting room was a certified SCIF; (ii) whether Defendant Ream held appropriate TS/SCI clearance status at the time; and (iii) whether any deception was intentional. Plaintiff explicitly stated that these were not discovery demands but narrowly tailored factual inquiries intended to mitigate ongoing medical and legal harm arising from a coercive threat of potential liability under the Espionage Act.

26.     Defendants' persistent refusal to respond, despite having direct knowledge of the relevant facts and access to internal security records, constitutes a knowing refusal to resolve a materially harmful ambiguity. Accordingly, Plaintiff invokes a reasonable adverse inference that: (a) the November 9 meeting was not held in a certified SCIF; (b) Defendant Ream lacked

appropriate clearance; and (c) Defendants intentionally misrepresented the security status of the meeting room.

27.     As a result, Plaintiff remains subject to the unresolved coercive threat of potential federal criminal liability—a threat that persists solely due to SMX's refusal to clarify facts within its control. This threat has materially obstructed Plaintiff's ability to retain legal counsel in New Jersey.  As a result, he has been forced to proceed *pro se* in this high-stakes matter where CEPA-qualified counsel would otherwise be readily available. It has contributed to hypertensive episodes, documented psychological stress, and procedural disadvantage in preparing this action.

28.     Had Defendants issued a clear, good-faith statement affirming that the meeting was properly secured, that Ream was cleared, and that no deception occurred, Plaintiff would have been in a position to reassess whether his trauma arose from a misunderstanding rather than a coercive act. Such clarification would likely have enabled Plaintiff to retain legal representation, avoid asserting a criminal coercion claim under CEPA, eliminate Espionage Act allegations from the pleadings, and significantly streamlined the structure of this Complaint and reduced the anticipated scope of discovery.

29.     Alternatively, if Defendants had volunteered a clear declarative statement and/or offered information demonstrating that Plaintiff did not knowingly reveal classified information in a non-classified meeting room on November 9, that too would have helped to remove medical and legal harm and enable mediation without the associated coercive threat.

30.     While not presented in full here, Plaintiff possesses medical documentation that supports the inference that had Defendants provided the necessary information and removed the coercive threat when it was first mentioned in 2025 settlement discussions, Plaintiff may not

have had his recurrent stroke on April 5, 2025, while attempting to prepare this litigation without legal representation.

31.     Defendants' refusal to offer any factual clarification—despite being advised of the medical and legal harm—has preserved the coercive threat, escalated the retaliatory posture, and significantly increased the litigation burden on both Plaintiff and the Court. Plaintiff accordingly reserves the right to treat this refusal as both (i) a basis for adverse inference, and (ii) a continuing retaliatory act—conduct that further underscores the retaliatory and obstructive pattern described throughout this Complaint.

32.     Plaintiff contends that Defendants' silence now crystallizes the legal basis for: (1) an adverse evidentiary inference; (2) preservation of criminal coercion claims under CEPA and *Pierce*; and (3) attribution of continued medical and procedural harm to Defendants' inaction.

33.     Plaintiff has filed a simultaneous motion seeking early resolution of this point. In the interest of judicial economy and case simplification, Plaintiff respectfully requests that the Court take judicial notice of Defendants' ongoing refusal—or in the alternative, formally acknowledge the procedural record of non-response—and consider its implications for equitable tolling, retaliation, and the scope of discovery.

(vi) Conclusion

34.     The documented record of SMX's conduct unequivocally demonstrates a consistent pattern of procedural obstruction, deliberate delay, and bad-faith actions exacerbating Plaintiff's ongoing medical and legal harm. This pattern is not isolated to recent events; rather, it has characterized Plaintiff's entire experience with SMX, beginning before his employment commenced and continuing through his employment and beyond termination. Particularly significant were SMX's coordinated non-responses to Plaintiff's key communications—

including the December 11 protected disclosures, January ArmyAI employment proposal, and the October 30 Executive Order clarification email—which collectively demonstrate a deliberate, sustained, and strategic effort by SMX to evade accountability. Additionally, SMX's prolonged refusal to clarify critical facts regarding the SCIF meeting and security-clearance issues further supports an adverse inference, compounding Plaintiff's harm and procedural disadvantages. Plaintiff respectfully submits this documentation as compelling support for equitable tolling, judicial stay, and narrow discovery relief, underscoring the necessity of court intervention to mitigate further irreparable harm and restore fairness and procedural equity in this matter.

Date: August 12, 2025

Signed,

/s/ Paul Richardson

**Paul Richardson, Pro Se Plaintiff**

dr.paul.s.richardson@gmail.com

[Residential address and telephone withheld pursuant to motion for privacy protection]